UNITED STATES DISTRICT COURT
FOR THE DISCTRICT OF COLUMBIA

RECEIVED
FEB 2 2 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Rami Elhusseini

Plaintiff,

Vs.

Compass Group, INC
Restaurant Associates

Defendants

Civil Action No: 06- 0100, RBW.

### PLAINTIFF'S REPLY TO DEFENDANTS' AFFIRMATIVE DEFFENSES.

I hereby respectfully submit my reply to the defendant's answers to my complaint and Elaborate Statement. I will address each of the paragraphs the defense has allotted numbers to by assigning them alphabetical headers, for each reply an opposition -except when one opposition is meant for more than one number- and with corresponding Roman numerals to each of the Affirmative Defenses. I also included a copy of the Human Resources' letter and the defendant's answer to my Elaborate Statement.

**a-** Defendants agree to recognize my complaint but fail to identify the grounds on which their actions constitute an infraction: Anti-Semitism is the unlawful act that the defendants' premeditated policy acquiesces to, it is committed when a person of Semitic background -in my case an Armenoid as defined by Encyclopedia Britannica, is considered non white and unjustly treated according to that consideration. In Paragraph 7; the defendants admit to my identifying as Caucasian but not to their admission of this

fact. As for the conspiracy to hide the racial agenda by causing psychological harm and economical ruin, it will be elaborated on in the reply to paragraphs 2, 3 and 4.

1-  I am suing Compass Group and Restaurant Associates for racial discrimination in contrast with the requirements of fair employment and malicious interference for conspiring to cover up their racial agenda and intent to cause personal psychological harm and economical ruin.

**b-** It is a fact that a sizable amount of my colleagues lived in half-way homes; if the defendants are required to submit their answer to the court of law and to their counsel under oath then denying this fact is an obstruction of justice. I can name a few of my colleagues who did reside in half-way homes: Maurice, Mike, and Michael Monroe. Some of my colleagues who were in Juvenile Detention: Edgar, Jose.

It is also a fact that the employees were discouraged from pursuing dual careers during formation sessions where "Restaurant Associates" representatives travel from NYC to administer company instructions. "Jennifer" if I remember the name correctly said that "you will burn out if you work at Fridays too" that entailed less productivity. She claimed that the CEO used to be a bus boy and that hard work goes a long way in this company, the is deceptive strategy and it is an aspect of conspiracy due to prior knowledge of its falsity and involvement of several parties to propagate it.

2-  As asked to by counsel Goetzl I will elaborate on my allegations; it is my belief that the intentions behind Restaurant Associates' actions towards its employees -a sizable amount of which reside in halfway houses, or are newly released from juvenile detention- aim at cutting off these employees from any alternative source of income like a parallel job by overworking them and by discouraging them from pursuing dual careers to avoid either a pink slip during downsizing in the slow season or lack of promotion.

**c-** Richard Hetzler the Chef at Mitsitam Café, the Restaurant Associates owned and operated establishment at the Smithsonian Museum of the American Indian during

several of our staff meetings that took place with all the employees attending, had warned that termination with Restaurant Associates does mean termination on the National Mall and all the other establishments owned and operated by it, he also "can be replaced the next day". If Mr. Hetzler is coerced to testify otherwise it could be testified to by several other employees as well as to the rest of the allegations I raise in my elaborate statement.

3-      Openly threatening that termination of employment with RA can result in the inability to work at any other museum on the mall or at any of the branches of the biggest restaurateur company in the US was frequent.

**d-** Dealing illicit drugs and pirated music CDs as well as pirated movies did take place in the restrooms of the Smithsonian Museum of the American Indian, I was offered some of these products, I saw them being exchanged for money, all with the knowledge of our supervisors. Fraternization did take place at that establishment, some employees were encouraged to embellish themselves in an alluring manner, while others were denied a hosting position for not being so alluring although in two cases the employees in question had very proper Native traits and were very hospitable and kind in terms of customer dynamics. I was directly asked to "be nice" to some managers by the same "alluring" hostess. The general managers were all of Arian traits except for one African American accountant who was not as competent as many other African American candidates who could have done a far better job. For example the accountant could not devise a receipt book to a station we had installed in front of the Hirshhorn museum despite several requests by museum employees and other customers, not to mention the inability to come up with a sufficient computerized system like other establishments who operated similar venues on the mall. Irregularities in the cashiers' accounts were seldom absent at that station and any tentative to address the problem were sometimes severely halted. It could be said that the Hirshhorn station was used as a reward system for a cashier or an employee to make "an extra buck" the Hirshhorn station was one of several venues that adopted the same accounting procedures but I didn't have any other shifts, although I did work with the same employees who rotated between them. The Human resources director Robin Cerrati did insist on terminating me even though she did not witness the incident in

question, and in reply to the defendant's claim about exhausting the administrative processes; Mrs. Cerrati did make it clear through my communications with her that only a legal recourse was left. As for the ombudsman for Compass, although he claimed to be a neutral party he had guessed that the nature of the problem was racial before I even mentioned it, he claimed that being an African American he would have known if Mrs. Cerrati's action was racially motivated, Mr. Machicote had either little knowledge of Compass's policy or even littler knowledge of equitable arbitration. Mrs. Cerrati gave several reasons for terminating me before a full inquiry was even started; one of the pretexts was the fact that I had to be restrained as an employee left the workplace, which according to her constituted a physical aggression and merited termination, when this proved false she gave another pretext which is fighting on company time, however that turned out to be false as well so the reason for termination became leaving the workplace with no prior permission. However that also is false because I had left at 4.00 PM, with a prior permission from Chef Hetzler to leave early to attend the National Powwow, and permission from the manager to re-clock in and finish my shift for the day. The issue was addressed to Ms. Cheryl Queen the vice president of Corporate Communication for Compass Group whom I mailed to all the details of the issue and my concerns. Failure to address the problem by Compass makes them accountable for the policies of a daughter company that falls in the general lines of the originating policy maker.

4-  Thus such a policy creates a dependant personality willing to cross the lines of moral and legal boundaries in certain instances, like illicit drug peddling and sexual favors to gratify a self created elite of managerial cadre sharing not competence or creative innovation but sheer Arian traits and belonging to a militia like clique extending up to the director of human resources and the arbitration department like the ombudsman mediating for "Compass" as it were.

5-  All that and more takes place under the roof of the Smithsonian Institute no less, a few yards away from the Capitol.

e- Defendants deny that I have qualifying characteristics despite being one of the oldest remaining employees since opening, and being the best seller at any station I am assigned to. I also excelled in my training at the kitchen and often was the only cook to proceed with a recipe in the same way it was devised.

6-  I was denied promotion and advancement in the company Restaurant Associates despite my competitive qualifications on both the applied and academic levels.

f- Defendants admit that I claimed to be Caucasian but do not state that they considered me to be one. My supervisor remarked that I wasn't born in this country. Many cooks who were veterans of the company, some won awards for their cooking innovations but were denied promotion because they were African American, while many new faces rose up to high positions very quickly and without merit while they happened to have Arian traits, some of whom weren't American but surely Arian.

7-  Promotions in the company as far as cooks hire is concerned are dispensed according to Arian features criteria for chef positions or on pseudo-utilitarian ends for line cooks, if an employee is not white -although in my case I'd checked in the white box for race on my application as I identify like a white man- nor white enough must correspond to a place in a hierarchy where he can either be a peddler, an absolutely subdued gofer or a closeted paramour.

g- Most of my colleagues had to revert to stealing food items like chicken tenders or French Fries simply because the portions weren't nearly satisfying, others had to get their food along although we were charged for the food we consumed albeit discounted. The managers could eat to their fill and didn't have to select from the less expensive selection the rest of the employees were restricted to. Promotion to manager was not very selective, and in most cases the candidates didn't even apply. The managerial cadre I mentioned in my Elaborate Statement are further up in terms of hierarchy and they have the power to promote employees when they see it convenient.

8-   The advantages were the possibility of advancement despite lack of qualifications and other perks like eating enough at lunch since the allocated portions were not nearly satisfying with the required work load behind the serving line or at the kitchen for example.

**h-** I was asked by my supervisor Tara Peralta to devote all the time that I can during the opening month because it would mean a better position within the company, with regards to my course attendance for several weeks right before and during opening I was denied a two hours break on Monday which was the only school day I had asked for and even though I had informed my supervisors of my college schedule. I was assured that after spending a year in the service of the company the possibility of funding my Nutrition degree would be very likely, my supervisor often repeated "you take care of us we take care of you"

9-   I was asked to drop out of school –notably Howard University, so I'd be more available during the opening month.

**i-** Richard Hetzler assured employees several times during general meetings than in-promotion was the company policy and specifically said " if a position opens up at the kitchen I will hire the server who already asked for kitchen training and is more experienced with the company". I was training several days a week at the kitchen and was asked to go to the line during rush hour. My supervisors rotated me to the busiest stations and I had the best feedback form clients, customers and colleagues, during station preparation and service.

10- I was promised a position in the kitchen as it became available but since I was noticeably competent on the serving line I was asked to revert to line server during the rush hours.

**j-** I was asked to train several employees as servers; they notably became better servers and lasted longer than some servers trained by my supervisors. I trained Walter, Edgar, Harrington, to name a few and I was often asked to start up a station so that some already trained servers would follow my lead in customer service.

11- I was asked to train new employees but never in a trainer's capacity.

**k-** Derek was a new comer to the company and the kitchen position he got when he was first hired could have been filled by myself, he later rose up to become the replacement of the Sous Chef albeit lack of experience and academic degrees. Janet also got hired, and other cooks were in training, I never got hired as a cook despite my training, my knowledge of the recipes, my ability to learn the new recipes faster than most veteran cooks and my excellent team qualities which were testified to by all my supervisors and colleagues. All mentioned cooks (chefs to be) were Caucasian as in Arian not as in Caucasus which is the root of the term and is the accurate description of the race category

12- The kitchen position was awarded to a new comer to the company; a less experienced and academically less equipped candidate but who unquestionably had the whiter traits.

**l-** The reply to paragraph 13 was addressed earlier in section d in the reply to paragraph 4. The altercation took place off company time as the computer records can show, it was not a break since a break is indicated by the time report, and with prior permission. The shift was practically over at 4.00 PM but not officially since the café closes at 5.00 PM. "Near the museum" is not near the workplace, the Mitsitam café is the workplace not the Smithsonian museum, the pavement in North West of The District of Columbia is the Jurisdiction of the DCPD, not the jurisdiction of Restaurant Associates' Human Resources on 5th Avenue NYC. The description of my colleague was witnessed by several employees present at the time of my return towards the café when his companion further bellowed some life threatening suggestions on the museum property which is near the workplace and while he was on company time. He was never penalized or warned.

13- I was terminated at his request ensuing an altercation with a young man he referred to as a "treat" despite the altercation physically being under the jurisdiction of the DCPD not on nor even near the workplace nor on company time and in spite of being actually threatened by my colleague who mastered the juvenile detention dialect and was often referred to as "dangerous" and "crazy" by his companions.

**m-** Mrs. Cerrati didn't return three of my phone calls and neither did her secretary, Tina. One of her employees, Ms. Montana misspelled her name for me making me unable to correspond via mail. Mrs. Cerrati didn't return any of my emails. When I corresponded about the problem with Ms. Queen Vice President of Corporate Communication Mrs. Cerrati then returned my phone call only to reaffirm her position using a condescending and dismissive language and telling me when I admitted to the altercation that doing the honorable thing isn't necessarily the best decision -which might not be anodyne about the possible recourses adopted during the defendants' reply. In her communication I was described as insubordinate, even delusional as far as having strong feelings about my work. The brandishing of knives took place on company time on the premises of the café during an altercation between Vincent and Walter who were disputing because of Elaine, a colleague of ours who was friendly with Vincent and disagreed with Walter –whom I trained- about some side work at their station. Denying the physical occurrence of this event under oath is an obstruction of justice.

14- I also endured a harsh and condescending treatment by the human resources director who was behind employing the "whiter" less competent chef, she claimed that laying my hand on a white employee cost me my job, despite the fact that I am white and the fact that I was attacked in an earlier altercation by a different employee on the serving station inside the restaurant; yet without any serious consequence and regardless of more serious altercations between employees involving the brandishing of knives which weren't even addressed.

15- Maybe due to the fact that the employees in questions were "black" and that such behavior fit their corresponding slot in the company's adopted hierarchy.

**n-** Defendants deny that I was recognized along with Robert Bonham and Kenneth Battle in a pre-meal meeting although it happened in broad day light. Robert Bonham a colleague of mine was requested several times by Tara Peralta to adopt a better hygiene policy with regards to his finger nails, he wore "Corn Rows" that he seldom washed and that had dandruff between them. Granting him the same recognition as the one I received at the request of a ranking manager would only dissipate it. Robert was also a close friend of newly recruited Derek who was a smoker; yet he handled food in the kitchen without any gloves since he was a Sous-Chef and in addition to biting his nails he often touched Robert's hair in a display of brotherly love usually after a cigarette break.

16- Despite my good performance I was denied awards, and conspired against to dismiss any awards I got against the will of my supervisors.

17- The possible reasoning behind it was probably to eliminate any cause for legal complaint, I was awarded performance recognition once by a general manager in the company who happened to notice the quality of my work, and whom I hope would testify to that affect if asked to by Honorable Judge Walton.

18- My direct supervisor had to announce my award but after consulting with more than one party which leads me to make allusion to conspiracy, she awarded the same recognition to several employees who weren't as competent for the sole effect of diluting the effect an award of the sort might have on bolstering my claim to a promotion.

**o-** More detail will be further explained at the request of Honorable Judge Walton.

19- These are the main lines of my case; more details will surely be elaborated during litigation.

## **COUNTERCLAIM TO THE AFFIRMATIVE DEFFENSES.**

I-      In reply to the FIRST AFFRIMATIVE DEFENSE: The deception employed by Restaurant Associates and propagated by Compass has caused me a great deal of psychological harm, the Anti-Semitism that lies behind their course of action caused me to suffer from Post-Traumatic Stress. My academic records suffered from a low grade on a normally flying colors transcript because I was denied leave to attend class, I was asked to drop some registered courses and lose the chance of completing a one time scholarly experience. The harm to my career due to the unjust termination and the time devoted to Restaurant Associates also constitute a ground for relief.

II-

III-    In reply to the SECOND AND THIRD AFFIRMATIVE DEFFENSES: When I was recruited by RA I was given the impression that advancement in the company was a function of productivity and efficiency. The feedback from my supervisors bolstered my hopes as I was led to believe that even my education might be sponsored by Restaurant Associates when I became eligible for school sponsorship. I was also quick to forming a good dynamic between me and my supervisors and colleagues. My managers knew I carried a crucifix tattoo on my back because my colleagues saw it and some managers did too as they used the same locker-room, I also shave my head and one manager even complimented me on using the razor so well, I was also known to be Lebanese and I ate pork regularly. However when my Zionist sympathies became known a slow and silent change began to take place. It peaked when I got into a argument with a colleague of mine on a serving station when he tried to serve Spanish Rice that had chicken broth to a group

of Jewish visitors during Pass-Over, the visitors had clearly requested vegan food and I had discretely mentioned to my colleague that the rice he had on his station was not a proper food. When he dismissed my concerns and proceeded with serving the group I intervened and asked them politely if they wouldn't mind chicken broth. They did mind and were glad to having been warned. My colleague did not take the matter lightly, he addressed it with management, and at a later time as he was seriously intoxicated with uppers – that he offered to sell me at some point- he attacked me in the restaurant on company time and had to be restrained and even sent home. He didn't get a written warning, little did I know what peaked was only the tip of a greater structure. The unfair manner in which the Human Resources justified my termination was in clear contrast with non discriminatory principles. It doesn't lack legitimacy because these institutions are free to employ the laws they see fit for their constituency, but the free economy is also bound by laws that render this legitimacy accountable to the judiciary institution of the land.

IV-   In reply to the FOURTH AFFIRMATIVE DEFFENSE: Human Resources clearly stated that my request to resolve the issue without legal recourse was to no avail. HR letter adjoined.

V-    In reply to the FIFTH AFFIRMATIVE DEFFENSE: Defense doesn't mention duties required to alleviate damages, in term of official duties that is.

VI-
VII-  In reply to the SIXTH AND SEVENTH AFFIRMATIVE DEFFENSES: Defense doesn't clarify which claims are barred by doctrines of clean hands, laches, waiver and estoppel. During the 4th of July – which is viewed as the single most important celebration on the National Mall- the company awarded a colleague of mine an award for making a sale in the amount of 27.000$ on a hot dog cart. I had often sold as much on a busy day at the Mitsitam café, I had sold out certain ingredients with half the cost because I used to ration the portions with a scale making at least twice the profit that other colleagues

made and while they over portioned the foods they rarely served half as much customers to begin with. On the academic side of it I also excelled in school. In other words; the words, tone and intent with which the Human Resources director described my feelings towards my work and the amount of relief I asked for fit the description of unclean hands. I believe that the salaries paid to some of the directors are an equitable amount for relief. The doctrine of unclean hands should bar the defendants from refuting my claims.

VIII- In reply to the EIGHT AFFIRMATIVE DEFFENSE: The relevance of after-acquired evidence can only be considered after the court's decision regarding RA's violation of anti-discrimination laws especially that the investigation of the inappropriate conduct is in question. Besides my claims for relief are independent from the termination per-se, the termination was only an aspect of a general policy employed by Compass and RA.

IX- The NINTH AFFIRMATIVE DEFFENSE begs the question.

X- The TENTH AFFIRMATIVE DEFENSE bases its argument on what seems to be a prior knowledge of employees' testimony, the defendants are quick to use terms like prejudice in a fashion closest to projection in psychological jargon.


P.S. The defendants offered a settlement of up to ten thousand dollars according to Counsel Kennedy.

Respectfully submitted on the 2/22/06
Rami Elhusseini, Pro se. *[signature]*
2517 Mozart Place NW
Apartment # 103
Washington DC 20009

## CERTIFICATE OF SERVICE

I hereby certify that on February 22nd 2006 a copy of the foregoing motion was served by certified mail upon the following:

Littler Mendelson, P.C.

C\O Katherine Goetzl
1150 17th St. NW, Suite 900
Washington DC 20036


Rami Elhusseini
Pro Se