# EXHIBIT A

# PART 1 OF 3

Rami Elhusseini

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3 RAMI ELHUSSEINI,              :

4            Plaintiff,         :

5     v.                        : Civil Action

6 COMPASS GROUP USA, INC.,      : No. 06-100 (RBW)

7            Defendant.         :

8                               : Pages 1 - 308

9

10

11

12            Deposition of RAMI ELHUSSEINI

13                 Washington, D.C.

14            Friday, November 10, 2006

15

16

17

18

19

20

21 Reported by:  George W. Tudor, RPR

Page 2

```
1
2
3
4
5                                    November 10, 2006
6                                         10:05 a.m.
7
8
9 Deposition of RAMI ELHUSSEINI, held at
10
11      1050 17th Street, N.W.
12      Suite 900
13      Washington, D.C. 20036
14
15 Pursuant to notice, before George W. Tudor, RPR, a
16 Notary Public of the District of Columbia.
17
18
19
20
21
```

Page 3

```
 1 APPEARANCES:
 2
 3 Rami Elhusseini
 4 In Proper Person
 5      2517 Mozart Place, N.W.
 6      Apartment 103
 7      Washington, D.C. 20009
 8
 9 Littler Mendelson
10 For the Defendant
11      1150 17th Street, N.W.
12      Suite 900
13      Washington, D.C. 20036
14      (202) 7889-3411
15 BY:   Katherine A. Goetzl, Esq.
16
17
18
19
20
21
```

Page 4

```
 1                C O N T E N T S
 2 EXAMINATION OF RAMI ELHUSSEINI
 3 BY:                                      PAGE:
 4 MS. GOETZL:                                 6
 5
```

```
 6 EXHIBITS    DESCRIPTION                   PAGE
 7 No. 1       Application for employment     67
 8 No. 2       Receipt for employee handbook  96
 9 No. 3       Employee handbook              96
10 No. 4       EEO policy                    100
11 No. 5       Zero tolerance policy         100
12 No. 6       Work environment document     101
13 No. 7       Interoffice memo dated 8/3/05 102
14 No. 8       Semi-annual review form       109
15 No. 9       Corrective communication      197
16 No. 10      Statement                     202
17 No. 11      E-mail message                204
18 No. 12      Corrective communication      204
19 No. 13      E-mails                       226
20 No. 14      Termination letter            228
21 No. 15      E-mail                        231
```

Page 5

```
 1 EXHIBITS    DESCRIPTION                   PAGE
 2 No. 16      Elaborate statement           256
 3 No. 17      Interrogatory answers         256
 4 No. 18      Answers to Interrogatories    257
 5 No. 19      Complaint                     290
 6 No. 20      Elaborate Statement           291
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

**Rami Elhusseini**

Page 6

1       Thereupon,

2                    RAMI ELHUSSEINI,

3 the Plaintiff, called for oral examination by

4 counsel for the Defendant, having been duly sworn

5 by the Notary Public, was examined and testified

6 as follows:

7       EXAMINATION BY COUNSEL FOR THE DEFENDANT

8 BY MS. GOETZL:

9       Q.   Good morning, Mr. Elhusseini.

10      A.   Good morning.

11      Q.   Can you please state and spell your full

12 name for the record?

13      A.   Rami Elhusseini; R-A-M-I, first name;

14 last name E-L-H-U-S-S-E-I-N-I.

15      Q.   What is your address?

16      A.   2517 Mozart Place, Northwest, Apartment

17 103, Washington, D.C., zip code 20009.

18      Q.   Have you ever had your deposition taken

19 before?

20      A.   No, not to the best of my knowledge.

21      Q.   Okay.  Do you understand that you're

Page 7

1 under oath, just like you would be in court?

2       A.   Yes.

3       Q.   And you understand that Mr. Tudor, the

4 court reporter, is taking down the questions that

5 I ask and the answers that you give?

6       A.   Yes, I do.

7       Q.   And the questions and the answers will

8 be transcribed into a sort of booklet form that

9 you will be able to review if you want to do that,

10 okay?

11      A.   Sure.

12      Q.   And when you're reviewing the

13 transcript, you can make changes to it, like

14 spelling corrections and things like that, but not

15 any substantive changes to your testimony today.

16      A.   Sure.

17      Q.   And it's important that you give verbal

18 responses, such as yes or no, as you have been,

19 not nodding or shaking your head, because that

20 would be difficult for the court reporter to take

21 down, okay?

Page 8

1       A.   Yes.

2       Q.   And if you don't understand any of my

3 questions, just let me know and I'll try to

4 clarify it.

5       A.   Sure.

6       Q.   And if you answer my question, I'm going

7 to assume that you understood it, okay?

8       A.   Okay.

9       Q.   And if I'm going too fast, just let me

10 know, and I'll slow done.  If you need to take a

11 break during the course of the deposition, just

12 let me know and we will go ahead and do that.  I

13 expect this is going to take several hours, so if

14 you need a break, let me know.  The only thing I

15 would ask is that if there is a question pending,

16 that you answer the question before we take the

17 break.

18           Mr. Elhusseini, are you on any

19 medication?

20      A.   No.

21      Q.   Have you taken any drugs or alcohol in

Page 9

1 the past 24 hours?

2       A.   No, I didn't.

3       Q.   Are you having any problems at all that

4 might affect your ability to think or remember?

5       A.   No.

6       Q.   So are you able to understand the

7 questions that I ask and to provide truthful,

8 accurate and complete answers today?

9       A.   Yes.

10      Q.   Have you reviewed any documents to

11 refresh your recollection in preparation for the

12 deposition today?

13      A.   No, but I have some here in case we need

14 to take a look at them.

15      Q.   Okay.  So you did not review any

16 documents?

17      A.   No.

18      Q.   Have you talked to anyone about this

19 deposition before coming here today?

20      A.   No.

21      Q.   Have you talked to anyone about this

3 (Pages 6 to 9)

Rami Elhusseini

1 case?

2    A.    No, excluding yourself and me, no.

3    Q.    Okay.

4    A.    I mean, except for the person that I

5 have indicated in the first discovery request.

6    Q.    And who is that?

7    A.    I believe, aside from yourself and me,

8 people from the Justice Department that I

9 mentioned that I will be getting into the case

10 against Restaurant Associates.

11    Q.    Who did you talk to at the Justice

12 Department?

13    A.    Someone who works at the Justice

14 Department.

15    Q.    You don't know the person's name.

16    A.    Yes, I do, but I don't see -- I don't

17 think I would be comfortable in telling you,

18 because me telling the person will not be in any

19 way or form an issue in this case.  This person

20 will not be -- will not be a witness.

21    Q.    Is the person your attorney?

1    A.    No.

2    Q.    Okay.  You don't really have any right

3 to not answer any of the questions that I ask you

4 today unless you're going to be claiming some sort

5 of attorney-client privilege, and I don't think

6 that would apply in this case, since you're

7 representing yourself, so can you tell me the name

8 of the person at the Department of Justice?

9    A.    No, I couldn't.

10    Q.    You don't know the person's name?

11    A.    I do know the person's name, but I can't

12 tell it to you, because it's irrelevant to the

13 case.

14    Q.    Okay.  Do you understand what I was just

15 telling you about answering my questions?

16    A.    I do.  I do.

17    Q.    Okay.  You're also not actually supposed

18 to refer to any documents.

19    A.    Okay.  I thought you wanted me to refer

20 to the documents.

21    Q.    Well, if you have the person's name, I

1 would like the person's name, and if you have any

2 documents that show the person's name from the

3 Department of Justice, I think that those would be

4 responsive to the discovery request that I have

5 sent to you.

6    A.    It was not an official -- it was not an

7 official communication with the Justice

8 Department.  It so happened that this person

9 worked with the Justice Department.

10    My knowledge of this person were in a

11 different context than in what pertains to this

12 case.  It just so happens that this person was one

13 of the people that I mentioned me getting into a

14 case, to a court case against Restaurant

15 Associates.  But this person was not in any way --

16 did not provide any legal counsel or any advice of

17 any sort, for that matter.

18    Q.    Okay.  So --

19    A.    So it could have been just a private

20 acquaintance of mine that I told about the case,

21 but it wasn't in any legal context.

1    Q.    Right, I understand that, but that

2 doesn't mean that you don't have to tell me who it

3 is.  So I'm asking you again.

4    A.    Why is it -- I mean, if you don't mind

5 telling me the reason why you think it might be

6 essential for this case to disclose this person's

7 name.

8    Q.    Well, I have a right to know who you

9 have talked to about the case to find out what you

10 have told them in the event that you're telling

11 them something different than what you're telling

12 me or you alleged in the case.

13    A.    In case you would want to communicate

14 with these people, is that what you're saying?

15    Q.    Sure.  I mean, I have a right to do

16 that.

17    A.    The person's name is called -- is

18 Randolph Scott.

19    Q.    What I was trying to explain to you

20 before was that, really, the only ground that you

21 have in this deposition to not answer one of my

4 (Pages 10 to 13)

Page 14

1 questions would be if there were some sort of
2 privilege involved, like an attorney-client
3 communication. So if this person was your
4 attorney, you would still have to tell me the
5 person's name; you just wouldn't have to tell me
6 the substance of the communications you had with
7 them.
8    A.   Sure.
9    Q.   Okay? But since I understand that he is
10 not your attorney, you have to tell me what you
11 told him. I mean, there isn't any sort of
12 privilege, it sounds like, from what you have told
13 me.
14    A.   No, there isn't. And in any case, I
15 didn't agree to any -- between us. So I do not
16 reserve the right to not answer. I will answer
17 all your questions.
18    Q.   Okay. So what did you tell Mr. Scott
19 about this case?
20    A.   That I -- I did get into legal
21 proceedings against Restaurant Associates, for

Page 15

1 whom I was working.
2    Q.   And when did you talk to Mr. Scott?
3    A.   I talked to him in September, 2005, I
4 believe.
5    Q.   So over a year ago?
6    A.   Yes, just when it happened.
7    Q.   So shortly after you were terminated.
8    A.   Shortly after I was terminated, yes, and
9 in the beginning, when I first went to court,
10 after it was clear that we were going to court,
11 and this is when I also told him. I told him that
12 I did get into trouble with Restaurant Associates
13 and that I was going to pursue the matter in the
14 court of law.
15    Q.   So. You didn't actually file your case
16 against Restaurant Associates until December of
17 2005.
18    A.   It would be in December and September
19 that I talked to him about it.
20    Q.   So you talked to him two times.
21    A.   About this, yes.

Page 16

1    Q.   More than two times, or just two times?
2    A.   Just two times.
3    Q.   So in September of 2005 and December.
4    A.   And in December, I presume, yes.
5    Q.   Okay. And do you recall anything else
6 that you told Mr. Scott about this case?
7    A.   When you say this case, counsel Goetzl,
8 do you mean the case as far as me and Littler,
9 Mendelson is concerned or anything regarding my
10 relationship with Restaurant Associates, just to
11 be clear on that?
12    Q.   The latter.
13    A.   So anything between me and Restaurant
14 Associates, even before the case became a case?
15    Q.   Yes.
16    A.   Well, I did disclose to Mr. Scott that I
17 suspected that Restaurant Associates might have a
18 white supremacist agenda on a managerial level.
19 And I thought it was pertinent to inform the
20 Justice Department about it.
21    Q.   So did you actually make some sort of

Page 17

1 complaint to the Justice Department?
2    A.   No, no, it just so happened that this
3 person worked for the Justice Department, and that
4 I thought if -- if it might be a proper thing to
5 do, to tell them, and basically, there was no
6 advice from Mr. Scott about regarding this issue
7 except to pursue it legally, as we are doing now.
8    Q.   Mr. Scott told you to file your case?
9    A.   No, Mr. Scott told me that he couldn't
10 give me advice. That any help I might be able to
11 get should be gotten through the regular legal
12 process if I wished to do so. That he -- as his
13 capacity -- in his capacity as a Justice
14 Department employee, there was nothing that he
15 could do or even advise at that point.
16    Q.   Is he a lawyer?
17    A.   No, he's not a lawyer, but he has some
18 information about the law.
19    Q.   Okay. I guess I'm a little bit confused
20 about how you started talking to him. Did you
21 call the Department of Justice and get connected

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 18

1 with him, or how you know him?

2     A.   Oh, no, I know this person. I know

3 Mr. Scott, and it so happened that I talked to him

4 about this case.

5     Q.   Okay. I understand. So as far as you

6 can remember, you only talked to him about your

7 case two times?

8     A.   Two times, and then there is Ms. --

9 Ms. Faye, Ms. Faye Wright, who used to be a

10 colleague of ours at the National Museum of the

11 American Indian, and I told her that I was

12 intending to sue and if she was also interested in

13 doing so.

14     Q.   And was she?

15     A.   And she was not. She was not. She --

16 at least she did not pursue it, practically pursue

17 it. She talked about being interested, or at

18 least entertained the thought, but she did not

19 actually pursue it when I asked her to call me

20 back regarding that matter, and that was the last

21 time we talked about the case.

Page 19

1     Q.   Okay. How many times did you talk to

2 Ms. Wright about this case?

3     A.   I would say two times, once to -- once

4 telling her that I was intending to do it and

5 probably once to ask her if she was interested in

6 doing so as well.

7     Q.   Do you remember the approximate dates of

8 when you talked to her?

9     A.   I would say around December, too.

10     Q.   Of 2005?

11     A.   December of 2005 would be a good date.

12 Definitely -- I would definitely got an answer

13 from her or understood from Ms. Wright that she

14 was not interested in pursuing the matter before I

15 filed in December.

16     Q.   Okay. So in the conversation when

17 Ms. Wright told you that she was not interested in

18 filing suit, that occurred before --

19     A.   She did not say she was not interested,

20 she just did not call back to say that she was

21 willing to pursue it.

Page 20

1     Q.   Okay. So did you actually talk to her

2 once or twice?

3     A.   I talked to her more than twice. Just

4 about the case, I only talked to her twice.

5     Q.   Okay. So other than Mr. Scott and

6 Ms. Wright, is there anyone else that you talked

7 to about the case?

8     A.   And -- not to the best of my

9 recollection.

10     Q.   Okay. Have you ever sought the advice

11 of a lawyer regarding the end of your employment

12 with Restaurant Associates?

13     A.   I tried. I tried -- I tried to contact

14 ACLU, and they were not interested when they knew

15 that it was against Restaurant Associates. They

16 declined to provide any legal assistance.

17     Q.   When did you talk to the ACLU?

18     A.   I would say November.

19     Q.   Of 2005?

20     A.   2005, I'm sorry.

21     Q.   That's okay. I just want the record to

Page 21

1 be clear; that's why I'll ask you follow-up

2 questions.

3     A.   Sure.

4     Q.   Okay. So you contacted the ACLU in

5 November of 2005, asking if they would represent

6 you in the case?

7     A.   Or they could provide -- they could

8 provide legal assistance or advice.

9     Q.   Okay.

10     A.   Any sort of legal help that I might be

11 able to get from them, because I was under the

12 impression that they were the sort of the

13 authority or people who would help you if you got

14 into any of the labor law issues.

15     Q.   Okay. But they told you they were not

16 interested in taking the case?

17     A.   At least they were not interested in he

18 helping me pro bono. They offered if I would be

19 interested in getting legal advice in the regular

20 manner, in the sense that I would pay for a first

21 session with an attorney, and they couldn't

**Page 22**

1  provide an attorney's name, but they did not have
2  any pro bono advice or any lawyers of their own
3  who could assist me with that, with my problem.
4      Q.   So did they offer to give you a referral
5  to an attorney that you would have to pay?
6      A.   They offered, yes.  They offered if I
7  would be -- but they offered -- the best of my
8  recollection, that would also -- that would have
9  been something that I would have to pay for, too.
10 The referral would have to be something I would
11 pay for.
12     Q.   Okay.  So other than the ACLU, did you
13 talk to anyone else, trying to get legal
14 representation.
15     A.   Yes, I did contact the Anti-Defamation
16 League, the ADL, because I thought that they would
17 help me also in the sense of getting legal advice.
18     Q.   When did you contact them?
19     A.   In -- I would say definitely between
20 September and December.  Let's say November, to be
21 on the safe side.  It was more than once, and I

**Page 23**

1  did provide you with all the documents that I sent
2  them.
3      Q.   So that was between September and
4  November of 2005?
5      A.   I believe so.  I believe so, yes.
6      Q.   And if I remember correctly, you did
7  provide some documents that you had actually
8  filled out some forms that they had given you.
9      A.   Yes, I did, and I provided you with a
10 copy of those.
11     Q.   Right, and was there a response to the
12 forms that you gave them?
13     A.   There was only a response to my first
14 request of wanting to apply for a complaint.  It
15 was a complaint request that I asked, and they
16 sent me the needed documents to fill out, and they
17 said that once they received those and reviewed
18 them, if they felt that they could provide legal
19 advice or assistance, then they would, but they
20 did not.
21     Q.   Just so I understand what happened, you

**Page 24**

1  contacted the Anti-Defamation League.  They sent
2  you some forms to fill out, you filled out the
3  forms and sent them back in, and then you didn't
4  hear from them again.
5      A.   Yes, correct.
6      Q.   Did you contact them again after you
7  sent them the forms?
8      A.   No.  After I sent in the forms, no.  My
9  point was just to send the forms.
10     Q.   Okay.  So other than the ACLU and the
11 Anti-Defamation League, have you tried to get
12 legal representation from anyone else or any other
13 organization.
14     A.   I did also contact -- I don't think it
15 was with the Anti-Defamation League, I think it
16 was an independent organization; I don't know if
17 it was an organization, but I did -- I ended up
18 talking to a rabbi at some point on the telephone.
19 It was referred to me, I think it was the Jewish
20 referral -- the Jewish referral center that I got
21 the number to from the Jewish community center on

**Page 25**

1  16th Street, and they provided me with the number
2  for the Jewish referral -- Jewish Referrals, I
3  think it was just called that, and then I called
4  them and I communicated with a member of the
5  referral office and I talked to her about it.  I
6  can't remember her name.  And she also referred me
7  to a rabbi that I did talk to.
8      Q.   Okay.  I think probably you should not
9  tell me what you talked to the rabbi about,
10 because that might be covered by some sort of --
11     A.   All of a sudden you don't want to know?
12     Q.   -- some sort of religious privilege.
13     A.   Well, I'm not Jewish, so I don't know if
14 the conversation --
15     Q.   Okay.  Well, let's not talk about that,
16 just in case.  Because normally, say I was
17 Catholic -- but I'm not -- and I went to the
18 Confession and I talked to a priest, that would be
19 something that would be considered a privileged
20 communication.
21     A.   And if you didn't declare it as -- even

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 26

1 if I didn't want it to be privileged?

2    Q.    I'm not really sure, so --

3    A.    We don't have to.

4    Q.    We will skip over that one.

5    A.    No problem.

6    Q.    Okay.  So other than the rabbi, the

7 Anti-Defamation League and the ACLU, was there

8 anyone else that you contacted for legal

9 representation?

10    A.    Well, there's the referral, the Jewish

11 referral office between the ADL and the rabbi.

12    Q.    Anybody else?

13    A.    Not to the best of my recollection, but

14 if it comes to mind, I will surely tell you.

15    Q.    Do you know what the Equal Employment

16 Opportunity Commission is?

17    A.    Oh, sure, yes.  I had heard of the Equal

18 Opportunity office, yes.  And affirmative action.

19 I heard of them as one office.  I don't know if

20 they are one office.

21    Q.    Tell me what you know about the EEOC.

Page 27

1    A.    I know that they're the equal

2 opportunity and affirmative action office, and I

3 heard that they usually help out in issues of

4 discrimination like the one I thought I was

5 being -- getting into with the restaurant

6 association.

7    Q.    How did you first learn of the EEOC?

8    A.    When I was applying to graduate schools

9 in 1998, and at some point I got into a problem

10 during my application process, and reviewing the

11 application forms that I had, I read their name

12 and researched what they did and I contacted them

13 at that time, trying to get help with a problem

14 that I was facing.

15    Q.    What was the problem related to the

16 graduate school application that you thought that

17 EEOC would help you with?

18    A.    I was -- I got an acceptance to a Ph.D.

19 program in comparative literature at Emory school

20 in Atlanta, and after I received the acceptance

21 letters, and I was in the process of preparing to

Page 28

1 travel to Atlanta, they cancelled my application.

2 They cancelled out my application for no obvious

3 reason, and I tried to contact the equal

4 opportunity to ask them help in that matter, tell

5 them that I was accepted and they changed their '

6 mind, and asked them to intervene on my behalf to

7 kind of get the application accepted again.

8    Q.    Okay, and what happened?

9    A.    And I never heard from them.  They never

10 contacted me.

11    Q.    How did you contact the EEOC?

12    A.    I e-mailed them.

13    Q.    I'm sorry?

14    A.    I e-mailed them.

15    Q.    You e-mailed the EEOC?

16    A.    I e-mailed them.

17    Q.    And you never got a response to your

18 e-mail?

19    A.    I never got a response to my e-mail.

20    Q.    Did you call them or make any other

21 response other than e-mailing them?

Page 29

1    A.    No, I just e-mailed them, and when I

2 didn't get a response, I just assumed that they

3 were not going to...

4    Q.    Did you contact them because you thought

5 there was some sort of discrimination involved in

6 the graduate school acceptance?

7    A.    I thought it might -- I thought it might

8 be.  I contacted them more on the affirmative

9 action side than the equal opportunity.  So I

10 thought it was just help in general.  I didn't

11 think it was discrimination.  I don't know if it

12 was.  I hope not.  But it was -- it was an

13 abnormal occurrence, if you like, to cancel out --

14 it's like a breach of contract.  So they had the

15 contract signed by the chairman and the

16 responsible -- of acceptance, the people who were

17 responsible, were charged with admission, and then

18 they changed their mind about that, and I thought

19 that the affirmative action would be a proper

20 reference to kind of correct the breach of

21 contract.

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

**Rami Elhusseini**

Page 30

1   Q.   So with respect to the graduate school
2 program at Emory, are you saying that you were
3 accepted into the program?
4   A.   I was accepted, yes.
5   Q.   And then you told them that you wanted
6 to go.
7   A.   Yes.
8   Q.   And then they said no, you can't come?
9   A.   Yes, that's exactly what happened.  And
10 then they said, "Well, actually, you can't come,
11 because your acceptance has been revoked."
12   Q.   So have you ever filed any sort of
13 complaint or charge with the EEOC before against
14 anyone?
15   A.   No.  No, that was my first encounter
16 with them.
17   Q.   But in terms of the process, the only
18 thing that you did was sending the e-mail and that
19 was it?
20   A.   Yes.
21   Q.   And you got no response.

Page 31

1   A.   And I got no response, so I assumed that
2 I wasn't going to be able to file a formal
3 complaint and follow the regular procedure.
4   Q.   Okay.  So did you ever file a charge
5 with the EEOC against Restaurant Associates?
6   A.   No, I didn't.
7   Q.   Did you file a charge with any
8 government agency against Restaurant Associates?
9   A.   Other than this -- the District -- I
10 mean the Supreme Court of the District of
11 Columbia, no.
12   Q.   You're referring to the lawsuit that you
13 filed that we're here.
14   A.   The lawsuit, yes.  But other than that,
15 no, I did not file any complaint.  I don't think
16 the ADL or a formal -- I think they're a nonprofit
17 --
18   Q.   I'm sorry?
19   A.   The ADL is not government.
20   Q.   No, that's not a government agency, as
21 far as I know.

Page 32

1   A.   So the answer would be no, I did not
2 file any complaint with any government agency.
3   Q.   Okay.  It will help to keep the
4 transcript cleaner if you wait until I finish my
5 question to answer, and I'll try to do the same
6 for you.
7   A.   I apologize.
8   Q.   I just don't want us trying to talk over
9 each other.  It will make it difficult for
10 Mr. Tudor.
11   A.   Sorry about that.
12   Q.   Okay.  So did you ever file a charge
13 with the EEOC against Compass?
14   A.   No.  No, I did not.
15   Q.   And did you ever file a charge with any
16 government agency against Compass?
17   A.   No, I did not.
18   Q.   Before we get into the substance of your
19 complaint, just so I'm clear, it seems to me that
20 you have two separate claims in this lawsuit; the
21 first one being that you were denied a promotion

Page 33

1 because of discrimination and the second one being
2 that you were terminated from your employment
3 because of discrimination; is that correct?
4   A.   Yes.  There's three, actually, and then
5 another one is -- I think intentional tort?  I
6 forgot the exact term of the law, but it's
7 actually intentional cause of harm.  Other than
8 the unjustifiable termination and denial of
9 promotion and then intentional harm, intentional
10 tort.
11   Q.   And what is the third claim that you're
12 talking about?  What is the tort?
13   A.   That I suffered depression because of
14 their treatment.  I suffered from clinical
15 depression and I had to get treatment for it
16 because of the treatment that I endured during my
17 employment with the Restaurant Associates.
18   Q.   But you don't know exactly what the
19 claim is called; is that what you're saying?
20   A.   I know exactly; it's called -- I know
21 it's the law of tort and I think it's called

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

**Page 34**

1 intentional tort. I know it's not -- I know it's
2 not malicious interference, because that's the
3 radio law. *Malicious tort, I think. It might be*
4 called malicious tort.
5    Q.    But is the gist of the claim that what
6 Restaurant Associates did caused you to be
7 depressed?
8    A.    Yes. And intentional. And that there
9 was an intention to cause harm, psychological
10 harm, amongst my complaints.
11    Q.    It sounds to me like intentional
12 infliction of emotional distress.
13    A.    Sure. I mean, free advice from you that
14 I shouldn't be getting, but I guess.
15    Q.    I just want to be clear before I start
16 asking you about your claims to understand exactly
17 what they are, so --
18    A.    I think it might be one of the names of
19 the complaint, yes.
20    Q.    Okay. So going back to the first two
21 claims, the denial of the promotion and the

**Page 35**

1 termination of employment, are you bringing those
2 claims under Title 7 of the Civil Rights Act of
3 1964?
4    A.    The discrimination -- the denial of
5 employment. Actually, yes.
6    Q.    Both of them?
7    A.    I'm claiming that they're both -- under
8 the civil rights Act and under the company laws,
9 the company law. The unjust termination is also a
10 violation of the fair corporate investigation
11 under the company laws, which they should have
12 been required to do. So that's also one of the
13 laws that I think might be of interest. And I did
14 mention that in the discovery.
15    Q.    I don't know what law you're referring
16 to. Do you know what I'm talking about when I say
17 a law, like a statute or a --
18    A.    Yes.
19    Q.    Okay. Something that's been enacted by
20 the government? What the company says is not
21 actually a law.

**Page 36**

1    A.    I'm referring to the company law as I
2 thought it is called in the -- in terms of -- in
3 the legal referencing of it. I thought there was
4 a law called company law, as a statute of company
5 law, and that they were in violation of it. Maybe
6 it's the statute in common law, and I don't know
7 the exact differentiation between, like, a common
8 law and federal rules, I mean, if that's the one
9 we're referring to.
10    Q.    Okay. So I guess I'm not clear about
11 what this other claim is that you're trying to
12 articulate. I understand the denial of promotion,
13 the termination of the employment, the emotional
14 distress claim, and is there something other than
15 that?
16    A.    Unfair enrichment. I thought that was
17 also part of -- under company law, something that
18 they call unfair enrichment, when basically you
19 deny the fair share of the benefits to the
20 employees who helped you make the benefits. I
21 thought when I research it, I thought I found

**Page 37**

1 those statutes, but I can definitely research some
2 more and try to get the exact nomenclature.
3    Q.    Okay. I might have to keep the
4 deposition open, because I'm still not clear what
5 all your claims are, so I may have to talk to you
6 like this on another day after you have told me
7 what other claims you think you might have.
8    A.    If you think that that's best. I think
9 we -- if you don't mind me bringing them in the
10 form of documents, because I have to, like, print
11 them out and know the exact names of them. Would
12 that be --
13    Q.    Well, I wish that you had told me a long
14 time ago what they were.
15    A.    I thought I did send them with the
16 discovery requests. When you asked me for the
17 correction, when you said that some of the items
18 were not exact or were not a proper response and
19 you asked me to re-send this discovery, basically,
20 and I did.
21    Q.    Okay. Well, we will talk about your

10 (Pages 34 to 37)

Rami Elhusseini

Page 38

1 interrogatory answers later today, and then maybe
2 you will be able to show me in there what you're
3 talking about.
4        But going back to my question about the
5 denial of promotion and the termination of the
6 employment, are you bringing those claims under
7 Title 7?
8    A.   Sure. Yes.
9    Q.   Are you bringing them under any other
10 law?
11   A.   Yes, the one that we will talk about
12 later, the unfair enrichment and unfair
13 investigation.
14   Q.   Okay. Now, with respect to the two
15 discrimination claims, what characteristic of
16 yours are you saying that the discrimination was
17 based on?
18   A.   I think it was antisemitism, my
19 identifying as a person of Semitic belonging.
20   Q.   Okay, and I don't mean to appear
21 ignorant, but when you say anti-Semitic, are you

Page 39

1 talking about your religion or your race?
2    A.   I am talking about my -- you could say
3 my religious belief, because I did practice fast
4 when I was working with Restaurant Associates,
5 which gave away my religious belief, and to my
6 cultural upbringing and to my race.
7    Q.   And how would you describe what your
8 race is?
9    A.   If I use -- I filled up their
10 application, I filled out the "white" category for
11 race. I identify, as far as employment is
12 concerned, as a white male. However, in the more
13 common understanding of the white race, I came to
14 understand that anybody who is of European descent
15 is considered white only, which means that if you
16 are not of African descent, but are not from
17 European descent, then you would be Semitic.
18 That's as far as race is concerned. As far as the
19 encyclopedia defines it, the technical, biological
20 term is called Armenoid.
21   Q.   See. So are you saying that you were

Page 40

1 discriminated against because of your religious
2 beliefs and your national origin?
3    A.   I don't think that the national origin
4 is -- alone a factor in the discrimination, it was
5 more the, if you like -- I don't know -- political
6 and cultural belonging. With -- along with my
7 national origin. My national origin alone, had I
8 been anti-Israeli, would not have been a problem
9 in my employment with Restaurant Associates. The
10 fact that I was of the national origin that I was
11 from, being Lebanese and pro-Israeli and
12 pro-Zionist, caused the antisemitism behavior to
13 kind of be inflicted, if you like.
14   Q.   Okay. So if you can just list for me
15 the characteristics of yours that you believe the
16 discrimination was based on.
17   A.   The fact that I was -- the fact that I
18 was pro-Zionist, that I was -- that I was not
19 anti-Israeli, that I was very culturally sensitive
20 to Jewish traditions, if you like, at some point
21 during the discovery, and I also mentioned in an

Page 41

1 altercation with one of the employees there was a
2 misunderstanding regarding customers at the time
3 of Passover, and it was my -- basically, my
4 sensitivity toward their requirements at that time
5 that caused the discrimination behavior to be
6 expressed, if you like, even more clearly. Or to
7 be solidified, become solidified, the antiSemitic
8 behavior that I was exposed to.
9    Q.   Okay. So you think that you were
10 discriminated against because you were pro-Israeli
11 and because you were pro-Zionist?
12   A.   Yes, and pro-Jewish, basically.
13   Q.   Okay. Anything else?
14   A.   As far as antisemitism is concerned, I
15 think this is what it was based on.
16   Q.   Well, are you saying other than the
17 antisemitism, is there anything else that you
18 think Restaurant Associates discriminated against
19 you based on?
20   A.   No. Not that comes to mind. But if it
21 does, I will state it. I will let you know if it

11 (Pages 38 to 41)

**Page 42**

1 comes to mind.  But to the best of my recollection
2 now, as far as I can remember from my -- from the
3 thoughts that I had with regard to this issue, I
4 think that would have -- I mean, the combination
5 of the fact of being pro-Jewish and my national
6 origin, that may have let the Restaurant
7 Associates believe that it might be anti-Jewish.
8       The mixture of that, the mixture of me
9 being Lebanese, which is somewhat considered to be
10 with a -- someone who is Lebanese is usually
11 someone with an anti-Jewish predisposition.  The
12 fact of that consideration with the fact that I
13 was pro-Jewish, led to the antidiscrimination
14 behavior from my previous employer.
15     Q.    So you think that the discrimination was
16 based on the combination of your being Lebanese,
17 but also pro-Jewish?
18     A.    Yes.
19     Q.    Is that it, or is there anything else?
20     A.    I think -- I think this is it.
21     Q.    Okay.

**Page 43**

1     A.    Also, me being, I believe, also me being
2 nonwhite of European descent, too.  Other than
3 that, now that you have asked me, I didn't answer
4 clearly, but also the denial of promotion was
5 also -- was also because someone else needed to be
6 promoted and I was not as, if you like, white as
7 that person who were to be promoted, so me being
8 nonwhite also.
9     Q.    Okay.  I'm not trying to give you a hard
10 time or be difficult, I'm just trying to
11 understand what the basis for your claims is, and,
12 you know, since the case has been going on for
13 almost a year now, I think that I should have
14 known a long time ago, but, you know, for some
15 reason, it just has not been clear to me.
16       Okay.  So when did you start working for
17 Restaurant Associates?
18     A.    I believe in August of 2004.
19     Q.    Okay, and prior to Restaurant
20 Associates, what job or jobs had you had in the
21 food industry?

**Page 44**

1     A.    I worked for Woodley Cafe, a restaurant
2 called Woodley Cafe, which is an American-style
3 restaurant.
4     Q.    Okay.  Before you worked for Restaurant
5 Associates, did you have any other food-related
6 jobs other than the Woodley Cafe?
7     A.    I believe not.
8     Q.    Okay.  So when did you start working at
9 Woodley Cafe?
10    A.    I started at Woodley Cafe in, I would
11 say, April of 2004.
12    Q.    And was that a full-time or a part-time
13 job?
14    A.    It was full time.
15    Q.    What was your job title there?
16    A.    I was a line cook.
17    Q.    What were your job duties?
18    A.    Do you mean the specifics of -- of my
19 station, or just in general?
20    Q.    What did you do?
21    A.    I cooked.  I cooked.  If you want the

**Page 45**

1 specifics of -- as a cook's job, I can also tell
2 you, like cleaning up the stations and serving
3 several stations, being a grill, a salad station
4 or a pizza station, just to give you the details
5 and be on the safe side, yes.
6     Q.    Yes, I would like you to tell me
7 everything that you did as a line cook.
8     A.    Okay.  As a line cook, I was expected to
9 service a pizza station, a salad, which is also a
10 salad station; I was expected to serve on a fryer,
11 on a deep fryer station and on a grill, and I was
12 also expected to clean all the stations that I
13 worked at and to prepare them for the day shift
14 and the shift that would come after me.
15    Q.    So how many hours a week did you
16 normally work at Woodley Cafe?
17    A.    I would say 40.  I would say 40.
18 Sometimes, sometimes a little more than 40,
19 depending on -- depending on the influx of
20 customers.
21    Q.    And how much did you get paid there?

12 (Pages 42 to 45)

Page 46

1    A.    I started out getting $7 an hour, and
2 then moved up to seven fifty an hour.
3    Q.    Do you remember when you got that raise?
4    A.    Maybe a month after I had started.
5    Q.    Okay.
6    A.    Sometimes the payment -- payments at
7 Woodley Cafe, the wages were paid sometimes half
8 in cash and half in checks, and sometimes it was
9 not very clear how much they -- how much they kept
10 in taxes and how much they gave out in cash.
11         So sometimes you would be under the
12 impression of getting paid seven dollars and you
13 probably would be getting -- or seven fifty, and
14 then you would actually be getting seven,
15 depending on how much taxes they withhold and how
16 much they would give you in cash.
17         But the official -- I would say that I
18 start the out, I think since it was training, I
19 believe it was seven, and then probably a month
20 after the fact it was seven and a half. And when
21 I left for Restaurant Associates, it was still

Page 47

1 seven and a half dollars an hour.
2    Q.    So you stopped working at Woodley Cafe
3 when you started working at Restaurant Associates?
4    A.    A little after I started working for
5 Restaurant Associates. I worked for both of them
6 for a while, because I gave -- because I had to
7 give fifteen days' -- what do you call it?
8    Q.    Notice?
9    A.    -- notice, yes. I had to give them
10 notice. And I also -- and I also went back and I
11 returned to work for Woodley Cafe --
12    Q.    Okay. Hold on for just one second. So
13 you started working there, you said, in April of
14 2004?
15    A.    Yes.
16    Q.    And then you said you worked a little
17 bit at Woodley Cafe and Restaurant Associates at
18 the same time?
19    A.    Yes.
20    Q.    So when during the first time that you
21 worked at Woodley Cafe, when did you stop, working

Page 48

1 there?
2    A.    The first time I probably would say -- I
3 probably would say September. I probably stopped
4 in September.
5    Q.    Of 2004?
6    A.    Of 2004. I stopped working for Woodley
7 Cafe and I was exclusively working for Restaurant
8 Associates.
9    Q.    So the first time you worked at Woodley
10 Cafe, did you have any benefits?
11    A.    No.
12    Q.    Were benefits offered to you?
13    A.    No.
14    Q.    Who was your supervisor there the first
15 time you worked there?
16    A.    Danny was his first name, but I can't
17 remember his last name. Danny was the kitchen
18 manager and he was my supervisor.
19    Q.    Was he your supervisor the whole first
20 time that you worked at Woodley Cafe?
21    A.    He was my supervisor the whole time at

Page 49

1 Woodley Cafe. He is the kitchen supervisor.
2    Q.    Still?
3    A.    Yes. I believe so. I mean, I haven't
4 been there.
5    Q.    So the first time you worked at Woodley
6 Cafe, did you get any promotions?
7    A.    I believe I got fifty cents raise, yes.
8    Q.    Okay. A raise is different than a
9 promotion. I mean did you get promoted to a
10 different job title than line cook.
11    A.    No. From trainee, from trainee to line
12 cook, yes.
13    C.    I see. So when you got hired by the
14 Woodley Cafe in April of 2004, you were a trainee?
15    A.    I was a trainee.
16    Q.    Making seven dollars an hour?
17    A.    Yes.
18    Q.    Then about a month after you started,
19 you were promoted to a line cook, and in
20 conjunction with the promotion, got a fifty-cent-
21 and-hour raise?

13 (Pages 46 to 49)

Rami Elhusseini

Page 50

1   A.   I would say so, yes.

2   Q.   So the first time that you worked at

3 Woodley Cafe, did you ever get any sort of

4 discipline, either verbal or in writing, for any

5 reason?

6   A.   Not specifically, no.  Not -- nothing

7 major.  Nothing major, I would say, no.  I was

8 never suspended.  This is how they -- the penalty

9 system at Woodley Cafe was by, usually, suspending

10 employees.  They would just take away from your

11 hours.  And I never got any of those.

12  Q.   Did you get into some sort of minor

13 discipline that didn't involve a suspension?

14  A.   I would get, if you like -- I mean, it's

15 a kitchen, if you know what I mean, it's not a law

16 office, so usually at rush hour, sometimes advice,

17 which is very constructive advice, would be given

18 in a way that would be viewed as harsh and more --

19 I don't want to say civilized, but more --

20 easygoing place, work environment.

21  Q.   I don't mean to cut you off, but I'm not

Page 51

1 talking about, you know, someone yelling at you

2 because you're not cooking fast enough or

3 something like that; I mean did anyone ever tell

4 you, you know, that you had done something wrong

5 or, you know, that you didn't follow some sort of

6 procedure that you were supposed to or anything

7 like that, get a writeup or --

8   A.   No.  No, I believe not.

9   Q.   It sounded like what you were describing

10 was just someone telling you how to do your job.

11  A.   Exactly.  Training.  I was training.  It

12 was along the lines of training, yes.

13  Q.   That may seem like discipline, but --

14  A.   I wasn't written up.  I wasn't written

15 up for any reason during my -- or suspended.

16  Q.   Okay.  So you said, I believe, that you

17 stopped working at Woodley Cafe the first time a

18 few weeks after you started at Restaurant

19 Associates.

20  A.   Yes.

21  Q.   And then I think you had started to

Page 52

1 explain that you worked at Woodley Cafe another

2 time; is that right?

3   A.   Another time, around New Year's of 2005,

4 I would say.  Maybe December.  Maybe January, to

5 be exact, in January, after New Year's.  I was

6 also working a few hours at Woodley Cafe along

7 with my full-time job at Restaurant Associates.

8   Q.   So that would have been December, 2004

9 to January, 2005?

10  A.   Yes.

11  Q.   Okay.  And so about how many hours a

12 week would you say -- well, let's start with how

13 many weeks would you say you worked there during

14 that second time at Woodley Cafe.

15  A.   The second time, I would -- maybe two

16 months.  Maybe two months, by the time I got

17 another part-time job other than Woodley.

18  Q.   Okay.  So two months, and you said it

19 was part time?

20  A.   It was part time, yes.  My full-time job

21 was Restaurant Associates.

Page 53

1   Q.   So about how many hours a week would you

2 say you worked at Woodley Cafe during those two

3 months?

4   A.   Maybe ten.  Ten as a maximum.

5   Q.   Was it on any particular day of the week

6 or as needed, or...

7   A.   It was maybe on -- definitely on the

8 busy days, because it was slow season in general,

9 in the winter, and I would say maybe Fridays and

10 Sundays.

11  Q.   And how much were you getting paid at

12 Woodley Cafe at that time?

13  A.   Eight dollars.

14  Q.   Eight dollars an hour?

15  A.   An hour, yes, ma'am.

16  Q.   Did you have any benefits that time?

17  A.   No.

18  Q.   And was Danny your supervisor again?

19  A.   Yes.

20  Q.   Who was the manager of the whole

21 restaurant at that time?

14 (Pages 50 to 53)

**Rami Elhusseini**

Page 54

1    A.    I would say Omar Salami. Omar Salami is
2 the owner and the ultimate decisionmaker in that
3 establishment.
4    Q.    Did he manage the restaurant on a
5 day-to-day basis, if you know?
6    A.    I believe so, yes. I mean, every
7 decision was his at the end of the day. He was
8 not at the restaurant twelve hours a day, but it
9 was his decisions.
10    Q.    Who was the top manager who was at the
11 restaurant, usually?
12    A.    I would say one of them was called Fadi,
13 F-A-D-I, first name, and his last name, Saker,
14 S-A-K-E-R.
15    Q.    And what was his job title?
16    A.    Manager. Floor manager.
17    Q.    Did you say floor manager?
18    A.    Floor manager. Floor manager would be
19 the most appropriate title.
20    Q.    So he was the person who was in charge
21 of the restaurant?

Page 55

1    A.    I would say so, the dining hall, at
2 least. As far as -- anything but the kitchen.
3    Q.    Was there anybody else who was in charge
4 of the whole restaurant?
5    A.    Danny, the same person who was the
6 kitchen manager, would also be the general
7 manager.
8    Q.    So there is a kitchen manager, a floor
9 manager, and then the person who owns the
10 restaurant?
11    A.    Yes.
12    Q.    Is there anyone in between the owners
13 and the two managers?
14    A.    No, no. The general manager, the
15 kitchen manager, was also -- also had the capacity
16 of general manager, if you like. He could have a
17 general manager's decision.
18    Q.    Okay. So --
19    A.    And there was one more manager, if you
20 would like, just for the sake of having everything
21 on the record if you want to.

Page 56

1    Q.    Sure.
2    A.    His name is Mahmoud, M-A-H-M-O-U-D, and
3 I can't remember his last name.
4    Q.    And what was his title?
5    A.    Floor manager, too. I think.
6    Q.    So the second time you worked at Woodley
7 Cafe for those two months or so, did you get any
8 sort of discipline for any reason?
9    A.    No.
10    Q.    And the second time you worked at
11 Woodley Cafe, why did you stop working there?
12    A.    I got a -- I got a position at The
13 Diner, The Diner, D.C., that's what the
14 establishment is called, and they paid better. It
15 was closer to my -- where I lived, too.
16    Q.    Okay. So about when would you say you
17 got the job at The Diner?
18    A.    I would say March. March, that I can --
19 yeah, March.
20    Q.    Of 2005?
21    A.    Of 2005, yes.

Page 57

1    Q.    And was the job at The Diner part time
2 or full time?
3    A.    It was part time.
4    Q.    So about how many hours a week did you
5 work there?
6    A.    Maybe fifteen. Between fifteen and
7 twenty, to be exact.
8    Q.    And what days of the week did you
9 normally work there?
10    A.    I worked on the days that I had off from
11 Restaurant Associates, which were sometimes
12 Tuesdays and Thursdays. And I worked on weekend
13 nights.
14    Q.    What was your job at The Diner?
15    A.    I was a line cook.
16    Q.    And how would you describe your job
17 duties as a line cook?
18    A.    As a line cook, they also had a grill,
19 they had a salad station, and they had a flat
20 grill.
21    Q.    What's that?

15 (Pages 54 to 57)

Page 58

1    A.    A flat grill, which is basically a hot
2 plate that did not have partitions and actual
3 flames underneath. It's just a flat grill. If
4 you had -- if you had -- what do them call -- they
5 do them on a flat grill, where you fry an egg in
6 the middle of a bread piece, and that's kind of a
7 procedure that you did on a flat grill.
8    Q.    How much did you get paid at The Diner?
9    A.    At The Diner, I started with, I believe,
10 seven fifty an hour as a trainee. And once my
11 training was over, I believe I was getting nine
12 fifty an hour. Nine dollars an hour, excuse me,
13 nine dollars an hour. Eight fifty once the
14 training was over, it was eight fifty. The first
15 pay raise, once the training was over, was eight
16 fifty.
17    Q.    And when did you get the raise to eight
18 fifty?
19    A.    I believe -- I believe two months after
20 I had started working for The Diner.
21    Q.    Until May of 2005?

Page 59

1    A.    I believe so, yes. May would be fair
2 enough.
3    Q.    Then you mentioned you got another raise
4 to nine dollars an hour.
5    A.    Then I got another to nine dollars, yes.
6    Q.    When was that?
7    A.    Maybe in June.
8    Q.    Of 2005?
9    A.    Yes. A month -- not too far from the
10 first one. I believe so.
11    Q.    Then you got raise to nine dollars an
12 hour, were you still a line cook?
13    A.    I was still a line cook, yes. It was --
14 you just handle more stations. You still -- you
15 were still -- your duties were still called line
16 cook, but you just -- was expected to handle more
17 stations you. You weren't fixed to one station,
18 and this is how the promotions were sort of
19 dispensed.
20    Q.    Okay. Did you have any benefits when
21 you worked at The Diner?

Page 60

1    A.    They offered benefits if I had -- if I
2 would become full time with them.
3    Q.    So you didn't take benefits.
4    A.    No.
5    Q.    Because you were part time?
6    A.    I was still part time, yes.
7    Q.    Okay. So who was your supervisor at The
8 Diner when you started?
9    A.    The supervisor was called Marco Corenza,
10 Marco, M-A-R-C-O, and then Corenza, I don't know
11 how you write it. I used to spell it
12 K-O-R-E-N-Z-A, but I don't know if he spelled it
13 with a K or with a C.
14    Q.    Was he your supervisor the whole time
15 you worked at The Diner?
16    A.    Yes. Yes.
17    Q.    Were you ever disciplined, verbally or
18 in writing, for any reason when you worked at The
19 Diner?
20    A.    Not at that time. Not at the time that
21 we -- that I was working part-time. I did get a

Page 61

1 disciplinary -- we call them notice or action when
2 I became full-time later that year.
3    Q.    Okay. When did you start working full
4 time at The Diner?
5    A.    A week after I was terminated from
6 Restaurant Associates.
7    Q.    So when you became full time at The
8 Diner, about how many hours a week did you work?
9    A.    Forty hours, I would say, or a little
10 less.
11    Q.    And you would have become full time in
12 August of 2005?
13    A.    Yeah, I think. A week after -- I can't
14 remember if they fired me at the end of August,
15 like the last week of August, or in the beginning
16 of August, I forgot. But it wasn't later than a
17 week after I was officially terminated from --
18    Q.    Just so I'm clear about your work
19 history, you worked at the Woodley Cafe from April
20 of 2004 to September of 2004. Then you worked
21 again at Woodley Cafe between December of 2004 and

16 (Pages 58 to 61)

Rami Elhusseini

Page 62

1 January of 2005?

2    A.    And March, yes.  I started -- I went
3 back in, and the process of coming back was
4 between December and January, and then I worked
5 for them until I started working at The Diner,
6 which is in March, so that gives it maybe two
7 months of part-time at Woodley a second time.

8    Q.    So you worked part time at the Woodley
9 Cafe all the way up until you got the part-time
10 job at The Diner.

11    A.    Yes.

12    Q.    And then you worked part time at The
13 Diner starting in March of 2005 and then you
14 started working full time there about a week after
15 your termination from Restaurant Associates.

16    A.    Yes, correct.

17    Q.    Okay.  Then how long did you work at The
18 Diner?

19    A.    I worked at The Diner until a little
20 less than Thanksgiving of 2005.  Just before
21 Thanksgiving, I think I was terminated.

Page 63

1    Q.    What was the reason for your termination
2 from The Diner?

3    A.    I was -- disciplinary.  An altercation
4 between me and my manager, Marco Corenza, the one
5 I mentioned.

6    Q.    So you had an altercation with
7 Mr. Corenza and then that led to your termination
8 before Thanksgiving.

9    A.    Exactly.

10    Q.    And then after Thanksgiving of 2005, did
11 you get another job somewhere else?

12    A.    Yes.  I went back to Woodley Cafe.

13    Q.    And when was that?

14    A.    It was in -- it was right after New
15 Year.  Actually, before New Year, I was working --
16 I think I was working Christmas night, if I recall
17 correctly.

18    Q.    Is that when you started working at
19 Woodley Cafe?

20    A.    I was supposed to start in January, but
21 I started, maybe, a little earlier than that.

Page 64

1    Q.    So it would have been late December.

2    A.    Late December, I started back.

3    Q.    2005?

4    A.    Yes.

5    Q.    So the time you worked at Woodley Cafe
6 starting in late December of 2005, this is the
7 third time that you have worked at Woodley Cafe?

8    A.    Yes, correct.

9    Q.    So was that full time or part time?

10    A.    I wasn't full time yet, because it was
11 slow season.  I was working part time when I went
12 back.  It was in lieu of a full-time position.

13    Q.    So when you started in late December of
14 2005 at Woodley Cafe, about how many hours a week
15 were you working?

16    A.    It was probably 20.

17    Q.    And then when, if ever, did you become
18 full time?

19    A.    I never actually got 40 hours a week.
20 It was a maximum of maybe 25 hours a week, but I
21 never -- so technically speaking, I was not full

Page 65

1 time at Woodley Cafe ever when I came back for the
2 third time, but I was on call.  I was potentially
3 full time, I was available to be full time, had
4 there been a customer influx and need for me to be
5 full time.

6    Q.    Okay.  And are you still working at the
7 Woodley Cafe?

8    A.    No.

9    Q.    Okay.  So when did you leave the Woodley
10 Cafe?

11    A.    I was terminated in February, I would
12 say, of 2006.  Early February of 2006, I think.

13    Q.    So when you were at the Woodley Cafe for
14 the third time, were you working as a line cook
15 again?

16    A.    I was a line cook, yes.

17    Q.    Did you have the same job duties you had
18 the previous two times?

19    A.    Yes.

20    Q.    Okay.  How much were you getting paid
21 the third time you worked at Woodley Cafe?

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 66

1    A.    Eight dollars an hour.

2    Q.    And did you have any benefits there?

3    A.    No.

4    Q.    And was Danny your supervisor again?

5    A.    Yes.

6    Q.    And did you get any sort of discipline

7 for any reason?

8    A.    I got into -- I got into an altercation

9 with the manager and I was terminated ensuing that

10 altercation, yes.

11    Q.    So in February of 2006, you had an

12 altercation with your manager at the Woodley Cafe,

13 and that led to you being terminated.

14    A.    Yes.

15          MS. GOETZL:  Okay.  Why don't we go off

16 the record for a minute.

17          (Brief recess.)

18 BY MS. GOETZL:

19    Q.    Let's go back on.

20          Mr. Elhusseini, do you recognize that

21 document?

Page 67

1    A.    It's my handwriting.

2          MS. GOETZL:  All right.  Can you give it

3 to Mr. Tudor to mark as Exhibit 1, please?

4          (Deposition Exhibit No. 1 marked for

5          Identification.)

6          MS. GOETZL:  And for the record, this is

7 the application for employment with Restaurant

8 Associates that was filled out by Mr. Elhusseini

9 on September 3rd of 2004.

10 BY MS. GOETZL:

11    Q.    Mr. Elhusseini, did you submit your

12 employment application to Restaurant Associates in

13 person?

14    A.    Yes, I did.  Yes, I did.  I believe it

15 was after the second interview, if I'm not

16 mistaken.

17    Q.    Do you remember what date you submitted

18 your application?

19    A.    It was the 3rd of September, I believe

20 is correct.

21    Q.    Okay.  And you mentioned that it was

Page 68

1 after the second interview that you had.

2    A.    It would make sense, because that would

3 make sense, because I had the recollection of

4 getting in contact with them in August, and I

5 mentioned August, so it must -- maybe it was

6 because I saw them at the end of August and I

7 filled out the real application on the 3rd.  I'm

8 just trying to fit in August in all of this,

9 that's all.

10    Q.    How did you first learn that Restaurant

11 Associates was hiring?

12    A.    On the internet.  I saw an advertisement

13 on the internet with the new regional opening and

14 I just went there.  It was a walk-in, and I got a

15 first interview.

16    Q.    Who was your first interview?

17    A.    I believe it was Tara Peralta.  Peralta,

18 P-E-R -- alta.

19    Q.    And do you remember what date you had

20 that interview with Ms. Peralta?

21    A.    I mean, it could have been the end of

Page 69

1 August; it could have been on the 3rd, but maybe I

2 saw the ad in August, so I can't tell you exactly

3 when.  I can't remember that far.

4    Q.    But somewhere around the end of August,

5 beginning of September, 2004?

6    A.    I would say so, yes.

7    Q.    Do you remember how long your interview

8 with Ms. Peralta lasted?

9    A.    A good, maybe, twenty minutes.

10    Q.    And tell me as best you can remember

11 what you said and what Ms. Peralta said during the

12 interview.

13    A.    She asked me about -- asked me my

14 education.  She was interested that I was a

15 nutrition student, and she asked me about my

16 experience as a cook, and I remember it was a very

17 positive interview.  Ms. Peralta asked me to come

18 back for another interview.

19    Q.    Okay.  So at the end of the first

20 interview with Ms. Peralta, she asked you to come

21 in for another one?

18 (Pages 66 to 69)

**Page 70**

1    A.    I believe so, yes.

2    Q.    And was there a date set at that time

3 for the second interview?

4    A.    I can't remember if it was a date then

5 or if she said "We will contact you," and then I

6 was eventually contacted and asked to come back

7 for a second interview.

8    Q.    During your interview with Ms. Peralta,

9 do you remember her making any sort of remarks

10 that you thought were discriminatory?

11    A.    Absolutely not.

12    Q.    So then you come in for a second

13 interview.

14    A.    Yes.

15    Q.    And who was that with?

16    A.    Richard Hetzler, H-E-T-Z-L-E-R.

17    Q.    And what was his job title?

18    A.    He was the chef.

19    Q.    And what was Ms. Peralta's job title?

20    A.    Sous-chef.  She was basically

21 second-in-command, let's put it that way.  He was

**Page 71**

1 the boss and Tara was second in command.

2    Q.    About how much time would you say passed

3 between your interview with Ms. Peralta and your

4 interview with Mr. Hetzler, if you remember?

5    A.    Maybe a few days.  Maybe a few days, I

6 think, at the most.

7    Q.    And do you remember how long your

8 interview with Mr. Hetzler lasted?

9    A.    With Mr. Hetzler, probably another 20 or

10 25 minutes, too.

11    Q.    What do you remember talking with

12 Mr. Hetzler about?

13    A.    He also asked me about your likings and

14 dislikings in the cooking business, and also he

15 asked me about line service, how I felt about it,

16 an I clearly remember him asking me what would be

17 a major change for me from my old job to the new

18 job that I would be getting, had I gotten it with

19 Restaurant Associates, and I told him that it

20 would be different because it would be on the

21 ground kitchen, the museum was on the ground, and

**Page 72**

1 he said that I wouldn't be on the ground, because

2 I would be a line server and I would be seeing a

3 lot of people.

4    And that's what I most remember, that

5 was most remarkably what I remember from the

6 interview with Mr. Hetzler.

7    Q.    Okay.  So he told you that the line

8 server job was above ground and --

9    A.    Yes, it was --

10    Q.    And did he tell you anything about what

11 the job duties were or anything like that?

12    A.    We did not go into the specifics.  He

13 said that I would get the training, but most of my

14 duties would be along the serving line, or at

15 least might be at the serving line at some point,

16 depending on how they -- how they -- where they

17 judged me most efficient.

18    Q.    Did Mr. Hetzler make any sort of remarks

19 during your interview that you thought were

20 discriminatory?

21    A.    Absolutely not.

**Page 73**

1    Q.    So how soon after your interview with

2 Mr. Hetzler did you actually get a job offer?  Or

3 did you get it during the second interview?

4    A.    I might have gotten it after the second

5 interview, yes.  I believe so.  I couldn't tell

6 you for sure, but I'm almost -- I'm almost

7 positive that the second interview meant that it

8 was -- the job was given; it was just a question

9 of deciding whether I would be a cook or a line

10 server.

11    Q.    Okay.  So how long after your interview

12 with Mr. Hetzler did you actually get a job offer?

13    A.    I definitely started -- probably -- I

14 mean, early September, because the opening was

15 September 21st, the opening of the museum was

16 September 21st, if I remember correctly, and we

17 had been in training for a good three weeks.  Or

18 two weeks, just to be on the safe side.  I would

19 say that we had trained two weeks before the

20 opening day on September 21st.  So that would give

21 us maybe the 8th?

19 (Pages 70 to 73)

Rami Elhusseini

Page 74

1    Q.   Okay.  So you actually started your job
2 as a line server or started training to become --
3    A.   I started as a trainee, yes.
4    Q.   So you started as a trainee, your
5 recollection is, two weeks before the museum
6 opened?
7    A.   Yes, ma'am.
8    Q.   Okay.  And the job you were offered was
9 line server, correct?
10   A.   Yes.  Yes.
11   Q.   And you started at the line server job.
12   A.   And I accepted that position, yes.
13   Q.   While you worked at Restaurant
14 Associates, did you ever have any job other than
15 line server?
16   A.   With Restaurant Associates?
17   Q.   Yes.
18   A.   No.
19   Q.   And what was your pay when you started
20 working for Restaurant Associates?
21   A.   Ten dollars an hour.

Page 75

1    Q.   And did you get any benefits from
2 Restaurant Associates?
3    A.   I didn't get them until a few months
4 after the fact, but, yes, I was enrolled for
5 benefits and I was granted the possibility of
6 getting them.  But we didn't get them when we
7 first started; we got them a few months after --
8 after we got started.  It's company policy.
9    Q.   There is some sort of waiting period; is
10 that what you're saying?
11   A.   For the benefits to kick in, there is a
12 certain amount where you have to pay ahead for a
13 few months and then after that, the benefits kick
14 in and you eventually enjoy them.
15   Q.   So if you started in, say, September 8th
16 or whatever it was, when did your benefits kick
17 in, if you remember?
18   A.   December.
19   Q.   December?
20   A.   December.
21   Q.   And what benefits did you get?

Page 76

1    A.   Medical insurance.
2    Q.   Anything else?
3    A.   No.
4    Q.   Was anything else offered?
5    A.   I believe they offered a -- some sort of
6 a 401K, but the pay was not as -- it wasn't enough
7 to invest in another form of --
8    Q.   So you could have participated in the
9 401K, but you declined?
10   A.   I believe I could have.  I believe I was
11 offered the possibility.  I did not look into the
12 fine print to see if I had to be a salaried
13 employee to participate in that, but I believe
14 that I was, there was a possibility that I could
15 have enrolled in it, had I wanted to.
16   Q.   Okay.  When you started working at the
17 museum, what were your workdays and hours?
18   A.   It was six days a week from seven in the
19 morning to sometimes seven at night.  It depends
20 on if I'm -- it depended on how busy the shift was
21 or how rigorous the training day was.

Page 77

1    Q.   So which day of the week did you not
2 work on?
3    A.   I believe that I had, maybe, Monday off,
4 if I'm not mistaken, because I was -- I think I
5 asked for Monday off so I could attend school.
6    Q.   Okay.  So the schedule that you just
7 described, the six days a week, seven a.m. to
8 seven p.m., did that continue the entire time that
9 you worked for Restaurant Associates?
10   A.   No, not at all.  It was maybe -- the
11 seven to seven probably was only on certain days.
12 We definitely started at seven in the morning
13 during the first week or two weeks of training.
14 We had to get used to being there at seven in the
15 morning in case we get hired as line cooks, as
16 kitchen cooks, instead of line servers, then we
17 would -- part of the training was getting us to
18 eventually be there at seven in the morning and
19 start working at that time.
20   Q.   So after your training period was over,
21 what days and hours did you normally work?

20 (Pages 74 to 77)

Rami Elhusseini

Page 78

1    A.    And then once my kitchen training was
2  over, I was asked to come in at nine in the
3  morning, instead of seven.
4    Q.    And how late did you usually work?
5    A.    And then if you started at nine and
6  then -- normally, you would be out by six o'clock,
7  five or six o'clock, but due to the busy schedule
8  during the opening season and the heavy training,
9  sometimes we would stay more than -- later than
10 six in the evening.  Sometimes you would -- I have
11 stayed until nine at night or even ten at night
12 sometimes at the museum, and on opening night, it
13 was a 24-hour open.
14   Q.    Okay.  So after the training period, did
15 you continue to work six days a week?
16   A.    During the opening month, I believe so,
17 yes.  Maybe -- maybe the first week, just to be on
18 the safe side, probably.  Yeah, we could not
19 afford to have two days off in the beginning,
20 because it was the very busy season and we had to
21 be there six days a week.

Page 79

1    Q.    So after the opening month, what would
2  you say your regular hours and days were?
3    A.    After that, once the schedule -- the
4  normal schedule would definitely not exceed --
5  they avoided overtime, so we definitely would not
6  have more than 40 hours a week and we would have
7  two days off.  And then on the slower days, we
8  would have three days off and much less than 40
9  hours.
10   Q.    So did you have a regular schedule that
11 you worked, or did it change every week?
12   A.    It wouldn't change every week; I would
13 say it changed every couple of months.  The busy
14 season in the restaurant business usually goes by
15 month, by a couple of months.  So it's a couple of
16 months of slow business and then a couple of
17 months of medium business and then a more busy
18 season.
19   Q.    So after the opening month, what was
20 your schedule like?
21   A.    I would say nine to -- nine to six with

Page 80

1  two days off for a good two months after the
2  opening.  From, I believe, September was --
3  September, and the October and November was
4  definitely busy, and then in December, the
5  business started to dwindle, it was smaller, and
6  by New Year's, we were definitely getting three
7  days off and less than 35 hours a week.
8    Q.    So that started in January of 2005?
9    A.    Yes, that would be fair to say.
10   Q.    How long did that last for, if you
11 remember?
12   A.    I would say March.  March.  Yes.  March
13 would -- at the latest would be the slow season.
14   Q.    And then what was your schedule like
15 starting in March of 2005?
16   A.    And then after that, it came back to
17 being nine to 5:30 five days a week.  Forty hours
18 a week, two days off.
19   Q.    And did that schedule continue until you
20 were terminated?
21   A.    I believe so, yes.

Page 81

1    Q.    Okay.  So you mentioned earlier that you
2  thought you had Mondays off?
3    A.    I did have Mondays off.  Depending on
4  the school -- the school days.  Sometimes I would
5  have Mondays off and at times I would have
6  Tuesdays and Thursdays off when we started to get
7  two days off.
8    Q.    So did you request the days off that you
9  wanted based on your school schedule?
10   A.    I would sit down with Richard Hetzler
11 and Tara Peralta and we would discuss when would
12 be a good time to schedule my days off.  And
13 basically, according to that, I would schedule my
14 courses in school, according to the days off that
15 would -- that they would prefer me to have.
16       So if they said it better for us to get
17 Tuesday and Thursdays instead of Mondays and
18 Wednesday days, then you would do that and I would
19 register for the courses that would be given on
20 Tuesdays and Thursdays.
21   Q.    So you coordinated your school and work

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 82

1  schedule.

2      A.    Yes, according to my work schedule.  I

3  coordinated the school according to work.

4      Q.    Okay.  I understand.

5          Now, did the hours that you worked vary

6  depending on which station you were working at?

7      A.    Some stations, I did work less,

8  depending on the influx of customers.  In general

9  in the restaurant, some people did go -- did leave

10 early or have to leave early because their station

11 was not a busy station.  In my situation, I was

12 scheduled to work on a station that opened the

13 latest.

14     Q.    Okay.  I understand there is a number of

15 stations at the museum; I actually have not been

16 there myself yet, but I have heard the food is

17 good.  Can you tell me the names of the different

18 food stations that they have and then the hours

19 that are associated with each one?

20     A.    Sure.  Normally, the whole -- the

21 cafeteria, I believe, is open from ten --

Page 83

1  officially from ten to five.  Sometimes they would

2  schedule events that go later than five o'clock or

3  five-thirty, depending on the museum schedule for

4  certain groups.

5          The stations were basically divided in

6  three big blocks, a big block they called the

7  plains, which served a lot of fast food and a lot

8  of, basically, popular items, I would say, like

9  Buffalo chile and Buffalo burgers and French fries

10 and items like that, and then we had a sort of

11 taco station, which also included a more -- how do

12 you say -- like maybe the more expensive items at

13 that station, like Buffalo steaks and fish, and

14 then a third station that had turkey and -- like

15 specific -- I'm trying to think of specific items

16 that would - it wasn't -- the not-so-popular

17 station, if you like, despite the fact of turkey

18 selling a lot, but however, that station would be

19 one of the stations that would be scheduled to

20 close earlier than the others.

21     Q.    So far, I have got the plains station,

Page 84

1  the taco station and the turkey station.

2      A.    Yes.

3      Q.    Were those the only three stations?

4      A.    That's the only three blocks.  The

5  turkey station and the taco station had two

6  stations and were subdivided into two, but there

7  were the three -- physical, separate blocks were

8  one big plains station with the fast food, one

9  with the taco and the fish and one with the turkey

10 and the food or what-have-you.

11     Q.    What hours were the plain stations

12 normally open?

13     A.    The plain stations would normally be

14 open from -- we would be scheduled from nine to

15 five-thirty to work on it.  The people working on

16 the taco station sometimes would be scheduled from

17 nine to four, and the people on the turkey station

18 would sometime be scheduled from nine to three in

19 the slow season.  Three in the afternoon.

20     Q.    Okay.  And were the hours that you just

21 listed for those three stations, were those slow

Page 85

1  season hours or --

2      A.    They were definitely slow season hours.

3  In the busy season, everybody went to five-thirty

4  in the afternoon unless there were scheduled

5  groups to come in after closing hours, which was

6  frequent.

7      Q.    Okay.  So just so I understand, during

8  the slow season, the turkey station would be open

9  from nine to three, but in the busy season from

10 nine to five-thirty?

11     A.    Yes, correct.

12     Q.    I'm sorry, that's not even the right

13 thing to say.  Not that the station was open, but

14 if you were working at that station, those were

15 the hours that you worked.

16     A.    Exactly, or you were scheduled at those

17 hours, yes.

18     Q.    Okay.  Was there one particular station

19 that you usually worked at, or did you rotate

20 amongst them all?

21     A.    I would -- we were supposed to rotate.

22 (Pages 82 to 85)

**Rami Elhusseini**

Page 86

1 Everybody was expected to know all the stations.
2 However, I was definitely more scheduled to work
3 on the plains station, because it had the hardest
4 influx of customers, maybe because of the position
5 in the cafe, being the first station that you come
6 into, maybe the items that they carried on that
7 station, but for one reason or another, I was the
8 station that was hardest hit, and this is where I
9 was scheduled most of the time, almost a normal
10 rate. I would be expected to be at that station.
11      Q.    Okay.
12      A.    But however, if another station got to
13 be busy and they needed help, then I would rotate
14 and help out in a busy station where a line would
15 be forming if they need help.
16      Q.    So was that normal, to move from station
17 to station during a shift if it was needed based
18 on how many customers there were?
19      A.    It was -- it was customary for some
20 workers to do it. It was -- it was particularly
21 expected of me to do it. I would also shift from

Page 87

1 being -- after my employment, after my training
2 and employment had started, I was also training in
3 the kitchen as a kitchen cook, and then I would be
4 expected to work at the kitchen and then rotate at
5 any station or anywhere I would be needed, for
6 this matter. So for me, it was part of my regular
7 work description to --
8      Q.    Okay. And you mentioned that there were
9 other employees like yourself who would rotate
10 between stations as needed.
11      A.    Yes. Yes, there would be a few --
12      Q.    Okay. I think that you answered this
13 already, but you were still working at the Woodley
14 Cafe when you started working for Restaurant
15 Associates, right?
16      A.    In the beginning, yes, ma'am.
17      Q.    And when you started working for
18 Restaurant Associates, what hours and days were
19 you working at the Woodley Cafe?
20      A.    I would say maybe Fridays and Sundays,
21 just to be on the safe side. I mean, in the

Page 88

1 beginning, when I first started, I -- probably a
2 few more days, probably Wednesdays and Fridays and
3 Sundays, when I was giving my notice, because I
4 couldn't leave completely at the beginning and I
5 had to keep some form of schedule with Woodley
6 Cafe. But once my notice was over, then it was
7 less than that, it was probably two days, and
8 sometimes just Sunday.
9      Q.    And I think you mentioned that you were
10 going to school when you started working at
11 Restaurant Associates.
12      A.    In the beginning, yes.
13      Q.    And when you went to Restaurant
14 Associates to apply for your job, had this
15 semester already started?
16      A.    I believe not, no. Probably not, no.
17 It was going to begin with, I think, with -- as my
18 employment was starting, so I told them that I
19 would have to -- I believe the semester started in
20 training, when I was still in training, because I
21 remember leaving the training and going to school.

Page 89

1      Q.    And where were you going to school?
2      A.    Howard University.
3      Q.    And what classes were you taking?
4      A.    I was at -- I believe it was intro to
5 nutrition or -- yeah, either intro to nutrition or
6 nutrition principles or something. Policy course,
7 that's what it was.
8      Q.    I'm sorry.
9      A.    It was a course on the policies of the
10 different nutritional agencies that a nutrition
11 major would be expected to work with.
12      Q.    So when you were doing your training for
13 Restaurant Associates, you would leave the
14 training so you could go to your class; is that
15 right?
16      A.    When I was permitted to do so, yes, I
17 would do that, yes. I would ask permission to
18 leave training and go to attend my courses and
19 then go back to training, if I was permitted to,
20 and when I was not, I didn't.
21      Q.    When you were not --

23 (Pages 86 to 89)

Rami Elhusseini

**Page 90**

1   A.   When I was not permitted to attend my
2 class, I didn't. I didn't attend my class.
3   Q.   What days and times was your nutrition
4 class, if you remember?
5   A.   It was a Monday, that particular class
6 during training was Monday at eleven in the
7 morning, I believe. If I'm not mistaken.
8   Q.   And how many hours was it?
9   A.   It was a one-hour class.
10   Q.   So eleven to twelve?
11   A.   To twelve, yes. I would usually offer
12 to leave -- to leave by 10:30 and be back by 12:30
13 or --
14   Q.   Okay. I thought you testified earlier
15 that you had Mondays off from work.
16   A.   When we started getting days off, yes,
17 it was Mondays. After the busy training and
18 season were over and done with, then, yes, I would
19 have all Monday to go at any time I wanted to
20 school. But before that, it wasn't possible for
21 me to take my days off, so I couldn't. Sometimes

**Page 91**

1 I had to go both to the training, and I would ask
2 permission to leave and attend class. If I was
3 given that permission, I would go, and if I
4 wasn't, then I couldn't.
5   Q.   So how long into your employment with
6 Restaurant Associates did you start getting
7 Mondays off?
8   A.   I would say a good month. I would say I
9 missed -- I definitely missed a good, maybe, four
10 classes.
11   Q.   Because you were at work?
12   A.   Because, yes, because I had to be at
13 work, yes.
14   Q.   So you're saying that you asked for
15 permission four times to go to class and you were
16 not allowed to go?
17   A.   Yes. Yes. I would say four times as an
18 estimation, as a safe estimation.
19   Q.   How many classes were there total during
20 the semester?
21   A.   At that particular semester, that was

**Page 92**

1 the only class I was attending, so it would have
2 been possible for me to attend all of the classes.
3   Q.   What I meant was, if you missed four of
4 the classes, how many did you go to?
5   A.   I was scheduled for just this one
6 course, if you'like, and that course was only
7 given on Mondays, so when I missed it, I didn't go
8 to any.
9   Q.   Right. How many times during the
10 semester did that class meet?
11   A.   A semester is maybe an estimation of
12 four months, and it's maybe four times a month, so
13 we would say at least thirteen times, we would
14 have thirteen classes that we had to attend. And
15 of those thirteen, I did miss an estimate -- a
16 good estimate of four.
17        But the problem is, they were -- I mean,
18 if you care to have it on the record, that they
19 were in the beginning of the classes and they were
20 one after the other. I would have to miss two
21 classes, one after the other.

**Page 93**

1   Q.   Did you go to school in the spring
2 semester of 2005?
3   A.   Yes, I did.
4   Q.   And was that also at Howard?
5   A.   I was still at Howard, yes, ma'am.
6   Q.   And what classes did you take then?
7   A.   It was, I think, food science. Food
8 science or meal management, one or the other.
9   Q.   How many classes did you take?
10   A.   I registered for two, but I couldn't
11 have two. I did not have the -- I was not given
12 the days off, so I had to end up with only one.
13   Q.   In the spring of 2005?
14   A.   Yes.
15   Q.   And so you ended up taking one class in
16 the spring semester of 2005?
17   A.   Correct.
18   Q.   And what dates and times was that class
19 scheduled to meet?
20   A.   The class was scheduled on Tuesdays and
21 Thursdays and it was scheduled to meet from, I

24 (Pages 90 to 93)

Rami Elhusseini

**Page 94**

1 would say, nine to 11:50.

2     Q.   Did you say 11:15?

3     A.   Fifty, five-zero.

4     Q.   Nine to 11:50, Tuesdays and Thursday?

5     A.   Yes. It included a lab, and that's why

6 it went longer.

7     Q.   So in the spring semester of 2005, did

8 you have Tuesdays and Thursdays off from work?

9     A.   I would say so, yes.

10    Q.   So you had no problem going to that

11 class.

12    A.   I did not, no. We agreed to the class

13 schedule with Tara and Richard before I even

14 registered for the class.

15       Oh, we -- may I add something? I didn't

16 say that I did drop the class. The class that I

17 had and had to drop was during the first semester

18 in the fall, when I was going to training, and

19 then -- and I believe I was registered for two

20 classes and I had to drop one of them, and I ended

21 up attending the class that was given on Monday.

**Page 95**

1 I apologize for the mixup, but now that it comes

2 to mind.

3       So I was registered for more than one

4 class in the fall, and the classes did convene on

5 Mondays and Wednesdays, but I was not allowed -- I

6 had to drop one of them; I was only left with one

7 that was given on Monday, and of those classes, I

8 missed four. After dropping a whole schedule, a

9 whole registered course altogether that I was

10 scheduled to attend in the fall.

11    Q.   Okay. So then are you still saying that

12 you had registered for two classes in the spring,

13 but ended up only taking one?

14    A.   And it was only one, so the registration

15 for two classes was in the fall, it was not in the

16 spring. In the spring it was only one class, and

17 we agreed to and we figured out the schedule

18 together with Richard and Tara so that what

19 happened in the fall would not happen again in the

20 spring.

21    Q.   Okay. Did you receive an employee

**Page 96**

1 handbook when you started at Restaurant

2 Associates?

3     A.   Yes, I did.

4     Q.   Is that the handbook that you got?

5 (Proffers document to the witness.)

6     A.   I believe so, yes. Yes.

7       MS. GOETZL: Can we get that marked as

8 Exhibit 2, please?

9       (Deposition Exhibit No. 2 marked for

10       Identification.)

11 BY MS. GOETZL:

12    Q.   And do you recall signing that receipt

13 for the employee handbook?

14    A.   I sure do.

15       MS. GOETZL: Can we get that marked as

16 Exhibit 3, please?

17       (Deposition Exhibit No. 3 marked for

18       Identification.)

19 BY MS. GOETZL:

20    Q.   Did you read the employee handbook?

21    A.   Yes, I did.

**Page 97**

1     Q.   Did you read it before you signed the

2 receipt of acknowledgment?

3     A.   I believe that we read through it with,

4 I think, the person who is in charge of lecturing

5 on it, and then after that, we signed the paper

6 and we did give it back at the end of the meeting,

7 yes. So it would be after having read the

8 booklet, yes.

9     Q.   So you were familiar with the Equal

10 Employment Opportunity policy that's on page one

11 of the handbook?

12    A.   Yes, I would be.

13    Q.   And you were familiar with the open door

14 policy that's on page two of the handbook?

15    A.   Yes, sure. Yes.

16    Q.   So you understood that if you were

17 having some sort of problem at work, you could

18 talk to your direct supervisor or the person above

19 your direct supervisor or someone at human

20 resources.

21    A.   Yes. It was also circulated several

25 (Pages 94 to 97)

Page 98

```
 1  times, the open door policy, and we were given
 2  even more specific information than here, we were
 3  given phone numbers and web sites and much more
 4  specifics about it at several other occasions
 5  other than this first time.
 6      Q.   And you were familiar with the workplace
 7  violence policy that's on page 19?
 8      A.   Yes, I was.
 9      Q.   And you familiar with the standards of
10  behavior that are on pages 19, 20 and 21 of the
11  handbook?
12      A.   Yes, I was.
13      Q.   You mentioned that someone was lecturing
14  to you about the employee handbook?
15      A.   Yes.  What I meant was, someone was
16  heading the meeting when the employee handbook was
17  given out, and someone -- I believe it was Richard
18  Hetzler, who was going through the handbook step
19  by step with us so everybody would be in the know.
20      Q.   Was that during your orientation for
21  training when you started working?
```

Page 99

```
 1      A.   Yes.
 2      Q.   Do you recognize this document?
 3  (Proffers document to the witness.)
 4      A.   I believe so, yes.  I believe I'm
 5  familiar with the content and then the
 6  relationship with -- with the employer.
 7      Q.   Have you seen that document before?
 8      A.   I believe so, yes.  I'm not sure if I
 9  was given -- if I seen it when I first started
10  working for Restaurant Associates, but at some
11  point -- it looks familiar.  It could have been
12  one of the discovery request documents.
13      Q.   Well, you will see that there is a
14  number at the corner, and that means that I did
15  produce it to you in discovery.
16      A.   Exactly.
17      Q.   But what I'm asking you is, did you see
18  that document while you were employed by
19  Restaurant Associates.
20      A.   I will answer yes, just for the sake
21  of -- yes, I was expecting to get the treatment
```

Page 100

```
 1  promised in this document, yes.
 2      Q.   Okay.  So you do remember seeing this
 3  document while you were working at Restaurant
 4  Associates?
 5      A.   I will say yes.
 6           MS. GOETZL:  Okay.  Can you give it to
 7  Mr. Tudor to mark as Exhibit 4?
 8           (Deposition Exhibit No. 4 marked for
 9            Identification.)
10  BY MS. GOETZL:
11      Q.   Do you recognize that document?
12  (Proffers document to the witness.)
13      A.   I believe that the contents of this
14  document were provided at some point or another in
15  circulation provided by the employer, yes.
16      Q.   Did you ever see that document while you
17  were working for Restaurant Associates?
18      A.   I'm going to answer yes, too.
19           (Deposition Exhibit No. 5 marked for
20            Identification.)
21
```

Page 101

```
 1  BY MS. GOETZL:
 2      Q.   Do you recognize that document?
 3      A.   Yes, I do.
 4      Q.   Where have you seen that document?
 5      A.   I have seen it during my employment with
 6  Restaurant Associates.
 7           (Deposition Exhibit No. 6 marked for
 8            Identification.)
 9  BY MS. GOETZL:
10      Q.   Did you read that document that's been
11  marked as Exhibit 6?
12      A.   Yes, I did.
13      Q.   Do you recognize that document?
14      A.   Yes, I do.
15      Q.   Where do you recognize it from?
16      A.   From my employment, during my employment
17  with Restaurant Associates.  I believe that's
18  where I got the number for the open door policy
19  that I used to communicate regarding the issue
20  with -- with regard to my employment.
21      Q.   So you got this interoffice memo while
```

26 (Pages 98 to 101)