# EXHIBIT A

# PART 2 OF 3

Page 102

1 you were working for Restaurant Associates?

2     A.     Yes, I believe so, yes.

3     Q.     And did you read that document?

4     A.     Yes, I did.

5          MS. GOETZL:  Can we get that one marked?

6          (Deposition Exhibit No. 7 marked for

7          Identification.)

8 BY MS. GOETZL:

9     Q.     The documents that have been marked at

10 Exhibit 4, 5, 6, and 7, were those documents or

11 the contents of those documents explained to you

12 during your training and orientation when you

13 first started working at Restaurant Associates?

14     A.     Briefly.

15     Q.     Briefly.  Okay.

16          What were your job duties when you

17 started as line server?

18     A.     My duties were to prepare the station,

19 serve the station and then basically clean it, to

20 begin with, clean it and prepare it to prepare for

21 the day, get it ready for the day, serve it and

Page 103

1 clean it while I was on it and then make sure that

2 the proper temperature and the serving methods are

3 being taken care of, and then cleaning it after I

4 was done and then cleaning the actual -- the

5 physical place, like the floor and the -- and the

6 areas where we used, for like, the heaters and

7 utensils that we used to serve.

8     Q.     Did your job duties change at all while

9 you were a line server?

10     A.     They changed in the sense that I was

11 familiar with more stations, that I got to serve

12 more than one station, and that I got kitchen

13 training as a cook and that I got to handle the

14 temperature logs, but I -- they never changed in

15 terms of official promotion, as in promotion

16 title.

17     Q.     Okay.  So your job title the whole time

18 you worked for Restaurant Associates was line

19 server.

20     A.     Yes.

21     Q.     But as you worked there, you got more

Page 104

1 experience and got to work at more stations and

2 got more responsibility.

3     A.     Yes.  There was more expected of me.

4 Some of it was because I asked for it and some of

5 it because we were expected to.  At some point the

6 schedule had to be modified in order to

7 accommodate the fewer number of employees; for

8 instance, the number of employees who worked at

9 the dish room, and then at some point during my

10 employment, I was also expected to get the china

11 or the serviceware that I needed at my station,

12 too.  That's one of changes that would have come

13 later during my employment.

14     Q.     So are you saying that as fewer people

15 worked at the museum, say during the slow season,

16 you got more responsibilities to do?

17     A.     Yes, yes.  We shared -- we shared

18 more -- we shared more responsibilities during

19 employment.

20     Q.     Okay.  Did you receive any raises when

21 you worked for Restaurant Associates?

Page 105

1     A.     I believe I did receive a raise after,

2 maybe, six months of my employment, and I can't

3 remember if it was twenty cents or ten cents, but,

4 I mean, it wasn't as expected.  I thought I would

5 be getting more, and I didn't.

6     Q.     You thought you would be getting a

7 bigger raise?

8     A.     I expected to get a bigger raise, yes.

9 I was under the impression that I might be getting

10 a bigger raise than the one I got.

11     Q.     Okay.  And I said you think that was

12 after you had worked there for about six months.

13     A.     Yes, after six month, at least.

14     Q.     Who was your direct supervisor when you

15 started working as a line server?

16     A.     I believe it was Tara, Tara Peralta.

17     Q.     And did you have the same supervisor the

18 whole time you worked for Restaurant Associates?

19     A.     There were several supervisors that we

20 were expected to answer to, and they were the same

21 throughout my employment.  Tara was definitely the

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

Page 106

1 official sous-chef that we had to answer to, and
2 sometimes we would also have to answer to a floor
3 manager if that floor manager happened to be
4 present and asked of us to do anything.
5     Q.   Who was the floor manager?
6     A.   It could be someone who just -- who
7 happened to be a station line server, but also a
8 floor manager, like Flo Long -- that's F-L-O and
9 then Long -- and she was also kind of floor
10 supervisor, and we had to answer to her.  And
11 sometimes it would be a floor manager like someone
12 working at the management office, and it would be
13 a manager and he would have the capacity of a
14 floor manager, and then you would have to answer
15 to them, too.
16     Q.   And who would that be?
17     A.   Like -- anybody in higher management.
18 It could be Larry Ponzi, it could be Courtney,
19 Ms. Courtney -- I forgot her last name; it could
20 be -- what's her name -- Michelle Perry; Alphonso
21 something, I forgot his name.

Page 107

1     Q.   But did you consider Tara Peralta your
2 direct supervisor?
3     A.   Yes.  Yes.  I would definitely refer to
4 Tara whenever I had any issues that required my
5 dealing with a supervisor.  When it came to my
6 days off or my training, my kitchen training,
7 anything that I would ask, I would talk to Tara
8 about it.
9     Q.   Okay.  So if you needed to change your
10 schedule or get a day off or change your hours,
11 Mrs. Peralta is the one that you would talk to.
12     A.   Ms. Peralta.  I would refer to
13 Ms. Peralta.  Sometimes she would tell me go
14 straight to Richard Hetzler and sometimes I would
15 go straight to Richard Hetzler, but I just got
16 used to dealing with Tara.
17     Q.   Were you ever disciplined verbally for
18 any sort of performance problem when you worked as
19 a line server?
20     A.   Not to the best of my recollection.
21     Q.   Were you ever disciplined verbally for

Page 108

1 any reason when you were a line server?
2     A.   Not that I recall.  I was called into
3 the office with regards to an issue, but I do not
4 believe that I was -- that I was verbally
5 disciplined.  I was called in for the chef to kind
6 of investigate an altercation that had taken
7 place, a verbal altercation that had taken place
8 at the serving station, but I was not officially
9 ever told that that was a disciplinary action.
10     Q.   Who was the altercation with?
11     A.   With Chris Spangler, the same person
12 that I had the trouble with that led to the
13 termination.
14     Q.   We will get to that a little bit later.
15     A.   Sure.
16     Q.   Were you ever disciplined in writing for
17 any sort of performance problem when you were a
18 line server?
19     A.   No.
20     Q.   Were you ever disciplined in writing for
21 any reason when you were a line server?

Page 109

1     A.   No.
2     Q.   Do you recall ever being counseled that
3 your actions could be perceived as harassment by
4 your coworkers?
5     A.   No.
6     Q.   Was your performance ever evaluated
7 when you worked for Restaurant Associates?
8     A.   Yes.
9     Q.   Do you recognize that document?
10     A.   Yes, I do.
11         MS. GOETZL:  Can we get that marked as
12 Exhibit 8?
13         (Deposition Exhibit No. 8 marked for
14         Identification.)
15         MS. GOETZL:  The document that's been
16 marked as Exhibit 8 is a Restaurant Associates
17 hourly semi-annual review form for Mr. Elhusseini
18 dated May 7th of 2005.
19     Q.   Now, Mr. Elhusseini, who did your
20 semi-annual evaluation?
21     A.   I believe it was Tara Peralta.

28 (Pages 106 to 109)

**Rami Elhusseini**

1    Q.    On the line where it says director/chef

2 in section three, signatures, you think that's --

3    A.    I think it was her, yes.  I think it was

4 Tara.

5    Q.    Did you and Ms. Peralta ever discuss

6 your evaluation?

7    A.    We discussed it when we were doing it,

8 but I never talked about it or the reasons that it

9 was the way it was.

10    Q.    So are you saying that you and

11 Ms. Peralta were sitting down together while she

12 filled out this document?

13    A.    Yes, she would be telling me about the

14 scores and what they meant, and then she signed it

15 and I was asked to sign it and that was my

16 evaluation.

17    Q.    Are you sure it was Ms. Peralta and not

18 Mr. Hetzler?

19    A.    I'm almost sure that I sat down and

20 talked about it with Ms. Peralta, yes.  Unless my

21 memory completely betrays me, but I'm almost sure

1 it was Tara.

2    Q.    Do you recognize that handwriting that's

3 in section two?

4    A.    I was under the impression it was her.

5 I remember being called to the office and I sat

6 down with her and we talked about it.  I don't

7 remember talking with Richard about this.  But it

8 might have been, maybe, Richard who was supposed

9 to fill it out before I got into the office and I

10 talked about it with Tara.  I don't know.  I can't

11 be sure.

12    Q.    But as far as you can recall, you

13 discussed this evaluation with Ms. Peralta.

14    A.    Yes, I signed this in front of

15 Ms. Peralta, yes.

16    Q.    And did you agree with this evaluation

17 of your performance?

18    A.    No.

19    Q.    But you didn't write any comments in the

20 comments section.

21    A.    No.  No, I didn't, either.  I thought --

1 I just took whatever comments were given me and I

2 just thought it would be kind of a good thing to

3 just advance from there, and I also, to be honest,

4 I was under the impression that the appreciation

5 wasn't up to my expectations maybe on purpose,

6 because I would eventually be transferred to the

7 kitchen, and then whatever promotion I had in mind

8 would be given to me then.  But since I was still

9 a line server, and maybe I was under the

10 impression that they didn't want my colleagues to

11 feel bad about me getting two promotions in a row,

12 so I thought maybe this was sufficient sort of

13 a -- it was -- compared to my work over there,

14 this is kind of a poor evaluation compared to my

15 real work over there, and I thought maybe it was

16 okay, because I would eventually get the real

17 promotion I was intending to get once I would be

18 hired as a cook.

19         So I didn't discuss it much.  I thought

20 it was just to appease, if you like, my coworkers

21 in case they got to say "How come he gets

1 promotion now and to the kitchen and we don't?"

2    Q.    Okay.

3    A.    This is why; this would have been my

4 personal reasons for not dwelling over the

5 evaluation.

6    Q.    Okay.  So basically, you did not agree

7 with this evaluation of your performance, but you

8 decided that you would not make any comment on

9 here.

10    A.    That I would get better, anyway.  I

11 decided to get better, regardless.

12    Q.    Okay.  So when you met with Mrs. Peralta

13 to discuss your performance evaluation, did

14 Ms. Peralta make any comments that you thought

15 were discriminatory?

16    A.    Thinking back, thinking back, I would

17 think that the whole evaluation process did stem

18 from a discriminatory predisposition that I

19 believe Ms. Peralta was somewhat requested to do.

20    Q.    And my question was, did she make any

21 discriminatory comments during your meeting about

**Page 114**

1 your evaluation.

2    A.    Other than the scores that were filled

3 in reflecting a lower level than the reality,

4 Ms. Peralta did not utter any discriminatory

5 words, no.  But the scoring, with comparison to

6 the reality of my work level is, was

7 discriminatory, yes.

8    Q.    Have you ever seen an evaluation form

9 like Exhibit 8 for any other Restaurant Associates

10 employee?

11    A.    I believe that I asked about it, about

12 other employees, about their scores, but I can't

13 say for sure that I did take a look in details at

14 another employee's evaluation form, no.

15    Q.    So did you ever see any other employee's

16 evaluation?

17    A.    No.  I can't say for sure, no.  So I'm

18 going to answer no.

19    Q.    Are you saying that you somehow became

20 aware of the scores that your coworkers were

21 getting on their evaluations?

**Page 115**

1    A.    We asked each other.  We asked each

2 other whenever we got through the process of

3 evaluation, on our way out, we would talk about

4 it, and even -- and even our supervisors would

5 give us some leads into why some scores were lower

6 than what they should have been in comparison to

7 another who would have -- another employee who

8 would have scored higher because he did the job in

9 a better way and we would -- so if you like, by

10 implication, I guessed what other scores would be,

11 but I don't believe that I sat down and took a

12 look at another employee's evaluation form, no.

13    Q.    So are you saying that you don't

14 actually know what score any other employee got on

15 their evaluation?

16    A.    Not from looking at their evaluation

17 form, no.  But from asking them and from asking my

18 supervisor.

19    Q.    Can you tell me which employees you

20 asked about their evaluations?

21    A.    I believe everybody I worked with,

**Page 116**

1 every -- most of the employees we worked with, we

2 asked each other about it, and Edward, for

3 instance, Edward and James, which were my

4 colleagues on stations that I would be working at.

5    Q.    And did they tell you what their scores

6 were?

7    A.    I believe they did, yes.

8    Q.    And what did they tell you they had

9 gotten?

10    A.    I think, like, definitely it was surely

11 above 25.  Above -- I asked -- the scores that I

12 asked about were definitely, I heard about a 26, I

13 heard about a 27.  I heard about 21, too.  There

14 were people who scored lower, too, and I would say

15 I at least was -- I knew of at least five

16 evaluations that scored above expectations on the

17 range that they described in the application,

18 which is between 23 and 31.

19    Q.    And who do you think scored above

20 expectations?

21    A.    I can't remember.  I mean, I'm sure

**Page 117**

1 maybe Hobart, we had a colleague by the name of

2 Hobart Wilson, and I think Hobart scored higher.

3    I'm not sure if Edward -- Edward may

4 have scored higher, too.  James, James Allison,

5 also scored higher.  He was also -- and I believe

6 Flo Long scored higher, too.  She was a manager.

7 Just to give you a few...

8    Q.    So the four people that you just named,

9 Edward, James, Hobart and Flo, you believe, based

10 on conversations that you had with them, that they

11 were rated above expectations.

12    A.    Yes, I do.

13    Q.    And that's because that's what they told

14 you.

15    A.    Yes, I believe so.

16    Q.    Okay.  And you believe that your

17 performance should have been rated above

18 expectations.

19    A.    Yes, I believe so.

20    Q.    Okay.  Did anyone at Restaurant

21 Associates ever make any sort of comments that you

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 118

1 thought were discriminatory while you were working

2 there?

3    A.    Like say something?

4    Q.    Yes.

5    A.    Not to my face.

6    Q.    Did you ever hear about anyone at

7 Restaurant Associates ever making any

8 discriminatory comments?

9    A.    Yes.  Yes, I heard from cooks, from

10 colleagues of mine who worked at the kitchen that

11 some supervisors and some managers did do -- I

12 mean, did discriminatory things, like --

13    Q.    Who did you hear that from?

14    A.    I heard that from -- I believe it was

15 Brett, I forgot his last name, who was a cook, and

16 I believe that he was not promoted properly and

17 this is how I knew about it.

18    Q.    And what did he tell you about

19 discriminatory comments?

20    A.    That he -- that he would -- just was not

21 promoted.  I didn't go into the details of it.

Page 119

1    Q.    So a cook named Brett told you that he

2 was not promoted.

3    A.    Yes.  That's not discriminatory; is that

4 what you're saying?

5    Q.    I'm asking you what he told you.  And it

6 didn't sound like -- it sounded like --

7    A.    I was like an act, more than a

8 statement.  Then, yeah, I would probably --

9 then -- re-answering the question properly would

10 be that I probably did not hear any Restaurant

11 Associates managers state a discriminatory

12 expression, no.  It was never said.  Nobody at

13 Restaurant Associates in front of me saying

14 anything discriminatory about anyone in terms of

15 race or --

16    Q.    Okay.  So you never heard any Restaurant

17 Associates manager say anything that was

18 discriminatory, correct?

19    A.    I believe not, yes.

20    Q.    Okay.  And then I was asking you if

21 anyone else had ever told you that they had heard

Page 120

1 anything like that.

2    A.    I believe not.

3    Q.    Okay.  We were talking earlier about the

4 claims that you have in this case.

5    A.    Yes.

6    Q.    And one of them is that you were denied

7 a promotion due to what you believe was

8 discrimination, right?

9    A.    Yes, I do.

10    Q.    And what is the position that you wanted

11 to be promoted to?

12    A.    Well, cook, definitely, and -- as a

13 first promotion, and then eventually to be

14 promoted within the company, within Restaurant

15 Associates and Compass, I wanted to be at a point

16 where they would sponsor my education, where I

17 would be a nutrition graduate, basically, and join

18 the lines of company as a managerial cadre, as a

19 chef at some point or a manager, because I would

20 have the nutritional expertise that would make up

21 for the culinary expertise.

Page 121

1    Q.    So in terms of actual positions that

2 became available while you worked there, what is

3 the job or jobs that you felt you should be

4 promoted to?

5    A.    Kitchen cook.

6    Q.    And when did that position become

7 available?

8    A.    I don't know exactly when.  They hired

9 several cooks after the slow season was over and

10 done with and the busy season started coming in,

11 and I had already gotten some of my training, and

12 that would be, as a fair estimate, it would be

13 maybe in March of 2005.  March of 2005 would be a

14 fair estimate of the end of the low season, and

15 that's also the sort of completion of my training

16 in the kitchen that I had started when the slow

17 season had started.

18    Q.    So in March of 2005, you had been

19 working for Restaurant Associates for about six

20 months; is that right?

21    A.    Yes.  Yes.

31 (Pages 118 to 121)

Rami Elhusseini

Page 122

1  Q.  And how did you find out that the
2 company was hiring cooks at that time?
3  A.  We just saw new cooks coming in.  We
4 just saw new people in the kitchen being hired.
5  Q.  And what is your understanding of the
6 qualifications for the cook position?
7  A.  It was -- if you like, the term was
8 coined by Richard Hetzler in one of the meetings,
9 as he said, "If I have someone who knows how my
10 kitchen works, then that person will be hired when
11 there is need to hire a new cook."  So the --
12  Q.  What I'm asking is, what did you think
13 the qualifications were for the position in terms
14 of years of experience and things like that?  I
15 mean, it seems like --
16  A.  It would be just someone who knows how
17 that kitchen works and someone who knows the
18 recipes, how they wanted the recipes to be and the
19 way to prepare them, and someone who could do that
20 in a proper fashion.  This is what was asked of
21 us.  Even if we have extra experience, we were

Page 123

1 required to sort of leave it at the door and learn
2 the training and the preparation methods that they
3 advised, and this is why the training was provided
4 to us.
5  Q.  Did you ever talk to Mr. Hetzler about
6 what sort of experience either in terms of working
7 at a restaurant or in another kitchen or in terms
8 of education, what the qualifications were for a
9 cook position?
10  A.  Yes.  Yes, I did ask him.  I did ask
11 him, and he said that I would be qualified for a
12 cook, but because I was good at the service line,
13 that I would probably serve better on the service
14 line because of my, if you like, people qualities.
15 This is how I coined it.
16  So as far as I know, I thought I was --
17 I could fulfill the position of at least a
18 starting cook, because not all the cooks at the
19 kitchen were of the same level.  There were
20 apprentice cooks and there were more expert cooks.
21 But in addition to my cooking ability, I also had

Page 124

1 the -- what they call a people quality, which is
2 being good with customers.  And that was the
3 reason why I was specifically asked to serve on
4 line, rather than just in the kitchen, because I
5 would be more useful, if you like.
6  Q.  Okay.  So in your opinion, you were
7 qualified to be a cook trainee?
8  A.  I would -- yes, I think I would have
9 been qualified to be a kitchen, a line cook, a
10 kitchen cook.
11  Q.  When you found out that cooks were being
12 hired at the museum, what, if anything, did you do
13 to apply for that position?
14  A.  I didn't.  I was just asking for my
15 training, and I was under the impression that when
16 I would -- I would be given that position whenever
17 it's convenient, whenever it's fit, when my
18 supervisors saw it right or proper.
19  Q.  So you didn't actually ever do anything
20 to apply for a cook position.
21  A.  I did not separately fill out a cook's

Page 125

1 position, no.
2  Q.  So you were getting some sort of
3 training in the kitchen, and because of that, you
4 thought eventually you would become a chef or a
5 cook trainee?
6  A.  Yes.  I asked for that training.  I
7 asked for the training in order to be a cook
8 within the company.
9  Q.  Okay.  But you never applied for a cook
10 position, and I'm assuming that also means you
11 never interviewed for the position.
12  A.  No I haven't.  I interviewed in the
13 sense that I interviewed when I asked for the
14 training.  I was asked why did I want the
15 training, and I was -- and I talked about that,
16 and if we want to consider that as an interview
17 for the training, then, yes, it was.
18  But after that, no, there was other
19 cooks hired and then I would still be working at
20 the kitchen after, supposedly, the training was
21 over, I would be cooking and preparing food at the

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

**Page 126**

1 kitchen.

2          There were several employees who also

3 did that.  Some of them were transferred

4 completely to the kitchen and became cooks, and

5 when the restaurant would get busier, they would

6 be requested to help at the stations.

7     Q.   Okay.  So who were the people, if you

8 remember their names, who were hired as cooks in

9 this March, 2005 time frame.

10     A.   Well, I mean, I remember Derek.

11     Q.   Is he the only one that you remember

12 being hired then?

13     A.   Janet.  Janet.  She pronounced it

14 Janette (phonetic), but it's spelled the same, I

15 guess.

16     Q.   So the two cooks that were hired around

17 March of 2005 were Derek and Janet?

18     A.   Yes.

19     Q.   Do you remember when Derek started

20 working?

21     A.   No, no.  I mean, after March, I believe,

**Page 127**

1 if I'm not mistaken, but I couldn't give you an

2 exact date, no.

3     Q.   Do you know how many restaurants Derek

4 worked at before he came to Restaurant Associates?

5     A.   Well, I know he worked at Wendy's.  We

6 talked about Wendy's, and going back to the

7 question about discriminatory things that someone

8 said, he talked -- he joked about giving ham to a

9 Jewish colleague of his at Wendy's, too.  He

10 mentioned Wendy's.  I don't know if that's

11 considered discriminatory.  He mentioned it as a

12 joke, but it was in the --

13     Q.   So you're saying that Derek told you one

14 time that he gave ham to a Jewish coworker of his?

15     A.   Yes, as a sort of joke or something.

16     Q.   Okay.  Do you know whether Derek had

17 worked at any other restaurant beside Wendy's

18 before he came to Restaurant Associates?

19     A.   I knew that he worked at some restaurant

20 at an early age and that he didn't get any formal

21 training in culinary arts, but the only restaurant

**Page 128**

1 that I know by name at which he had worked would

2 be Wendy's.

3     Q.   And what do you mean by he didn't have

4 any formal culinary training?

5     A.   At some point, I was in a discussion

6 between me and Derek in the kitchen, and I asked

7 him about his training and if he had any

8 culinary -- culinary arts degrees or education,

9 and he said that he didn't, and that he had been

10 cooking since he was young, and that's all I

11 remember as far as experiences.

12     Q.   Do you know how many years of experience

13 Derek had as a cook before he came to Restaurant

14 Associates?

15     A.   No, I don't.

16     Q.   Do you know how many years of experience

17 Derek had as a sous-chef before he came to

18 Restaurant Associates?

19     A.   Well, none, because he was never a

20 culinary graduate.  So as far as I know, from what

21 he said, that it was none.  He didn't have any

**Page 129**

1 sous-chef experience.

2     Q.   And you base that on --

3     A.   On the fact that he didn't have any

4 culinary education.

5     Q.   So is it your understanding that in

6 order to become a sous-chef, you need to have some

7 sort of culinary education?

8     A.   Out of discussions that I had with my

9 supervisors at Restaurant Associates, and more

10 specifically with Tara, I did get to the

11 understanding that in order to be titled chef or

12 sous-chef, that you needed certain culinary

13 certification requirements, yes.

14     Q.   So as far as you know, Derek didn't have

15 any experience as a sous-chef?

16     A.   Yes, and as far as documented sous-chef

17 with a culinary education, I thought that he

18 didn't have any.

19     Q.   But you don't know for sure.

20     A.   I don't know for sure.  He might have.

21 He might be and he didn't -- he might have not

33 (Pages 126 to 129)

**Page 130**

```
1 mentioned it to me.
2     Q.   Do you know how many years of experience
3 in the food industry in general Derek had before
4 he came to Restaurant Associates?
5     A.   I don't.  I mean...
6     Q.   When did you find out that Derek had
7 gotten the cook position?
8     A.   Well, he was first hired in a cook's
9 position.  He was -- he wasn't hired as a line
10 server, he was -- when he was first hired, he was
11 hired as a cook.
12     Q.   So you found out that he got a cook's
13 position the first day that he showed up at work.
14     A.   Yes.
15     Q.   Okay.  And who do you believe made the
16 decision to hire Derek?
17     A.   I believe human resources.  That's human
18 resources at Restaurant Associates.
19     Q.   You don't think it was Mr. Hetzler who
20 would decide who would be hired as a cook?
21     A.   I don't think it was Richard Hetzler
```

**Page 131**

```
1 that hired him, no.  But I could be mistaken.  I
2 mean, he eventually would have had to accept him
3 to work for him, but I don't think that Richard
4 Hetzler got Derek into the position, no.  I
5 believe that Derek was hired and then Richard
6 accepted him as an employee, but I don't think it
7 was Richard Hetzler's decision to hire Derek, to
8 go and find Derek, job-hunt him and get him into
9 the restaurant, no.
10         No, but I mean -- I'm assuming, maybe
11 I'm wrong, that Derek would just see this job
12 advertised somewhere, send in an application and
13 then would interview -- I mean, the same way that
14 you got your job:  I don't believe that at that
15 point it was advertised.  I don't believe they did
16 advertise it at that point.  But I might be
17 mistaken.  He might have, but I don't think so.  I
18 think he was sort of referred to the cafe, to the
19 restaurant.
20     Q.   Well, let me ask you this:  Do you think
21 that it was Mr. Hetzler's decision to hire you?
```

**Page 132**

```
1     A.   It was Mr. Hetzler and Ms. Peralta's
2 decision, yes.  Ultimately, it was Mr. Hetzler's
3 decision to -- if you like, Tara would pre-select
4 us and then Richard would ultimately decide if he
5 wants us or not, so in my case, I would say it was
6 Richard Hetzler's decision to hire me, yes.
7     Q.   Because you had, if I remember from your
8 testimony earlier, your first interview with
9 Ms. Peralta and then she said you would be
10 contacted to come back for a second interview, and
11 then your second interview was with Mr. Hetzler.
12     A.   Yeah, correct.
13     Q.   So when do you remember Janet starting
14 to work at Restaurant Associates?
15     A.   Maybe -- let's say March, just for the
16 sake of being in line with the idea of the influx
17 of the busy season.  I don't think anybody new was
18 hired in February; that's why I say that.
19     Q.   Do you know how many restaurants Janet
20 had worked at before she came to Restaurant
21 Associates?
```

**Page 133**

```
1     A.   No, I don't.  However, she did have
2 culinary experience that she mentioned, that she
3 talked about.  I believe that she did have
4 certifications, and...
5     Q.   Do you know how many years of experience
6 as a cook Janet had before she came to Restaurant
7 Associates?
8     A.   No, I don't.
9     Q.   Do you know whether Janet had any
10 experience as a sous-chef before she came to
11 Restaurant Associates?
12     A.   No, I don't.
13     Q.   Do you know how many years in the food
14 business Janet had before she came to Restaurant
15 Associates?
16     A.   No, I don't.
17     Q.   And who do you think made the decision
18 to hire Janet?
19     A.   I don't know.  I don't know.  I don't
20 think that she applied, either.  She was from --
21 she was -- she was from, I would say -- she was
```

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 134

1 Irish, she was not -- she was not American.  She
2 was married to an American, so maybe she was also
3 referred by someone in Restaurant Associates or
4 Compass in England, but I can't be sure.

5          So to answer the question, no, I can't
6 be sure who hired Janet.

7      Q.  And you don't know who made the decision
8 that Derek should be hired, either, do you?

9      A.  Not particularly, no.  I wouldn't know
10 the name of the person, no.

11      Q.  But you don't know at all whose decision
12 it was to hire Derek.

13      A.  No, I don't, for a fact.  I have not
14 seen any document that would show the person, you
15 know, responsible for hiring him, no.

16      Q.  So while you were employed by Restaurant
17 Associates, did you complain to anyone at
18 Restaurant Associates about either Derek or Janet
19 getting a cook position?

20      A.  No.  No.

21      Q.  And while you were employed by

Page 135

1 Restaurant Associates, did you ever tell anyone at
2 Restaurant Associates that you thought you didn't
3 get a cook position because of discrimination?

4      A.  No.

5      Q.  Did anyone at Restaurant Associates ever
6 say you didn't get the cook position because of
7 discrimination?

8      A.  Not directly, no.

9      Q.  Well, what was said indirectly?

10      A.  It was -- I don't know if you could
11 consider someone's -- someone's indirect
12 expressions or someone's facial expressions or
13 behavior as a way of saying or communicating
14 anything, but looking back now, if any, there
15 would probably have been in that realm, but there
16 was never any incidents of any employee telling
17 me, "How come you did not get the cook's
18 position?"

19          So as clearly as it was formulated, if
20 you like, it was never said.  But it was sort of
21 understood.  It was a common understanding that,

Page 136

1 "How come he didn't get it while he was training
2 so much for it?"  And it was sort of understood
3 then, well, because of that, because -- you know,
4 because you're not white.  But it was never said.

5      Q.  Understood by whom?

6      A.  By the coworkers, who also were not
7 white, but were not hired or in view of being
8 hired to a sous-chef position.

9          Before me, there was -- there was a lot
10 of cooks at the restaurant, a lot of my colleagues
11 who were definitely more qualified than me to
12 being a sous-chef.  I was expecting to be hired as
13 a cook's position, but I was never expecting to be
14 hired in a sous-chef's position, because I did not
15 have the culinary requirements to fill that
16 position to begin with.

17          But there was a good deal of coworkers
18 who had both the culinary and the long years of
19 experience with Restaurant Associates who could
20 have been -- who could have filled the sous-chef
21 position, and the fact that they weren't hired

Page 137

1 were sometimes indirectly referred to as a general
2 attitude by the company.

3          However, I did not believe it.  I just
4 assumed that maybe there were other reasons why
5 some of -- some of my colleagues who were supposed
6 to be promoted were not promoted.  I thought
7 because of some office politics or any other
8 reason that might be -- led to their lack of
9 promotion.  But there was a common current, if you
10 like, that was -- a subculture of somewhat
11 discriminatory attitude in the dynamics of that
12 company.

13      C.  And what I'm asking you is, how is that
14 supposed discriminatory attitude made known.

15      A.  It was made known when someone with
16 expertise, like, for instance, Brett that we
17 mentioned earlier, would talk about the fact of
18 him not being promoted and being demoted instead,
19 by being a sous-chef in maybe another
20 establishment, or at least kitchen manager --
21 maybe even sous-chef.  I remember Brett referring

35 (Pages 134 to 137)

Page 138

```
 1  to himself as filling a sous-chef position in a
 2  different establishment run by Restaurant
 3  Associates, and the fact of him being somewhat
 4  demoted to a kitchen cook at the Midtown Cafe was
 5  referred to as a discriminatory action.
 6       Q.   By who?
 7       A.   By Brett.
 8       Q.   And do you know why he was demoted?
 9       A.   He never said that it was because of his
10  race.  He said because he was working for
11  another -- for another manager or another --
12  another, say, officer or another head in the
13  company.
14            So I understood it, or at least he gave
15  somewhat of also an impression that it was because
16  of office politics, that since you were with
17  another boss, if you're working for a new boss,
18  he's not going to promote you as one of his best
19  guys; you will probably get the lesser -- the
20  shorter, sort of, end of stick when you transfer
21  bosses, if you like.
```

Page 139

```
 1       Q.   So what does that have to do with
 2  discrimination?
 3       A.   Well, that would be the official reason,
 4  because had he given a -- had he discussed the
 5  discrimination as a reason for his lack of
 6  promotion in the workplace, it probably would have
 7  had worse consequences than just demotion.  He
 8  probably would have lost his job.
 9       Q.   Okay.  But you don't know that.
10       A.   No, I can't say for sure, no.
11       Q.   And you don't know why he was demoted.
12  And you're speculating that it was because of
13  office politics, or that's what he told you, but
14  he never told you he thought it was because of
15  discrimination.
16       A.   No.
17       Q.   That's an assumption that you're making.
18       A.   Yes.
19       Q.   Not really based on anything.
20       A.   It's not based on anything.  That's the
21  reason why I did not believe it was
```

Page 140

```
 1  discriminatory.  Those are exactly my reasons for
 2  believing that at that point, because had I known
 3  that it was discriminatory for a fact, I wouldn't
 4  have stayed there.  I wouldn't have stayed there
 5  if I realized that this is an intentional and
 6  conscious policy of this company.  Because I
 7  assumed it was just speculation, even from the
 8  part of Brett, that it was speculation, that it
 9  was not discrimination, that it was just because
10  of office politics, and you work for an old boss,
11  you come to the new boss, he's not going to
12  promote you.
13            And those were the reasons that led me
14  to believe that there was no discrimination, until
15  it hit home, and I realized very clearly that -- I
16  don't want to anticipate, but the questions that
17  will come, maybe that will lead us to this
18  conclusion.  But it was after the fact that I
19  started entertaining the thought of a
20  discriminatory agenda at this company.  Not after
21  that conversation.
```

Page 141

```
 1       Q.   You mean after your termination?
 2       A.   After the whole issue of termination.
 3  After I was terminated per se, I still thought it
 4  was normal policy, because after the termination
 5  was handled and led us to the legal proceedings
 6  that we are in now that I reached the conclusion
 7  that it was discrimination.
 8            MS. GOETZL:  Okay.  Why don't we go off
 9  the record for a minute.
10            (Discussion off the record.)
11            (Lunch recess, 1:00 - 1:50 p.m.)
12  BY MS. GOETZL:
13       Q.   Let's go back on.
14            Mr. Elhusseini, with respect to the
15  promotion to the cook job, who is it at Restaurant
16  Associates that you think discriminated against
17  you?
18       A.   I believe the decision comes from the
19  human resources department.  I don't know.  The
20  only person I know by name is Ms. Cerrati, Robin
21  Cerrati.  I don't know if it's her in particular.
```

36 (Pages 138 to 141)

Page 142

1 I know from my dealings with her that her
2 treatment was not an option.
3      Now, I know from my dealings with
4 Mr. Hetzler that he wouldn't have minded my
5 promotion, and Ms. Peralta, because I had worked
6 with them for a while and they knew what I was
7 capable of. However, it's a big company, and when
8 you get into the promotional channel, if you like,
9 the promotional lane, then it probably would be --
10 I assume, as, you know, I would speculate that it
11 would be harder to manage an undesirable element
12 at that particular time, once that person is on
13 the promotional lane, if you like.
14      Q.   So you think it was someone in human
15 resources?  You're not sure who, but someone in
16 human resources decided that you should not become
17 a cook.
18      A.   I believe that it's higher than the cafe
19 management who decided I shouldn't be promoted,
20 yes.  Cook or anything else.
21      Q.   Okay.  One of the other claims that you

Page 143

1 have in the case is that you were terminated
2 because of discrimination, right?
3      A.   Yes.
4      Q.   Okay.  And before you were terminated,
5 you had a fight with a coworker named Chris
6 Spangler; is that right?
7      A.   That was the altercation that led to the
8 termination.
9      Q.   Okay.  Now, the fight that you had with
10 Mr. Spangler was on August 13th of 2005; is that
11 right?
12      A.   I believe, I guess so, right.
13      Q.   Do you remember what day of the week
14 that was?
15      A.   I believe it was a Saturday.
16      Q.   Okay.  Did you and Mr. Spangler have an
17 argument the day before you had a fight with him?
18      A.   I believe so, yes.  I believe that was
19 what led to it.
20      Q.   If you remember, what station were you
21 working at on August 12th?

Page 144

1      A.   I believe I was on the plains, if I'm
2 not mistaken.  I could have been the plains; it
3 could have been the -- was it northwest, or what
4 they call the northeast -- let's say the taco
5 station.  It could have been the taco or the
6 plains station.
7      Q.   On August 12th of 2005, were you and
8 Mr. Spangler working on the same station?
9      A.   Yes, we were.  Yes, it was the plains.
10 Now that it comes to mind, now it's -- it comes to
11 mind fresh, I would say it was the plains station.
12      Q.   So on August 12th, both you and
13 Mr. Spangler were working on the plains station.
14 Okay.  Now, what was the August 12th argument
15 about?
16      A.   It was -- Mr. Spangler was becoming
17 belligerent, and, you know, using, like,
18 disparaging terms with regards to me being a
19 homosexual and him beating me up, or something
20 like that, so I referred the matter to supervisors
21 and I said that I was being kind of harassed

Page 145

1 verbally and I wished it to be taken care of.
2      Q.   Okay.  So are you saying that
3 Mr. Spangler just started calling you these things
4 out of the blue for no reason, or --
5      A.   It was rush hour.  It was -- ensuing the
6 rush hour, where you get a very busy station, and
7 many persons would be asking for food, and it
8 would be a tense situation, and at the time,
9 Mr. Spangler was getting -- I think he was getting
10 trained at that station; I was somehow supposed to
11 kind of help him out, and also, I had a duty to
12 kind of keep an eye on the service and the way the
13 customers were being handled, and I believe he was
14 upset because of me being -- remarks that I made
15 with regards to customer service, like if I had
16 corrected him and -- in a manner, maybe, or
17 something with that regards, like something
18 relating to that.  He would probably, if he gave a
19 wrong order, for instance, let's say, and I would
20 say, "Chris, that's not how you do it, you do it
21 this way," and that probably would have led to him

37 (Pages 142 to 145)

Page 146

1 going off.

2    Q.    So on August 12th of 2005, you and
3 Mr. Spangler are both working at the plains
4 station and you possibly were training him because
5 he was new at that station.

6    A.    He was new, new at the station, yes.
7 Yes.

8    Q.    And so you would have been correcting
9 him or instructing him on how to do things there?

10    A.    That would be correct, yes.

11    Q.    And because of something that you may
12 have said to him, that led to him making remarks
13 to you that were, in your mind, inappropriate?

14    A.    Yes, because of also the rush hour and
15 the stress that it causes on every employee, there
16 was -- the rush hour is very harsh, when you get,
17 like, a line of -- a lot of hungry people asking
18 for food, and it's -- you know, they're hard to
19 handle, and that would have led him to be -- and
20 this was kind of in the making, it was sort of in
21 the making.  We had worked on the same station

Page 147

1 before, and he -- I mean, I don't have the
2 documentation to prove that he was, probably, a
3 little bit upset at the way I would handle the
4 station, but he probably would have liked to be
5 better in what he does, and maybe that have led
6 him to have those -- the material that led to his
7 explosive behavior after that incident.

8    Q.    Just so I'm clear on what you're saying,
9 are you saying that something had happened between
10 you and Mr. Spangler before August 12th?

11    A.    It wasn't something in the sense of an
12 altercation, it was just -- serving stations,
13 there's a sort of competitiveness that comes about
14 in these places just with regards to who was the
15 better worker, just like in every workplace, and I
16 believe that at some point, maybe Mr. Spangler
17 felt bad about that competitive edge that was
18 present there, and it may have led to some bad
19 feelings that later were, you know, expressed by
20 him in a violent manner due to the stress of the
21 affair.

Page 148

1    Q.    Are you just speculating about --

2    A.    I am, yes.  I am speculating.  I don't
3 know his strength, if he has one, and -- no.

4    Q.    Okay.  So on August 12th, he made some
5 comments to you.  Were you guys working on the '
6 line at that time?

7    A.    We were on line, yes.  He made the
8 comments in front of customers.  Like he made a
9 fuss in front of -- on the line, yes.

10    Q.    Do you remember specifically what he
11 said to you?

12    A.    Well, something in the -- probably like
13 threatening to beat me up or something.

14    Q.    Did anybody else hear that?

15    A.    Yeah, whoever was on the station, and
16 the people, the customers who were there.

17    Q.    Okay.  Do you remember who else was
18 working on the station at that time?

19    A.    I believe it was Edward, Edward, I would
20 say, Edward and James, they were the people who
21 worked together most of the time, so they would

Page 149

1 probably be in the know.

2    Q.    Okay.  So was there any physical contact
3 between you and Mr. Spangler at that time?

4    A.    Oh, no.  No.  I waited until the -- kind
5 of rush was over and I reported it to the office,
6 to kind of get it over and done with.

7    Q.    So who did you report it to?

8    A.    I think I told Tara about it.  Tara or
9 Richard.  I mean, I know that we talked about it
10 with Richard and Derek present in the office.  So
11 the matter was handled in the presence of Richard
12 Hetzler and Derek.

13    Q.    But you don't recall if you actually
14 reported it to Mr. Hetzler or to Ms. Peralta?

15    A.    I would say, yeah, I reported to Tara,
16 and it was like he was there and Tara was there
17 and Richard was there, so it wasn't -- it wasn't a
18 big issue who did I report it to first.

19    Q.    But you told one or both of them.

20    A.    Yes, both of them.

21    Q.    Okay.  And then were you saying that you

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Rami Elhusseini

Page 150

1 met with Mr. Hetzler later that day to talk to him
2 about what had happened?
3     A.    Yes, we met at the office and we sat
4 down with Richard and Chris Spangler and Derek and
5 we talked about it.
6     Q.    Okay.  So the four people are in this
7 meeting.
8     A.    Yes.
9     Q.    You, Chris Spangler, Richard Hetzler,
10 Derek.
11    A.    Yes.
12    Q.    Okay.  So what happened during that
13 meeting, as best you can remember.
14    A.    Well, we talked about the altercation
15 between us, and sort of the bad feelings, if you
16 like, and Richard Hetzler clearly instructed us to
17 kind of put it behind us and that we have to, you
18 know, work together kind of thing.  Work on it and
19 stuff like that.  You know, when people get
20 together and the boss says you have to work
21 together and forget about the problem and stuff

Page 151

1 like that.  So that's what it was.
2     Q.    Do you remember anything else that was
3 said during the meeting?
4     A.    Well, that was -- I mean, do you want
5 the details, every --
6     Q.    As much as you can remember what each
7 person said.
8     A.    We talked about what was the reason
9 behind that, what was happening, like what led us
10 to kind of get into that sort of misunderstanding.
11 And I told him that at some point, we were working
12 on another station and I was making a joke with
13 one of the cashiers, and he got in on the joke,
14 and at some point he got offended by -- it was a
15 raunchy joke; it wasn't the most poetic --
16    Q.    Who got offended?
17    A.    Chris Spangler did.  It was kind of --
18 or maybe that he felt that I made some sort of
19 sexual advance to him or something, but he did not
20 say that he -- he did not formulate it as that at
21 that time, but he referred -- he talked about it

Page 152

1 to the floor supervisor, Flo Long, and later,
2 Ms. Long came up to me and said that -- and asked
3 me if I had made any sexual advances to Chris
4 Spangler, and I had told her that I was joking
5 with one of cashiers and he was in on it, he tried
6 to get in on the joke with us, and that what I
7 answered him might have been interpreted by him
8 as -- although it wasn't, and he did not -- he did
9 not express to me any offensive feeling that he
10 was sexually proposed to or anything regarding to
11 that.
12    Q.    So this incident that you discussed
13 being --
14    A.    I brought it up to Ms. Hetzler.
15    Q.    This incident that you're describing
16 happened before August 12th, the joke with the
17 cashier?
18    A.    Yes.  Then I brought it up to
19 Mr. Hetzler in the office.
20    Q.    During this meeting on August 12th?
21    A.    Yes.  And I said that this had happened,

Page 153

1 and that it may have been one of the things that
2 had led to kind of the catapult, if you like, to
3 the whole thing to where it was.
4     Q.    So what was the resolution that was come
5 to during the meeting?
6     A.    Well, he said -- Richard Hetzler said
7 that, you know, "You're in deep --" you know,
8 S-star-star-star-T, "and that you need to work it
9 out with us, your co-workers, and get over things
10 like that."
11    Q.    That you were?
12    A.    Both of us, me and Chris Spangler, were
13 in deep trouble.  We were in deep trouble, like
14 our problem is deep, like it's complicated, and he
15 said this shouldn't be happening at the workplace
16 and we should put it behind us.
17          And then -- and then that was that, as
18 far as I was concerned, that was that, and we even
19 joked about it even more, and that was it.  And we
20 went out of the office and we went back to work.
21    Q.    Okay.  So both you and Mr. Spangler went

39 (Pages 150 to 153)

Page 154

1 back to work after this meeting on August 12th?

2    A.    Yes.  And then he said that "they love

3 you," or something like that, referring to the

4 management, that "they love you so much" or

5 something.

6    Q.    Did you guys go back to working together

7 on the plains station that day?

8    A.    I think it was the end of the shift, so

9 we probably finished the shift together.  But I

10 believe that we were supposed to be scheduled to

11 different stations after that.  But I'm not sure.

12    Q.    Was that --

13    A.    The next day.  The next day, we were

14 supposed to have been scheduled to different

15 stations.

16    Q.    Was that said during the meeting?

17    A.    Probably not.

18    Q.    Then why would you think that?

19    A.    Just because usually, when there's

20 trouble between coworkers, you know, they place --

21 at the restaurant, they just separate the workers.

Page 155

1    Q.    But you don't recall anything being said

2 during the meeting about you and Mr. Spangler

3 working at different stations?

4    A.    It might have been said, yes.  It might

5 have been mentioned that, "You guys just work on

6 different stations".

7    Q.    And it was your understanding that he

8 and he would not be working on the same station

9 anymore?

10    A.    Yes, that's what I understood from

11 Richard Hetzler, that we probably shouldn't be on

12 the same station together.

13    Q.    Okay.  Now, for however long you two

14 continued to work on August 12th, did you have any

15 further arguments with him on that day?

16    A.    Not at all.  I mean --

17    Q.    How long did you all continue working

18 after the meeting was over?

19    A.    Maybe an hour, I think, just to kind of

20 tidy up and clean up the station.

21    Q.    Okay.  So the next day would have been

Page 156

1 August 13th, which I think you have testified was

2 a Saturday.

3    A.    I think it was.

4    Q.    And did you and Mr. Spangler have an

5 argument on the 13th?

6    A.    I believe we did, yes.  I believe we

7 did.  He was -- he was working on the plains for

8 some reason.

9    Q.    Okay.

10    A.    On a Saturday, which was a busy day.

11    Q.    Okay.  So on the 13th of August, he's

12 working on the plains and are you also working on

13 the plains.

14    A.    Yes.  Yes.  I was -- normally, that was

15 the station I usually would be scheduled to.

16    Q.    And what was the argument about on the

17 13th?

18    A.    I think it was some of the same stuff,

19 you know, the stress with the rush hour coming in,

20 and then doing something wrong and then probably

21 would be -- usually the wrong thing would be a

Page 157

1 wrong serving size or, you know, different things

2 that wouldn't go on the product that we sell.

3 That would be the -- yes.

4    Q.    So you were correcting something that he

5 was doing wrong?

6    A.    Most likely, yes.  That usually would be

7 the reason why a person in training would be

8 corrected on the station.

9    Q.    Okay.  Do you remember about what time

10 this argument happened?

11    A.    That would most likely be around rush

12 hour.

13    Q.    When was that?

14    A.    Usually rush hour starts at -- I would

15 say maybe eleven to two, between eleven and two,

16 that's the hard -- you know, hard rush hour.

17    Q.    Were you both working on the line at the

18 plains when you had this argument?

19    A.    Yes, we were, for some reason, working

20 next to each other the next day.

21    Q.    So when you realized on August 13th that

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Rami Elhusseini

Page 158

1 you and Mr. Spangler were both working on the
2 plains station, did you say anything to whoever
3 was in charge that day?
4    A.    There was only Derek.  This wasn't --
5 Tara and Richard were not there.
6    Q.    Okay.  But did you say anything to
7 Derek, like "I thought I wasn't going to be
8 working with him anymore," or --
9    A.    No.  I just went to work and I -- you
10 know, we committed to getting over our
11 disagreements and just go to work.  There would be
12 no reason for me to...
13    Q.    So were there any witnesses to the
14 argument on the 13th?
15    A.    I would say also Edward and James.  I'm
16 mean, I'm sure one of them would have been off
17 that day, but just one of them might have been
18 there, too.
19    Q.    Did this also happen in front of
20 customers?
21    A.    Yes, it did.  Yes, it did.

Page 159

1    Q.    Do you remember what Mr. Spangler said
2 to you.
3    A.    Probably some of the same stuff, some of
4 the usual -- the usual delicacies.  I don't know
5 how to say it, the usual fine stuff.
6    Q.    Something beyond --
7    A.    Something disparaging, you know, like
8 something about beating me up and something about
9 being gay.
10    Q.    Okay.  So if you're working on the
11 plains station that day --
12    A.    If I recall correctly --
13    Q.    You would be leaving at 5:30.
14    A.    I would probably have been supposed to
15 leave at 5:30, but that particular weekend, I
16 would have been let go earlier, because I had
17 asked for a day off on Friday.  I had asked
18 Richard Hetzler for days off, because they had
19 this event at the MCI Center, and if someone would
20 be let go early, it would have been me, because I
21 asked to come in late, and instead, I was asking

Page 160

1 to come in regular time and leave early.
2         So that's with regard to the time.  And
3 also with regard to the altercation on the 13th, I
4 believe it didn't evolve as much as it did on
5 Friday.
6    Q.    You say it didn't what.
7    A.    It did not evolve to a -- like a
8 back-and-forth.  It was more, if I remember
9 correctly, more of a tense situation that was in
10 the making, but it was not developed.
11    Q.    Okay.
12    A.    And I think that's the reason why I did
13 not think that anything would entail from it.  I
14 just assumed that it was just resolved and there
15 wouldn't be any problem after that.
16    Q.    So normally when you working on the
17 plains station, you leave at 5:30.
18    A.    Sure.
19    Q.    And you're saying that you had asked
20 Mr. Hetzler earlier that week if you could leave
21 early that Saturday.

Page 161

1    A.    That weekend.  That weekend in general.
2 I asked for Sunday morning, but since I could not
3 leave on -- I could not have Sunday morning off,
4 then I could have -- I could leave early.  That
5 was not specifically on Sunday early, but it was
6 early, so I took it as the weekend early.  Like
7 instead of coming late four hours on Sunday, I
8 could have two hours early Saturday and two hours
9 early on Sunday and go to the National Powwow.
10    Q.    So I'm a little unclear about what,
11 exactly, did you ask Mr. Hetzler for and what did
12 he say that you could do?
13    A.    I asked for Sunday morning off.
14    Q.    Right.
15    A.    And he said that I can't have Sunday
16 morning off, and instead, I can leave early.
17    Q.    When?
18    A.    He did not specify.  It could have been
19 Saturday and Sunday, because we usually did.  When
20 the rush hour was over, I mean, it was something
21 that happened.  I have left early before, and it

41 (Pages 158 to 161)

Page 162

1 wasn't a thing they disliked. If it was slow,
2 they preferred us to leave early.
3     Q.    So your understanding was that you could
4 leave early on either Saturday or Sunday, but you
5 could not have Sunday morning off.
6     A.    Yes.
7     Q.    Okay.
8     A.    Correct.
9     Q.    But you were not specifically given
10 permission to leave at a certain time on Saturday
11 or a certain time on Sunday.
12    A.    No, I wasn't. I wasn't. Basically, the
13 thing behind this, my reason behind the -- the
14 reason behind my argument in that area is that it
15 was a possibility of people leaving early, and
16 their reasons for termination, they used their
17 leaving early as a crucial reason for termination,
18 and it was not the case. Usually between -- after
19 four o'clock there was a possibility for people to
20 leave early, especially, and in my case in
21 particular, since I had that kind of sort of

Page 163

1 permission to leave early, it wouldn't have been a
2 valid reason for a termination. This is the
3 reason why I'm giving this argument, to --
4     Q.    I understand what your argument has
5 been. What I'm trying to find out from you is,
6 say you were supposed to be working, normally,
7 until 5:30 on the plains station.
8     A.    Normally, yes.
9     Q.    And then Mr. Hetzler did not say to you,
10 "Mr. Elhusseini, you can leave at 3:30 on
11 Saturday."
12    A.    No, he did not. I cannot claim that,
13 no.
14    Q.    But you understood that since you had
15 not been given Sunday morning off, as you had
16 asked for, that you would be allowed to leave
17 early on either Saturday or Sunday, depending on
18 how busy it was.
19    A.    Oh, yeah, because I definitely could not
20 leave, for one reason or another. If we had a
21 rush hour going on until four o'clock or five

Page 164

1 o'clock, then I obviously cannot leave, no matter
2 what. But if the rush hour had stopped early,
3 fairly enough, then I could leave early enough,
4 and that's why Chris Spangler was let go, because
5 obviously the rush hour was slow enough for a
6 manager to let go one of the station cooks.
7     Q.    So I know you said that on other
8 occasions you had been allowed to leave early if
9 it got slower or whatever was going on. On those
10 occasions, wouldn't you ask someone whether you
11 could leave or not?
12    A.    Normally, yes, you definitely tell
13 someone that you are leaving. Not that it hadn't
14 happened, some people had left without telling the
15 manager that they were leaving, and they were not
16 fired. So it wasn't the first time that someone
17 leaves without at least telling a manager that he
18 was leaving the workplace, especially having
19 talked about it earlier in the week.
20    Q.    Tell me who left early without telling a
21 manager that they were leaving and did not get

Page 165

1 fired.
2     A.    Abdullah, Abdullah Jihad, J-I-H-A-D,
3 last name.
4     Q.    Anybody else?
5     A.    Not that comes to mind now.
6     Q.    And when did Mr. Jihad do that?
7     A.    I can't remember the exact date, but I
8 remember because he was having a housewarming
9 party. It was some sort of housewarming event,
10 and he had to make preparations for that, and we
11 were working on the same station together, and he
12 left. And he never came back that day and he was
13 not terminated.
14    Q.    How do you know that he didn't have
15 permission to leave?
16    A.    Because he left in front of me and he
17 didn't let anybody know of the management that he
18 was leaving.
19    Q.    So you didn't see him ask for
20 permission?
21    A.    Well, no. I mean, he could have, but

42 (Pages 162 to 165)

**Ramf Elhusseini**

Page 166

1 since I was with him working all day and we were
2 working on the same station, and he left and he
3 was supposed to be there and people asked about
4 him and nobody knew where he was at, that led me
5 to think that nobody knew that he was leaving,
6 since he was -- he was expected to be there and
7 people asked about his whereabouts later in the
8 day. That led me to think that the managers did
9 not know where he was and he did not tell them
10 that he was leaving.
11    Q.    But you don't know that he didn't have
12 permission to leave.
13    A.    No, no, he could have asked them and
14 they forgot. When they asked why he was not
15 there, he could have asked them and they had
16 forgotten. That may be a possibility, yes.
17    Q.    So you just didn't see him, yourself,
18 ask for permission.
19    A.    I did not see him and none of the
20 managers told us that he did. When we asked about
21 his whereabouts and the reasons why he was not

Page 167

1 there later in the day, and the managers did not
2 know where he was, that led us to think that they
3 didn't know, either, so that he didn't ask them
4 for permission.
5    Q.    Okay. But he may have gotten permission
6 to leave early the day before?
7    A.    Possibly. I can't say for sure that he
8 didn't. So it is possible that he may have, yes.
9    Q.    So he might have had permission to
10 leave.
11    A.    He might have. I wouldn't be able to
12 tell you, yes.
13    Q.    Is there anyone else that you can think
14 of that left without permission and didn't get
15 fired?
16    A.    No.
17    Q.    Okay. Now, when you and Mr. Spangler
18 had this argument on August 13th, when you're
19 working on the line, was there any physical
20 contact between the two of you?
21    A.    No.

Page 168

1    Q.    And did you report this argument to
2 anyone?
3    A.    I believe not, because it was resolved
4 on the station. It didn't evolve into a big
5 argument. Mr. Spangler seemed to just calm down,
6 and asked for my key to use the rest room, and I
7 guess -- I believe that this is when he went down
8 and kind of smashed my locker, and I guess that
9 calmed him down. Because he seemed as if it was
10 no problem after that. And that's --
11    Q.    So you have this argument with
12 Mr. Spangler on the line on the 13th; it's similar
13 to the argument that you had with him the day
14 before, but not --
15    A.    It's similar, in the sense that we were
16 disagreeing, we were disagreeing on something, but
17 it was by no means as severe as the argument we
18 had the night -- the day before.
19    Q.    Okay. So you don't tell anybody about
20 this argument; is that right?
21    A.    No, no, I didn't get the chance to,

Page 169

1 because it didn't evolve to something where I
2 should tell anybody about it.
3    Q.    Do you know if Mr. Spangler told anyone
4 about it?
5    A.    He did not, no, because nobody told me
6 about it, and since he was -- he initiated it, I
7 suspect that he would go and ask a manager to kind
8 of discipline him for initiating an altercation
9 with me. But he might have; I don't know; maybe
10 he told his -- I don't know. But it would
11 probably be unlikely that he went out and told
12 somebody, "Hey, I initiated, you know, an
13 altercation with my colleague, and would you like
14 to give me some discipline or something?"
15    Q.    So you mentioned something about
16 something happening to your locker that day.
17    A.    Yes. Yes. Yes.
18    Q.    What is that about?
19    A.    It was bashed, it was -- the lock was
20 destroyed, as if someone was trying to break the
21 lock off it, and it was -- the lock was mangled

43 (Pages 166 to 169)

**Rami Elhusseini**

1 and it couldn't be opened.  And even if the lock
2 was removed, the locker in itself, what do you
3 call it, the knob, was damaged so it couldn't be
4 opened.  Even it needed a lot of maneuvering to
5 kind of --

6     Q.   And did you report that to anyone?

7     A.   I did, yes.  I did report it to Derek.

8     Q.   And was anything done to fix it?

9     A.   It couldn't be fixed.  I was just asked
10 to take my things out of it and I was asked to put
11 them in a bag and put them in the office, where
12 there are laws, and he took pictures of it and
13 that was it.  I don't think he would have been
14 able to fix it.

15     Q.   So Derek took pictures of what had
16 happened to your locker and then gave you a bag to
17 put your stuff in that had been in your locker,
18 and then let you put your bag of stuff in the
19 office with him.

20     A.   Yes.

21     Q.   Did this incident with your locker

1 happen before or after your argument?

2     A.   It happened after the argument, but my
3 reporting of the incident happened after.

4     Q.   Your reporting what happened to your
5 locker to Derek happened after you had the
6 argument with Mr. Spangler.

7     A.   Yes.

8     Q.   So when you reported the locker damage
9 to Derek, did you tell him that you had had an
10 argument with Mr. Spangler earlier that day?

11     A.   No.  No, no, I did not mention anything
12 about the altercation with Chris or the actual
13 physical altercation that happened at the end of
14 the day.  I did not mention that, either.

15     What happened is, we had the --
16 chronologically, we had a little argument during
17 the day.  After that, Mr. Spangler asked for my
18 keys.  He went down and he bashed my locker.  Then
19 I was given permission to leave early by Derek.
20 when he did that, I went down with him, and when I
21 went into the rest room, I was also trying to kind

1 of further calm him down and talk to him and try
2 to resolve the issue with him, because it was a
3 very -- there was a possibility of him going early
4 and causing -- you know, be waiting for me or
5 doing even more harm than was done to the locker;
6 to my eventual person.

7     Q.   You don't actually know that he did that
8 to your locker.

9     A.   Well, no, no, there are no cameras
10 allowed there, so technically speaking, I mean, in
11 a criminal investigation, no, I couldn't prove it.
12 But there is very clear and convincing evidence of
13 the fact, you know.

14     Q.   Because you think that he did it.

15     A.   Definitely.  Most definitely it's only
16 speculation.

17     Q.   That's your evidence, right?

18     A.   Yes, but there is no clear-cut evidence,
19 other than the fact that he had mentioned or
20 called my attention to the state of the locker
21 when we both went into the rest room, before I

1 even noticed it.  But that could have been just
2 because he knew where my locker was.

3     So, no, there is no, you know, clear
4 evidence to me showing -- no proof showing me that
5 he actually did it to the locker, but it would --
6 it just makes sense that he would have.  And when
7 I saw -- when I saw the state of the locker, and I
8 was already --

9     Q.   Hold on for a second.  So you and
10 Mr. Spangler go down to the locker room or rest
11 room or whatever this is?

12     A.   It's the same one.

13     Q.   It is?

14     A.   Yes.

15     Q.   And he had been given permission to
16 leave.  So he was leaving for the day.

17     A.   Correct.

18     Q.   Correct?  Do you remember what time that
19 was?

20     A.   Four o'clock, around four o'clock.

21     Q.   And he had permission to leave at four

Ramí Elhusseini

Page 174

1 from Derek.

2      A.   He was given permission to leave by
3 Derek, yes.

4      Q.   And so you and he are in the locker
5 room, and is that where you clocked in and out?

6      A.   Before then.  I go down from the station
7 with Chris.  I usually -- I basically went down
8 also to open the door for him.  I told them that
9 he would probably ask for my key, since he didn't
10 have a key, and instead of him having my key and
11 probably leaving with it, I thought I would go
12 down and open it for him and at the same time,
13 clock out.  And I did clock out for the day.

14           Now, why did I clock out for the day?

15      Q.   So Mr. Spangler is leaving for the day.

16      A.   Yes.

17      Q.   So he clocked out around four?

18      A.   Yes.

19      Q.   And then you are with him because he's
20 using your key.

21      A.   Yes.

Page 175

1      Q.   And so you clock out at that same time.

2      A.   Yes.

3      Q.   And then you follow him out of the
4 museum.

5      A.   Yeah, after our discussion in the locker
6 room, I follow him outside the museum, yes.

7      Q.   What did you talk about in the locker
8 room?

9      A.   In the locker room, we just talked
10 about, you know, trying to resolve this as
11 peacefully as we could, and then I asked him to
12 honestly tell me what he thinks might be the
13 problem, and if there is, like, changes I can
14 logically make without, you know, completely going
15 out of my way, that would resolve this problem
16 between me and him and take us back to a certain
17 time where these arguments were not present
18 between us.

19      Q.   Okay.  So did he have any suggestions
20 for you?

21      A.   Well, he had a suggestion to talk, he

Page 176

1 said, we will talk at Columbia Heights.  We will
2 talk when I see you at Columbia Heights.  This is
3 literally what he said.

4           And Columbia Heights is the neighborhood
5 where I live, and you can call it Adams Morgan if
6 you want to be nice; you can call it Columbia
7 Heights if you want to be -- you know.

8      Q.   So Mr. Spangler says to you that he does
9 have some ideas about things that you might change
10 and he will talk to you in Columbia Heights.

11      A.   That's what I came to understand.  He
12 said, "We will talk when I see you at Columbia
13 Heights."  That's the phrase he used.

14           If that can be understood that he had
15 some idea about how we can resolve our
16 misunderstanding, he was telling me those ideas at
17 a later time, then, yes.

18      Q.   What did you think he was talking about?
19 Hadn't you just asked him for ideas?

20      A.   Well, exactly.  That's why I followed
21 him outside the museum.  I kept on talking to him.

Page 177

1      Q.   So you were still talking to him; you
2 followed him outside the museum?

3      A.   Yes, and I told him just to give me
4 those ideas.

5      Q.   You wanted the ideas right then.

6      A.   Well, I was trying to kind of resolve
7 the issue without -- without him getting --
8 without him getting worse, without getting him
9 angrier to a point where he would actually go and
10 wait for me by the Metro stop at Columbia Heights.

11      Q.   So then you followed him across the
12 street to the Air and Space Museum.

13      A.   Yes.

14      Q.   And then you grabbed his arm.

15      A.   Yes.

16      Q.   And then what happened?

17      A.   Then he reacted, you know, like -- and
18 then we got into the -- you know, an actual fight.
19 We fight.  We get in a fistfight.

20      Q.   Okay.  Just so I'm clear, you and he are
21 talking in the locker room.  Both of you have

45 (Pages 174 to 177)

**Page 178**

1 already clocked out. You continue talking; you
2 follow Mr. Spangler out of the museum, across the
3 street into -- nearby the Air and Space Museum.
4 You grab his arm, and then the two of you get into
5 a fight.
6     A.    Yes.
7     Q.    Okay. And during this fight, is it true
8 that you step on and break Mr. Spangler's
9 sunglasses?
10    A.    Yes. At the end of it, yes. At the end
11 of it, once the -- it was understood that that
12 fight was initiated and we get into a fistfight
13 and we physically exchange blows, and then at some
14 point he loses his eyeglasses, and then he would
15 say -- I would grab the glasses and he would say
16 "Give them back to me," or something, and I would
17 ask him why did he do whatever he did to my
18 locker, and then he -- and then I step on them and
19 break them, yes.
20    Q.    Okay. So about how many blows would you
21 say were exchanged during the fight, if you

**Page 179**

1 remember?
2     A.    Not a lot. Three or four, and I never
3 hit him closed-fisted. I only hit him
4 open-fisted. I didn't inflict any -- or cause
5 to -- mean to cause serious physical harm.
6     Q.    So you hit him with an open hand?
7     A.    Open hand, yes, open fist.
8     Q.    How many times?
9     A.    Three times.
10    Q.    And did he actually ever hit you?
11    A.    Yeah, of course he did.
12    Q.    How many times?
13    A.    Probably the same. Same, I mean,
14 probably two or three times. I don't know if he
15 actually got me, but he tried.
16    Q.    You don't remember if he hit you or not?
17    A.    I mean, he did not actually -- I don't
18 know if he actually laid -- I had some, like,
19 boxing training, so I was -- I probably would have
20 been able to stop his blows before getting to me,
21 but I don't mean that he didn't try to throw any.

**Page 180**

1     Q.    That's what I'm asking you. Did he
2 actually hit you?
3     A.    Yes. Yes, he did hit me.
4     Q.    So his -- well, that's different. I'm
5 not asking if he tried to hit you. Did his hand
6 or fists or whatever actually hit you?
7     A.    Yeah. Yeah, they hit my hand, right?
8     Q.    They hit your hand. Where was he aiming
9 for?
10    A.    My face.
11    Q.    So you blocked his blows; is that what
12 you're saying?
13    A.    Yes.
14    Q.    With your boxing training.
15    A.    Yes.
16    Q.    Okay. And you hit him three times with
17 an open hand.
18    A.    Yes. Never with a closed fist.
19    Q.    Okay. So after you guys get into this
20 fight, is the end of it when you stepped on his
21 sunglasses?

**Page 181**

1     A.    Well, he goes back to the museum. He --
2 once I stepped on his glasses, he went back to the
3 museum and tried -- and called his friend, Edgar,
4 as we talked about before.
5     Q.    Okay. So did you go back to the museum
6 after the fight?
7     A.    I was walking back to the museum, yes.
8 But I was not following him. After he went inside
9 and I just went in, and not knowing where,
10 exactly, in the museum he was.
11    Q.    Did you, after you had this fight in
12 front of the Air and Space Museum, did you clock
13 back in and keep working?
14    A.    I clocked back in once I told Derek
15 about what had happened to the locker, and then
16 Derek asked me to clock back in, yes. He said
17 "Okay, clock back in."
18         I said, "Do you want me to clock back
19 in?" He said, "Yes, clock back in and finish
20 whatever you were finishing."
21    Q.    So after the fight, you go back to the

46 (Pages 178 to 181)

Page 182

1 museum; you find Derek and tell him that you and
2 Mr. Spangler have gotten into this fight?
3     A.    I didn't tell him about the fight.  I
4 just told him that I had a problem with my locker
5 and I suspect that it was Mr. Spangler, but I did
6 not mention that I got into a fistfight with
7 Mr. Spangler outside the museum.
8     Q.    So you just tell Derek about your
9 locker.
10     A.    Yes.
11     Q.    And then he tells you to clock back in
12 and finish your shift.
13     A.    Yes, and he took pictures of the locker
14 and helped me to get my things out and put them in
15 a bag.
16     Q.    Okay.  So you clock back in, you stay
17 until 5:30, like you're supposed to, and then
18 clock out?
19     A.    Yes.  Yes.  And then I clocked out for
20 the day at the end of that shift, yes.  After
21 having been clocked out completely at four.

Page 183

1     Q.    Do you remember when you got back to the
2 museum after the fight?
3     A.    Well, let's say 4:30.  Let's say the
4 whole thing took about a half an hour by the time
5 we also got back, and then his friend went out and
6 we had another little episode with the other
7 coworkers who were witnesses to it.
8     Q.    Okay.  So Mr. Spangler goes back to the
9 museum ahead of you.
10     A.    Yes.
11     Q.    And you say that he gets some guy named
12 Edgar.
13     A.    Yes.
14     Q.    And then what happened?
15     A.    Then they both come out of the museum,
16 and then at the same time, other colleagues come
17 in, too, and then they start -- that's when they
18 verbally, you know, threaten me with -- together
19 in front of the two other coworkers, who, you
20 know, who had -- testified that were there.  And
21 this is when it happened.

Page 184

1     Q.    So he comes back out with Edgar; they
2 threaten me, and then after that, I go back in and
3 I tell Derek about the locker and I clock back in
4 and finish my shift.
5     Q.    Okay.  And so you finish your shift in
6 the sense that you stay until 5:30.
7     A.    Around 5:30 or so, whatever time it was.
8     Q.    So you only tell Derek about the damage
9 to your locker, you don't tell him about the fight
10 that day.
11     A.    Exactly.
12     Q.    So when you're telling Derek about what
13 happened to your locker, is it just the two of you
14 talking, or is there anybody else there?
15     A.    I believe there were probably people
16 walking around in the restaurant, or maybe it was
17 in his office, I can't remember exactly, but --
18     Q.    But so --
19     A.    Nobody else listened in, if you like.
20 Nobody was there to keep watch of our
21 conversation, no.

Page 185

1     Q.    So you report to Derek what happened
2 with your locker, and then you -- do you go down
3 to the locker room and show it to him?
4     A.    Yes, yes, and then we go together and he
5 gets his camera and he takes picture of it, and
6 then because it was in a state that neither the
7 lock would -- could be removed or the knob opened,
8 so he said, "I will take pictures of it and then
9 we will just break the lock and force the locker
10 open so you can get your stuff out."  Because I
11 had, like, my ID and things that I needed to go
12 back home.
13          And this is how we did it; he took
14 picture of the locker and then we broke the lock
15 and took the things out.
16     Q.    I thought, before, you said you put your
17 stuff in a bag and put it in his office.
18     A.    Yes.
19     Q.    And then you kept working until 5:30?
20     A.    Well, he probably said to -- he said
21 "Just leave" or something.  He probably did not

**Page 186**

1 insist that I go and actually finish the shift.
2 He probably just said that I could leave or --
3 yeah, maybe I did finish, because I remember
4 changing and talking about it with other
5 colleagues in the locker room, and we were joking,
6 we made some jokes that if I -- because there was
7 this coworker of mine and we always had a joke
8 between me and him, I said, "If Chris Spangler
9 kills me when I go back home, give all my things
10 to James."
11       So I remember making that joke, and it
12 could only be possible that I could have done that
13 after having cleaned the station and went back to
14 change with the others who were also changing and
15 leaving to go home.
16    Q.   So you did go back to work and you
17 finished.
18    A.   I wouldn't be wrong to assume so, yes.
19 Otherwise, how could they have been at the locker
20 room.
21    Q.   So it sounds like you talked to some

**Page 187**

1 people right before you went home about the fight?
2    A.   Yes, yes, at that time, the rest of our
3 colleagues knew about the fight, because the
4 people who separated us were back in the
5 restaurant and told them about it while I was with
6 Derek taking care of the lock.
7       So Derek did not know, because he was
8 taking pictures of the locker, that the other
9 colleagues were telling the other workers in the
10 restaurant about the altercation.
11    Q.   Okay.  Now, you said that people
12 separated you?  Is that after you have the fight
13 in front of the Air and Space Museum and you're
14 now in front of the American Indian Museum?
15    A.   Yes, so basically, they separate him
16 from me, they separate Chris and Edgar, they
17 basically protect me from them, because it was
18 them who were trying to get at me at that point,
19 so they were basically separating them from me.
20    Q.   So this is --
21    A.   This is in front of the --

**Page 188**

1    Q.   This is later in time than when you and
2 Mr. Spangler are hitting each other in front of
3 the Air and Space Museum?
4    A.   Oh, yes.  It was right after that.
5 After the Air and Space, Mr. Spangler runs back to
6 the Indian museum, gets Mr. Edgar out, and they
7 both come out and they start threatening me,
8 saying that I shouldn't have, you know, done what
9 I did, and continued to threaten me, and at that
10 time, our other two colleagues, Hobart and -- I
11 think it was Jose', I believe, Jose' Salamanca who
12 were there, and they basically separated us.  They
13 did not allow them to physically get to me.
14    Q.   Okay, but nobody intervened when you and
15 Mr. Spangler were in front of the Air and Space
16 Museum.
17    A.   No.  No.
18    Q.   Okay.  So were you scheduled to work on
19 the next day, which would have been August 14th?
20    A.   Yes, I was.
21    Q.   Okay.  And did you go to work that day?

**Page 189**

1    A.   Yes, I did.
2    Q.   What time were you supposed to be there;
3 do you remember?
4    A.   I was supposed to be there at nine and I
5 was there at nine, I think.
6    Q.   Okay.  So what happened when you got to
7 work on the 14th?
8    A.   I was asked to -- I was asked to work on
9 a separate station from Mr. Spangler.  I was asked
10 not to, you know, talk about the incident with
11 him.
12    Q.   Who was telling you this?
13    A.   I think it was Derek and Ms. Peralta.  I
14 mean, Tara was there and we got into the office
15 and we -- I remember being in the office with
16 Derek alone.  So at some point --
17    Q.   On the 14th?
18    A.   On the 14th, when I first got into the
19 restaurant, I was asked to -- I was, if you like,
20 summoned to the office.
21    Q.   So as soon as you arrive at work on

48 (Pages 186 to 189)

**Page 190**

1 Sunday, August 14th, you're told to go to the
2 officer and talk to Derek.
3    A.    Yes.
4    Q.    Okay.  And what did Derek say to you?
5    A.    He asked me what had happened the day
6 before.
7    Q.    And what did you tell him?
8    A.    I told him that I -- that I clocked out
9 at four o'clock and I went out of the restaurant
10 and then I came back and I told him about the
11 locker, and I clocked back in, and he said -- and
12 when he asked me what had happened outside the
13 restaurant, I told him that it was just my
14 personal business and I didn't think it was any
15 of -- of any interest to him at that point.
16    Q.    Okay.  So at this time, it's just you
17 and Derek talking in the office.
18    A.    Yes.  And I believe maybe also Al, Al,
19 this new manager they had hired, Alphonso, in
20 difference to the chef, not to confuse them with
21 chef Al, Alphonso.  He was hired as a manager

**Page 191**

1 position, and it might have been him and Derek
2 together when I told Derek that what happened
3 after four o'clock was of no interest to him.
4    Q.    Okay, and what did Derek say about that?
5    A.    He said, "Well, go back up and do not
6 remain with Chris on the same station, and
7 just..."  He asked me not to talk to him, just
8 stay away from him.
9    Q.    So he tells you that you're not going to
10 be working on the same station as Mr. Spangler and
11 that you should not talk to him.
12    A.    Correct.
13    Q.    And you should not talk to anyone about
14 what happened the day before.
15    A.    Well, that, I read in his testimony, but
16 I don't remember him telling me not to talk to
17 anybody about what had happened.  I remember
18 clearly him saying, "Just don't work on the same
19 station together and don't talk to each other."
20         This is what I remember him telling me.
21 But I'm not going to say that he's -- I'm not

**Page 192**

1 going to dispute what he said in his testimony.
2 He might have; I just don't remember.  But I
3 clearly remember him telling me, "You're not going
4 to work on the same station and don't talk to each
5 other."
6    Q.    Did you talk to anyone about the fight?
7    A.    Not that morning, no.
8    Q.    Okay.  And then later that same day,
9 August 14th, did you meet with Derek and Tara?
10    A.    Later that day, yes, Tara called me
11 after -- we have what we call a pre-meal meeting,
12 where we all just gather around and talk about the
13 day's, you know, schedule, and at that time, after
14 that meeting, I was called by Tara and she said
15 she was investigating, and then --
16    Q.    So how long had you been at work before
17 you were called to meet with Derek and Tara?
18    A.    An hour, let's say.  Not even.
19    Q.    So then you have this meeting with Derek
20 and Tara and she tells you that she's
21 investigating.

**Page 193**

1    A.    Yes, that she's investigating the
2 incident and I would have to leave and I would
3 have to be actually suspended while the
4 investigation was taking place.
5    Q.    Do you remember her saying anything
6 else?
7    A.    No, no, that's it.  She said just -- you
8 know, and that they would call me back when...
9    Q.    That she will call you when?
10    A.    When she knows, you know, when she gets,
11 you know, a decision, or she makes her decision
12 about it.
13    Q.    Okay.  Did Derek say anything during the
14 meeting?
15    A.    No.  No, I believe not.  I believe not.
16    Q.    And what do you --
17    A.    I don't know.  Now it's coming back.  We
18 did, probably, talk a little in detail, that Tara
19 told me why I was being suspended.  Because she
20 said that some of your -- maybe some of your
21 coworkers were saying that you intentionally

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Rami Elhusseini

Page 194

1 aggressed them, and so because I remember being in
2 the elevator with Derek heading out of the museum
3 and telling Derek that I felt that he was not
4 being impartial, in the sense that he was not
5 being fair in his assessment of the problem or the
6 altercation.
7    Q.    When was that?
8    A.    Right after Tara asked me to leave the
9 museum. And then he, for some reason, escorted me
10 out and he went up the elevator with me, and this
11 is when I told him that I was feeling that he was
12 not being impartial, that he was taking sides and
13 that I felt that it was peculiar.
14    Q.    How could he be taking sides if the
15 investigation hadn't been done yet?
16    A.    Exactly. That was my point. That was
17 my point, that he was kind of agreeing, or at
18 least maybe he was the one to have told Tara that
19 I was intentionally aggressing other employees,
20 and that's when I told him that since he was
21 there, it would have -- it could have been, you

Page 195

1 know, better had he been a little more impartial
2 in his judgment.
3    Q.    Okay, because I thought you said that
4 Derek didn't say anything during the meeting.
5    A.    Of what Tara reported as Derek saying.
6 I mean, if I remember correctly, that's what led
7 me to think that Derek told her that I had
8 initiated the trouble, is her saying that "I was
9 told that --" so-and-so, I was told, and I assumed
10 that the person who told her was Derek. So he did
11 not say it in front of me when I was with he and
12 Tara in the office, but I was led to believe that
13 he told Tara that before I got into the office.
14    Q.    But you don't actually know who she was
15 talking about.
16    A.    No, I do not. But he did not deny that
17 he was the one. He just said that he was sorry
18 that I felt that he wasn't being fair.
19    Q.    But he didn't say that he was the source
20 of Tara's information.
21    A.    He did not deny it.

Page 196

1    Q.    But he didn't say that he was.
2    A.    No, he didn't.
3    Q.    So during this meeting, Tara is saying
4 that she was told this and she was told that, but
5 she doesn't tell you who told her these things,
6 correct?
7    A.    Probably not, yes.
8    Q.    Okay.
9    A.    She probably didn't.
10    Q.    So you assumed that it's Derek, but you
11 don't know.
12    A.    Yes, that's correct.
13    Q.    So do you remember, during that meeting
14 with Tara and Derek, admitting that you had
15 clocked out without permission?
16    A.    Yes, of course. That's what happened.
17 I did clock out without getting permission. This
18 is what I did.
19    Q.    Okay. And so you recall admitting that
20 you had followed Mr. Spangler to the Air and Space
21 Museum.

Page 197

1    A.    Yes.
2    Q.    And you recall admitting that you
3 grabbed Mr. Spangler's arm.
4    A.    Yes, I did.
5    Q.    And Tara tells you that she's going to
6 do an investigation about what happened, and
7 you're suspended while the investigation was being
8 done.
9    A.    Correct.
10    Q.    And then when the investigation is done,
11 when a decision is made, she will call you up and
12 let you know what the decision is.
13    A.    Correct
14    Q.    Okay. Do you recognize that document?
15    A.    Sure.
16        MS. GOETZL: Can we get this marked?
17        (Deposition Exhibit No. 9 marked for
18        Identification.)
19 BY MS. GOETZL:
20    Q.    So were you given the document that's
21 been marked as Exhibit 9 during the August 14th

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 198

1 meeting with Ms. Peralta and Derek?

2    A.    Yes.

3    Q.    And you refused to sign this document,

4 correct?

5    A.    Yes.  I believe -- yes.  Yes, yeah, I

6 refused to sign it because it says harassment,

7 violation of company policy and other attempts to

8 violate company policy.  That's the reason I

9 refused to sign.  I did not agree to those terms.

10   Q.    And you didn't write any comments or

11 anything on this.

12   A.    I believe not.  Not on that day, no.

13   Q.    So you didn't agree with what this

14 corrective communication was saying, but you did

15 not write your own comments on here, correct?

16   A.    That's correct.

17   Q.    So how did that meeting on August 14th

18 end?

19   A.    I was just asked to leave and I left,

20 and I -- and Derek accompanied me, and then he

21 walked me to the bus stop and that was it.

Page 199

1    Q.    So you were sent home after the meeting.

2    A.    Correct.

3    Q.    And when was the next time that you were

4 at the museum?

5    A.    I think the next day, wasn't it?  I

6 think it was -- if I remember correctly, I think

7 it was Monday, when I was asked to give back my

8 badge and --

9    Q.    I believe it was the 16th.  So --

10   A.    That probably would have been two days.

11 Okay.

12   Q.    How did you know to come in on Tuesday?

13   A.    I was called.  I was called at home and

14 I was asked to come in.

15   Q.    Who called you?

16   A.    I believe it was Tara.

17   Q.    And what did she tell you?

18   A.    She told me that I should come in and

19 talk to her and Larry with regards to the

20 incident.

21   Q.    Larry Ponzi?

Page 200

1    A.    Yes.

2    Q.    And so what happened when you got to the

3 museum that day?

4    A.    I went in and we sat down and they told

5 me that I was terminated.

6    Q.    Who was at the meeting?

7    A.    Tara Peralta, Courtney and Larry Ponzi.

8    Q.    Anybody else?

9    A.    No, I don't think so.  It was just the

10 four of us.

11   Q.    And where was this meeting?

12   A.    It was in the cafeteria, in the dining

13 hall.

14   Q.    And what happened during the meeting?

15   A.    We talked about the decision.  They said

16 that they had to terminate me, that was the

17 decision of human resources, and that I was to be

18 terminated, and then I asked Larry to kind of

19 intervene on my behalf and asked if this decision

20 could be reconsidered, and then the investigation

21 led more thoroughly showing that there was no

Page 201

1 ground for terminating me.

2    Q.    And what did Larry say he was going to

3 do, if anything?

4    A.    And he said that he would.  He said that

5 he would try to reconsider the termination with

6 the human resources and ask for a further

7 investigation.

8         And then there was a recount of the

9 events.  Tara talked about the incidents of that

10 day and then we did -- I did write my account of

11 the altercation, and I read what she had written

12 and then I --

13   Q.    I think that this is probably what

14 you're talking about.  (Proffers document to the

15 witness.)

16   A.    Yes.

17   Q.    So is that the statement that you wrote

18 during the August 16th meeting?

19   A.    Correct, that is me.

20        MS. GOETZL:  Can we get that marked as

21 10, please?

51 (Pages 198 to 201)

**Page 202**

```
1              (Deposition Exhibit No. 10 marked for
2              Identification.)
3 BY MS. GOETZL:
4     Q.    So this document that's been marked as
5 Exhibit 10 is the statement that you wrote during
6 the meeting on August 16th?
7     A.    Yes, that is the one.
8     Q.    Okay.  And in the statement, you admit
9 that you clocked out without authorization, which
10 is true?
11    A.    Yes.
12    Q.    And is that your signature at the bottom
13 of the page?
14    A.    Yep.
15    Q.    It looks like it got a little cut off on
16 this copy.
17    A.    But that's me.
18    Q.    But you recognize that?
19    A.    I do.
20    Q.    Do you recognize that document?
21    A.    Yes, I do.
```

**Page 203**

```
1     Q.    So are you saying that Tara wrote this
2 statement at the bottom of the e-mail and then you
3 signed and dated it?
4     A.    Yes.
5     Q.    Okay.  This part that you scratched out
6 and initialed after "Saturday to," the part that
7 is scratched out, do you remember what that said?
8     A.    "Saturday to --"  No.  But I remember it
9 was something I didn't agree to.  And that's the
10 reason why I wrote that other statement, because I
11 didn't agree with the way she formulated it, and
12 most particularly, probably, what I scratched out,
13 so I thought I would write that to kind of clear
14 my position.
15         MS. GOETZL:  Okay.  Can we get that
16 marked as 11?
17              (Deposition Exhibit No. 11 marked for
18              Identification.)
19 BY MS. GOETZL:
20    Q.    So on Exhibit 11, that's your signature
21 at the bottom of the page with the date, August
```

**Page 204**

```
1 16th, 2005?
2     A.    Correct.
3     Q.    Do you recognize that document?
4     A.    Yes, I do.
5     Q.    Were you given that corrective
6 communication during the August 16th meeting?
7     A.    I guess so, yes.  They dated it the
8 16th.
9     Q.    Isn't that the date that you met with
10 Tara and Courtney and Larry?
11    A.    I believe so.  I believe it was
12 following our meeting, yes.
13    Q.    Okay.  Can we get that marked as 12?
14              (Deposition Exhibit No. 12 marked for
15              Identification.)
16 BY MS. GOETZL:
17    Q.    And the document that's been marked as
18 Exhibit 12, again, you refused to sign that?
19    A.    Correct.
20    Q.    And you also didn't write any comments
21 on it, correct?
```

**Page 205**

```
1     A.    No, correct.
2     Q.    Okay.  So during the August 16th
3 meeting, you were told that you were terminated.
4     A.    Correct.
5     Q.    And who told you that?
6     A.    All of them, Larry, Tara and Courtney.
7     Q.    They all did.
8     A.    Yes, in unison.  Probably -- I mean, you
9 know, one after the other.
10    Q.    Okay.  So how did that meeting end?
11    A.    It ended on me asking Larry to try to
12 ask human resources to reconsider, and it was --
13 it ended up, you know, on a hopeful note, but also
14 on a sad note, because we were on good terms and
15 they were people I worked with for the last year,
16 and we were -- you know, when we live with people,
17 the way we work, you see them more than your own
18 family, so there was kind of, in a way, a
19 saddening to what could have been a longer career
20 with -- and we were all under the impression that
21 it would have been a good career with that
```

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979