# EXHIBIT A

# PART 3 OF 3

Page 206

1 company, the way I felt, at least, about my
2 employment with them.
3     Q.   Okay.  So you mentioned earlier that you
4 gave back your name tag and stuff like that.
5     A.   Yes.  I was required to do so.
6     Q.   So who do you think made the decision
7 that you should be terminated?
8     A.   I don't know who in human resources, but
9 I was plainly told that it was a decision of human
10 resources.
11     Q.   So with respect to the termination, is
12 it someone in human resources that you think
13 discriminated against you?
14     A.   I believe so, yes.
15     Q.   Did anyone make any discriminatory
16 remarks during the termination meeting?
17     A.   No.
18     Q.   Did anyone at Restaurant Associates ever
19 say that you were terminated because of
20 discrimination?
21     A.   Not to me.

Page 207

1     Q.   Did Larry give you any names of people
2 or phone numbers or anything for you to contact if
3 you wanted to appeal your termination or challenge
4 it or however you want to call it?
5     A.   I forgot.  Probably not, no.
6     Q.   Okay.
7     A.   I sort of figured it out because of the
8 communication of the open door policy
9 communication, that's how I -- that's how I got
10 that number.
11     Q.   Okay.  So after you were terminated,
12 what was the first thing that you did in terms of
13 trying to contact someone at the company to appeal
14 the termination, or whatever you want to call it?
15     A.   That's what I did, I went through the
16 open door policy and I called it and I said that I
17 had a problem and that I would -- that I think
18 that -- I thought that I needed, you know, help
19 with it, kind of -- trying to resolve my
20 termination issue.
21     Q.   So when you say you used the open door

Page 208

1 policy and you called, are you talking about
2 Exhibit 6, calling this number?
3     A.   For the one that I used, I think it's
4 the same one, right?  It's 1-866-BE-AWARE?  I used
5 the one in here.
6     Q.   In Exhibit 7?
7     A.   Yes.  866 --
8     Q.   1-866-232-9273?
9     A.   Yes.
10     Q.   So you called that number.
11     A.   Yes, I did.
12     Q.   And when did you do that?
13     A.   Probably did it on the 16th, if I
14 remember correctly.  It would have been only
15 logical to do it on the 16th.
16     Q.   Okay.  So you called the BE AWARE line,
17 you think, on August 16th?
18     A.   Yes, I did.
19     Q.   And what did you tell them?
20     A.   And I told them that I had a -- that I
21 believed that I was unjustly terminated and that I

Page 209

1 was hoping to get that situation resolved and get
2 back on the job.
3     Q.   And what did they tell you?
4     A.   And they -- I believe that they told me
5 that they will get in contact with me, that they
6 will -- they gave me, I believe, a case number,
7 and they said that we will, like, refer the matter
8 to someone who would contact me.
9     Q.   Okay.  So they basically took down
10 the -- what you were telling them and told you
11 that someone would call you back.
12     A.   Yes.  Yes.  It was...
13     Q.   And did someone call you?
14     A.   Yeah, of course, yes.  I spoke to
15 someone.
16     Q.   And who was that who called you?
17     A.   I forgot if I spoke to Joe Machicote
18 then, Don Bussman, if I spoke to them then or if
19 it was after I had e-mailed Sheryl Queen at
20 Compass.  I spoke to someone who would have
21 referred me to the offices of Ms. Robin Cerrati

53 (Pages 206 to 209)

Page 210

1 and I probably would have spoken to Mrs. Montina,
2 Shirley Montina, if I remember her name correctly,
3 which would have been -- I don't know how she
4 spells her name, Montina. I don't know if it's
5 Montana or Montina. I believe it was Montina.
6    Q.    And you remember talking to Shirley
7 Montina, Robin Cerrati, and Joe Machicote?
8    A.    Machicote, whatever. I think the
9 Machicote was after I talked to Sheryl Queen, who
10 was the communication director at Compass, and I
11 believe I spoke to the ombudsman after that.
12    Q.    So of those people that you named that
13 you talked to, do you remember who you talked to
14 first?
15    A.    It was Ms. Montina.
16    Q.    Okay. So how did you first get in
17 contact with Ms. Montina?
18    A.    I think I was given her number pursuant
19 to the open door thing. I believe someone called
20 me back and said that I should call her, or maybe
21 that she called me. I can't remember exactly. I

Page 211

1 can't recall precisely what may have happened.
2    Q.    Okay. How many times did you actually
3 talk to Ms. Montina on the telephone?
4    A.    I probably had talked twice, just to be
5 on the safe side. It could have been once, but
6 let's say twice.
7    Q.    Okay. And it sounds like you don't
8 remember if you called her or she called you the
9 first time.
10    A.    Yeah, I don't -- I believe she did, but
11 if it turns out that I did, then it wouldn't be
12 wrong, either.
13    Q.    Do you remember the date that you first
14 talked to her?
15    A.    Let's say the 18th. I was at least
16 given a day. There was at least a day that passed
17 after I had called that number and my
18 communication with the Office of Human Resources.
19 So it wouldn't be wrong to say after the 18th.
20    Q.    August 18th?
21    A.    That's right.

Page 212

1    Q.    And do you remember how long your first
2 telephone call with her lasted?
3    A.    Maybe a good twenty minutes.
4    Q.    Okay. Do you remember what was said?
5    A.    I explained the altercation with
6 Mr. Spangler, and I believe that was it, and then
7 that was my -- basically my ground for
8 reconsidering the termination, that I had told her
9 that I was basically -- I was the one who was
10 aggressed by him, and when I followed him, it was
11 to try to defuse the situation from growing even
12 worse, and that there was no ground for my
13 termination, that my termination should be
14 reconsidered because of that.
15    Q.    Okay. So the substance of the first
16 phone call was basically you explaining what had
17 happened with yourself and Mr. Spangler and how
18 you didn't think that that was reason for you to
19 be terminated from the company.
20    A.    Correct.
21    Q.    Okay. Did Ms. Montina say anything

Page 213

1 during the conversation?
2    A.    She said that the termination would not
3 be reconsidered, and then I asked to -- if I could
4 contact, you know, whoever is -- you know, her --
5 if it was possible to contact her supervisor,
6 maybe, or someone who would be able to change that
7 decision from the -- like pursuing our discussion,
8 I asked her if it was -- if it wasn't her decision
9 to consider, then who would be the person to
10 contact to sort of reverse this decision. Because
11 I'm saying that because I didn't ask her, like,
12 "Who is your supervisor?" I did not. I just told
13 her what would be the important next step to do in
14 order to reverse that decision, and then I was
15 probably given the number to Robin Cerrati.
16    Q.    Is that how your phone call with
17 Mrs. Montina ended?
18    A.    I would -- yes, that's how I remember
19 it, for some reason.
20    Q.    Okay. So that sounds like one phone
21 call with Ms. Montina. Was there another one?

54 (Pages 210 to 213)

**Page 214**

1    A.   Unless it was the first -- unless it was
2  in the first phone call that we talked about the
3  incident, and it was -- and it ended on a note
4  that "We will talk later and I'll let you know
5  what the decision was."
6        So if that was the case, then it would
7  have been two.  If not, then it would have been
8  only one.
9    Q.   Okay, but basically, in your
10  conversation or conversations with Ms. Montina,
11  you explained to her about the fight and that you
12  didn't think it was grounds for termination, and
13  she told you either during the first conversation
14  or the second one, if that happened, that the
15  termination decision was not going to be
16  reconsidered.
17    A.   Correct.
18    Q.   And then you asked to talk to someone
19  who would be able to change the termination
20  decision?
21    A.   Correct.

**Page 215**

1    Q.   And you were given Robin Cerrati's name
2  and telephone number.
3    A.   Correct.  And she misspelled her name,
4  too.  I don't know why she misspelled her name.
5    Q.   I'm sorry, who misspelled her name?
6    A.   Montina misspelled Ms. Cerrati's name.
7  It was probably not on purpose, but -- because I
8  couldn't e-mail Ms. Cerrati because her name was
9  misspelled, and the spelling of her name, I got it
10  from Ms. Montina.
11    Q.   Okay.  I see what you're saying.
12        So when you talked to Ms. Montina, did
13  she make any discriminatory remarks to you?
14    A.   Nope.
15    Q.   Have you ever met Ms. Montina in person?
16    A.   No.
17    Q.   Had you ever talked to Ms. Montina
18  before this telephone call in August of 2005?
19    A.   I don't think so.
20        MS. GOETZL:  Why don't we take a break.
21        (Brief recess.)

**Page 216**

1 BY MS. GOETZL:
2    Q.   Let's go back on.
3        For both your denial of promotion claim
4  and your termination claim, you have said that you
5  think it was someone in human resources who was
6  discriminating against you, correct?
7    A.   I believe so.
8    Q.   Now, how would anyone in human resources
9  know about the things you discussed earlier that
10  you think the discrimination was based on?
11    A.   Because of, you know, people talk about
12  their employees and who is sort of a candidate for
13  promotion, and employees are, I believe, discussed
14  between managers and their own superiors, and I
15  would believe that -- one of the ways it could
16  have been, because I must have been the subject of
17  promotion, the subject of -- and being discussed,
18  and it probably would have come to the attention
19  of management that I probably would not be such a
20  good candidate after all, because of the
21  characteristics that I displayed and that my

**Page 217**

1  supervisors knew about.
2    Q.   But you don't think that Mr. Hetzler
3  would have discriminated against you.
4    A.   I would find that hard to believe.  I
5  mean, it could have been, but it would be
6  difficult for me to believe that it was him.  It
7  would be, you know, a little shocking, maybe,
8  because I knew the person for a long time.  But it
9  might have been.  I don't think so.
10        I believe not.  I believe from our
11  day-to-day dealing and the time that we have spent
12  together, I believe that Mr. Hetzler would have
13  nominated me for promotion.
14    Q.   But you don't actually know that anyone
15  in human resources had any knowledge at all about
16  your pro-Jewish beliefs or --
17    A.   Pro-Zionist.
18    Q.   -- pro-Zionist or any of the things that
19  you mentioned before?
20    A.   I don't have proof of that, no.
21    Q.   So before we took the break, we were

Page 218

1 talking about the telephone call that you had with
2 Ms. Montina which ended by her giving you Robin
3 Cerrati's name and telephone number.
4    A.    I believe so, yes.
5    Q.    And did you actually ever have a
6 telephone conversation with Ms. Cerrati?
7    A.    Yes.  Yes, I did.  I certainly did talk
8 at some point.
9    Q.    How many conversations did you have with
10 her?
11    A.    Definitely more than two.  Two or more,
12 but it definitely was more than one.
13    Q.    And you got Ms. Cerrati's telephone
14 number from Ms. Montina?
15    A.    Correct.
16    Q.    Okay.  Do you remember the date of your
17 first phone call with Ms. Cerrati?
18    A.    No.
19    Q.    But it would have been after you talked
20 with Ms. Montina?
21    A.    I would assume so, yes.

Page 220

1    A.    If she seemed receptive?
2    Q.    Yes.  Was she going to listen to your
3 side of the story?
4    A.    She did listen, yes, she did listen to
5 my side of the story, yes.
6    Q.    And how did that first phone call end?
7    A.    Just for the sake of the record, to be
8 exact, I did talk to her twice; definitely once
9 from the diner where I was working at and once
10 from my home.  Which one was first, I can't
11 remember now.
12    Q.    Okay.
13    A.    I can't remember if in my conversation,
14 in my telephone conversation during my shift at
15 The Diner, the day shift, I was working at the day
16 shift and I called her and we talked and then
17 there was mention of her being on vacation, so I
18 don't know if we were supposed to talk after the
19 vacation or if I was supposed to write her the
20 letter after the vacation.  That, I can't
21 remember.

Page 219

1    Q.    Do you remember who initiated the first
2 phone call?
3    A.    I did.
4    Q.    Do you remember how long the first phone
5 call lasted?
6    A.    No, I don't.  Maybe -- I don't even -- I
7 can't even recall if we decided to reschedule for
8 another phone call or if we talked a little and
9 then talked another time a little longer, and I
10 can't remember, honestly.
11    Q.    Do you remember anything that was said
12 during the first phone call?
13    A.    Yeah, that we talked about, maybe, if it
14 was possible for the termination to be
15 reconsidered, and if she would be willing to
16 listen to my version of the events and maybe that
17 would have been -- that could have possibly be a
18 reason for her to reconsider or cause the
19 termination to be reconsidered.
20    Q.    And did Ms. Cerrati seem receptive to
21 listening to your version of what had happened?

Page 221

1         It would most likely be that, yes, we
2 talked from my home, I called from my home
3 telephone and I spoke to her and I told her the
4 version of what had happened between me and
5 Mr. Spangler and talked another time after that
6 during my day shift at The Diner.
7    Q.    Okay.  So during the first conversation
8 you had with Ms. Cerrati, she asked you to write
9 her a letter.
10    A.    During the second time.  During the
11 second time.  It was outside of The Diner, I
12 remember being outside on 18th Street and talking
13 about writing her after she comes back from her
14 vacation.
15    Q.    Okay.  So how much time passed, if you
16 remember, between the first and second phone
17 calls?
18    A.    Maybe a couple of days, but -- yeah,
19 probably not more than a couple of days.
20    Q.    Did you initiate the second phone call
21 or did she call you?

56 (Pages 218 to 221)

Page 222

1    A.    I did.  I believe I -- or maybe she did.
2  She did, after I had left several messages to her,
3  after I had -- yes, after I had left three
4  messages, she, I believe, contacted me, yes,
5  because otherwise, I wouldn't have talked to her
6  from behind the station.  It would only make sense
7  that she had called me as I was working at The
8  Diner and.I went outside to get the call because I
9  couldn't talk at the station.
10    Q.    So you left your cell phone number?
11    A.    I did leave my cell phone with her
12  assistant, with Ms. Martin as well as with her
13  assistant, Tina, and then on her personal voice
14  mail, and then after three left messages, she did
15  call back.
16    Q.    Okay.  So you leave her three messages,
17  and then she calls you back, and is that the call
18  where Ms. Cerrati calls you on your cell phone the
19  first time that you ever actually talked to her?
20    A.    The second time.  We talked first when I
21  called her from -- following, I think, referral by

Page 223

1  Ms. Montina, and then a second time when she
2  called me back.  I think so.  Yes.
3    Q.    So you called her one time and talked to
4  her; then after that, you called her three times
5  and left messages?
6    A.    Correct.
7    Q.    And then she called you back.
8    A.    Correct.
9    Q.    And where in that string of telephone
10  calls and messages do you send her an e-mail?
11    A.    After.  After the fact.
12    Q.    After all of that?
13    A.    After the second one, yes, after she
14  comes back from holiday, I believe, after she said
15  that she was going on vacation, and then the
16  e-mail was after she had come back from her
17  vacation, I believe.
18    Q.    Okay.  So did you ever talk to her after
19  you sent her the e-mail?
20    A.    No.
21    Q.    Okay.  Have you ever met Ms. Cerrati in

Page 224

1  person?
2    A.    Not to the best of my knowledge.  I
3  mean, she might have been there and I didn't know,
4  but, I mean -- I don't remember being formally
5  introduced.
6    Q.    Had you ever talked to her before these
7  phone calls in August of 2005?
8    A.    Never.  Never before.
9    Q.    And did she make any discriminatory
10  remarks during any of the telephone calls that you
11  had with her?
12    A.    She did say that it wasn't -- that I
13  didn't do the -- that it wasn't smart to do the
14  honorable thing, and I thought it was
15  discriminatory.
16    Q.    I'm sorry, what did she say?
17    A.    She said it wasn't smart to do the
18  honorable thing.
19    Q.    How is that discriminatory?
20    A.    Saying that it wasn't smart.  For being
21  honest and being diligent, it was a discriminatory

Page 225

1  remark.
2    Q.    I'm not sure you understand what
3  discrimination is.
4    A.    You mean racial discrimination?
5    Q.    Any sort of discrimination.  I mean,
6  it's mean to say that you're not smart, but it's
7  not discrimination.
8    A.    Then, yes, if it doesn't qualify as
9  discriminatory, then I believe that she had not
10  said any formally discriminatory remarks.
11    Q.    Well, discrimination is treating
12  somebody differently because of some
13  characteristic that they have, like if someone was
14  treating me unfairly because I am a woman.
15    A.    What about if you were lower in rank?
16  Like someone who has -- can be it a tone?  I mean,
17  she did have a very condescending tone when I was
18  talking with her the first time.  I don't know if
19  that's considered discriminary.
20        I don't know if this is my impression of
21  it, but other than that, no, she did not formally

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

**Rami Elhusseini**

Page 226

1  use any discriminatory terms or words.

2       Q.   Okay.  Do you recognize that document?

3  (Proffers document to the witness.)

4       A.   Yes.  Yes, that is the e-mail that I

5  sent her.

6       Q.   Okay.

7       A.   It was a chain mail.

8            MS. GOETZL:  Can we mark that as Exhibit

9  13, please?

10           (Deposition Exhibit No. 13 marked for

11           Identification.)

12 BY MS. GOETZL:

13      Q.   So Exhibit 13 is an e-mail that you sent

14 to Robin Cerrati and a number of other people, and

15 the subject is "Settle this," and it looks like

16 you sent it on Saturday, August 20th of 2005 at

17 5:30 in the morning.

18      A.   Correct.

19      Q.   And I think you testified earlier that

20 you sent this e-mail to Ms. Cerrati after you had

21 talked to her on the phone the second time.

Page 227

1       A.   I believe so, yes.  I believe that's

2  correct.

3       Q.   And that you did not ever speak to her

4  again after you sent this e-mail.

5       A.   I believe so, yes.  I believe we didn't

6  talk after this.

7       Q.   On the second page, which is

8  Bates-stamped RA 0061, you have a lot of numbers

9  in here that you're demanding for compensation.

10      A.   Yes.

11      Q.   $400,000, $700,000, $2 million if the

12 case is settled, three million if we go to jury

13 trial.

14      A.   Yes.

15      Q.   Where did you come up with those

16 numbers?

17      A.   They weren't -- they weren't based on

18 any formula or something.  I would just use, just

19 basically to kind of make whoever is reading them

20 feel a little uncomfortable, or just -- trying to

21 kind of convey that I meant business, that's all.

Page 228

1  By that time, I had realized that it was what it

2  was, that it was discrimination.

3       Q.   Do you recognize that document?

4       A.   Yes, I do.

5            MS. GOETZL:  Can we get that marked as

6  14?

7            (Deposition Exhibit No. 14 marked for

8            Identification.)

9  BY MS. GOETZL:

10      Q.   Is Exhibit 14 the termination letter you

11 got in the mail from Ms. Cerrati?

12      A.   Yes, it was the letter that I got from

13 her, yes.

14      Q.   Do you remember when you got that

15 letter?

16      A.   I don't remember, but I can know for

17 exact, because I think it was certified mail, so

18 we can definitely know the exact date of it,

19 but -- she dated it September 1st.  Let's say so.

20      Q.   Do you remember getting it shortly after

21 September 1st?

Page 229

1       A.   Probably a little shortly, maybe a week

2  or so, just to be on the safe side?

3       Q.   But you did get that letter.

4       A.   I did get it, yes.

5       Q.   Now, you mentioned a little bit earlier

6  that you had a conversation with the company

7  ombudsman.

8       A.   Yes.

9       Q.   How did you get his phone number?

10      A.   He called me.  He called me once after I

11 had sent the e-mail to -- that chain mail, and it

12 was received by Ms. Queen, the communication

13 director at Compass.  She forwarded it to the

14 proper e-mail of Ms. Cerrati, and then she

15 informed me that she was in the know, and then she

16 said that this is the proper e-mail that I should

17 address it to, and then I asked her for her

18 opinion on the matter, and if this can be resolved

19 within the company before trying to get any

20 outside legal process, and this is when I believe

21 she might have forwarded it to Mr. Machicote,

58 (Pages 226 to 229)

Rami Elhusseini

**Page 230**

1 because after that, he called me.  After the fact
2 that -- after the communication between me and
3 Ms. Queen, I ended up talking to Mr. Machicote.
4     Q.    Did you ever talk to Ms. Queen on the
5 telephone?
6     A.    No, we just e-mailed.
7     Q.    So you communicated with her only by
8 e-mail?
9     A.    Correct.
10     Q.    And you believe that Ms. Queen asked
11 Mr. Machicote to call you?
12     A.    I don't know if she asked him personally
13 or just initiated the company process where
14 someone from Compass would end up, you know,
15 calling me.  I don't know if they -- technically
16 if they had to tell the ombudsman or if she just
17 asked someone to say -- initiate this
18 investigation process and then Mr. Machicote ended
19 up calling me because someone told him to.
20          So -- but I sort of associated it,
21 because it was right after our communication that

**Page 231**

1 it happened.
2     Q.    Okay.  Do you recognize that document?
3 (Proffers document to the witness.)
4     A.    Yes, I do.
5     Q.    Is that an e-mail that you sent to
6 Sheryl Queen?
7     A.    Yes, it is.
8     Q.    And did you get the phone call from
9 Mr. Machicote, if you remember, before or after
10 you sent this e-mail?
11     A.    Oh, after this.  Definitely after this,
12 yes.
13          MS. GOETZL:  If we could have that
14 marked as 15?
15          (Deposition Exhibit No. 15 marked for
16          Identification.)
17 BY MS. GOETZL:
18     Q.    And how many telephone calls did you
19 have with Mr. Machicote?
20     A.    Maybe twice.  Maybe twice.  I believe he
21 called me once and I called him once, or maybe it

**Page 232**

1 was a phone tag, I can't remember exactly, but we
2 did speak twice, once to let him know -- to talk
3 about the issue in general, and then another time,
4 I think, probably so he would tell me, like, a
5 decisionmaking or for some reason.
6     Q.    Do you remember the date of your first
7 phone call with him?
8     A.    No.  No, I mean, I have dated it
9 somewhere, but I can't remember.
10     Q.    What do you mean, you have dated it
11 somewhere?
12     A.    I have taken a note of it somewhere.
13 When I was talking to him, I must have -- like I
14 can have the date somewhere, but I don't have it
15 fresh on mind.
16     Q.    Are you saying that you have some notes
17 at your apartment about the case that have not
18 been produced in discovery?
19     A.    Oh, no, no, it is in the discovery.  It
20 is within a few notes that I have taken, and in
21 there somewhere, I believe the date of my

**Page 233**

1 discussion with Mr. Machicote was scribbled
2 somewhere, so you probably have it in there in the
3 documents that I have provided.
4     Q.    So you said you think that you talked to
5 him twice; you called him once, he called you
6 once.
7     A.    I believe so, yes.
8     Q.    Do you remember how long the first phone
9 call lasted?
10     A.    Well, let's say twenty minutes, just for
11 the sake of it.
12     Q.    And what did you and he talk about in
13 the first phone call?
14     A.    Just about the altercation with
15 Mr. Spangler and the termination decision, and I
16 believe that I told Mr. Machicote that I -- how I
17 felt about the termination being somewhat of a
18 discriminatory nature, and this was when he told
19 me that it couldn't have been, because -- that if
20 it had been discriminatory, he would have known,
21 because he was an African-American.  Then when I

Esquire Deposition Services       MD - 1-800-539-6398
D.C. - 1-800-441-3376             VA - 1-800-752-8979

Page 234

1 asked him, "Do you think that -- do you think that
2 it was," so forth, if he thought it was -- there
3 was discrimination going on, and he said that if
4 there was, he would have known, because he would
5 have been subjected to it, being African-American.
6        So I remember that particular, just, you
7 know, to put it on the record.
8    Q.   When you talked to Mr. Machicote that
9 first time, did you tell him what you thought the
10 discrimination was based on?
11   A.   No.  That's the interesting part, that
12 he guessed that it was racial, and I didn't
13 mention it.
14   Q.   Well, it sounds like he said racial
15 because he is a minority.
16   A.   Yes, but I only mentioned
17 discrimination; I didn't say if it was because of
18 sexual orientation or because of political opinion
19 or gender, I didn't say anything, I just said
20 there was discrimination, and I told him that I
21 think it would possibly -- I probably might have

Page 235

1 been discriminated against.  Also legitimate for
2 him to think that if there was some sort of
3 discrimination against him, then it would be a
4 racial discrimination, and that's why he referred
5 to him being an African-American, because there
6 probably wouldn't have been any other
7 discrimination that he would have been subjected
8 to to begin with.
9    Q.   How did the first telephone call with
10 him end?
11   A.   It ended up on a very hopeful note.  He
12 seemed very responsive and, you know, very
13 positive about it, so I believed that it might
14 eventually turn out to be better, for the best
15 thing, and just me getting back my job and --
16   Q.   And how much time passed between your
17 first and second calls with him?
18   A.   A couple of days, maybe three days,
19 let's say three days, to be on the safe side.
20   Q.   And did you call him or did he call you
21 the second time?

Page 236

1    A.   I think he -- he probably called and
2 left a message and I called him and talked to him
3 in his office or something.
4    Q.   So how long did the second telephone
5 call last?
6    A.   I can't remember.  I can't even
7 remember, now that we're talking about it, if
8 there even was a real second -- probably the first
9 time was just to schedule another time that we can
10 talk and then the second time was the one where we
11 had the -- and then after that it was -- it was
12 probably just a brief, saying that the termination
13 was not reconsidered.
14   Q.   So you did have a telephone conversation
15 with Mr. Machicote at some time during which he
16 told you that your termination would not be
17 reconsidered.
18   A.   Correct.
19   Q.   Okay.  And do you remember anything else
20 about that conversation with him?
21   A.   No, no, but the most -- the most

Page 237

1 specific issues are the ones that we talked about,
2 that I he told me about discrimination, him being
3 of African-American descent.
4    Q.   Did Mr. Machicote make any
5 discriminatory remarks during your phone calls
6 with him?
7    A.   No.
8    Q.   Have you ever met him in person?
9    A.   No.
10   Q.   Did you ever talk to him before these
11 phone calls in August or September of 2005?
12   A.   I believe not.
13   Q.   Other than Ms. Montina, Ms. Cerrati and
14 Mr. Machicote, did you talk to anyone else at
15 Restaurant Associates about your termination?
16   A.   No.  I did not.
17   Q.   And have you talked to anyone at
18 Restaurant Associates since you talked to
19 Mr. Machicote?
20   A.   No.  No.  I thought he was Compass.
21   Q.   Pardon?

60 (Pages 234 to 237)

**Page 238**

1    A.   I thought he was with Compass.  I was
2 not under the impression that he was with RA,
3 Restaurant Associates.  When he introduced
4 himself, he introduced himself as being with
5 Compass.
6    Q.   It might be.
7    A.   If it's for the good of the record, just
8 to be exact.
9    Q.   When I have been talking about
10 Restaurant Associates, I have kind of meant both
11 Restaurant Associates and Compass, so do I need to
12 ask you these questions again?
13    A.   No, no.  Because I asked him
14 specifically, when I say -- and I asked him, "Are
15 you with Compass or with RA?"  And he said he was
16 with Compass.
17    Q.   Okay.  So you your understanding is that
18 Mrs. Montina and Ms. Cerrati and Ms. Queen are all
19 with Restaurant Associates?
20    A.   Ms. Queen is with Compass.  Ms. Montina
21 and Ms. Cerrati, Restaurant Associates;

**Page 239**

1 Mr. Machicote, Compass.
2    Q.   So of the four people that you just
3 named, have you talked to anyone else at either
4 company about your termination?
5    A.   I believe not.
6    Q.   And did you e-mail with anyone else at
7 either company?
8    A.   No, after that, no.
9    Q.   Have you sent any e-mails to anyone at
10 either Restaurant Associates or Compass since
11 Exhibit 15?
12    A.   Nope.  No, I haven't.
13    Q.   Okay.  Do you know of any Restaurant
14 Associates employee who has clocked out with
15 permission and started a fight with a co-worker
16 and not been terminated?
17    A.   Who clocked out without permission,
18 started out?  No, I don't.
19    Q.   So earlier today, we talked some about
20 other jobs that you have had, mainly with The
21 Diner and with Woodley Cafe, and I think you said

**Page 240**

1 that you were working full time at The Diner from
2 a week after your termination from Restaurant
3 Associates until right before Thanksgiving, 2005?
4    A.   Yes, a little bit before Thanksgiving,
5 yes.
6    Q.   And then you started working part time
7 at Woodley Cafe in late December, 2005, and you
8 were terminated in February of 2006.
9    A.   I think so, yes, early February.
10    Q.   Okay.  So have you had any job since
11 February of 2006?
12    A.   No.  No, I was unable to find work since
13 my termination from Woodley Cafe.
14    Q.   So you have not worked since February of
15 2006.
16    A.   Correct.
17    Q.   Since February of 2006, how many jobs
18 have you applied for?
19    A.   I would say at least fifty.
20    Q.   Five-zero?
21    A.   Five-zero, yes.

**Page 241**

1    Q.   Do you have any documentation reflecting
2 any of those job applications?
3    A.   I do, yes.  I do have some faxed forms
4 that I sent from an employment office that could
5 be verified.
6    Q.   Okay.  You need to give copies of those
7 documents to me, because that would be covered by
8 the discovery request asking for documents you
9 have related to mitigation of your damages.
10    A.   And I didn't?
11    Q.   I don't remember seeing them, no.  I
12 don't think you gave me anything about other jobs
13 that you have applied for.
14    A.   Okay.  Well, I would most definitely
15 take care of that.  I was under the impression
16 that I didn't mean to -- I mean, there were not
17 any certifications from the employment office
18 saying that I did, it was just -- like personal
19 e-mails that I have e-mailed employers and faxes
20 that I sent from their offices.
21    Q.   Right.  Right.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 242

1    A.   But if you -- I have no problem giving
2 you those.
3    Q.   I need to see whatever evidence you have
4 showing --
5    A.   All of them?
6    Q.   Whatever evidence you have showing that
7 you have applied for jobs since February of 2006.
8    A.   Evidence meaning that my application was
9 received?
10   Q.   Whatever documents you have sent out,
11 and if they sent you something back saying that
12 they received your application, that, also.
13   A.   Okay.  You don't mind if it was just me
14 sending an application, without any proof showing
15 that that application was in fact received by
16 someone?  That's my question.  You don't need it
17 to be verified?
18   Q.   Oh, no.  No.
19   A.   Sure.  I can definitely provide that.
20   Q.   I mean, assuming that you have cover
21 letters or e-mail copies or whatever, things that

Page 243

1 you have sent out that show you have been trying
2 to get a job.
3    A.   I have a lot, yes.  I didn't think that
4 you would be -- I mean, that you needed them.
5    Q.   That's fine.  If you can give them to
6 me.
7    A.   Without a problem, sure.
8    Q.   Do you remember the names of any of the
9 restaurants or companies or anything that you have
10 applied to since February?
11   A.   Sure, yes.  I have applied to -- I mean,
12 the main ones that come to mind is Providence
13 Hospital.  That's because they wrote back, and I
14 can prove they did, and Sodexo.  Sodexo, at some
15 point I spoke to someone with regard to a
16 position, and then those are the ones that come to
17 mind, clearly.  But, I mean, I'll find out and
18 I'll send you all the documents with the others.
19   Q.   So today, all you can remember in terms
20 of jobs you have applied for since February of
21 2006 are Providence Hospital and Sodexo?

Page 244

1    A.   And Sodexo, and then -- yes, because a
2 lot of the jobs that I applied for through the
3 unemployment web site do not always specifically
4 list the employer, they just list an application
5 form that you sent to them, and they confirm
6 receipt of that application, but that doesn't mean
7 that they will tell me who, exactly, the employer
8 was.
9    Q.   What sort of confirmation receipt do you
10 get?
11   A.   I will try to see if I can get copies of
12 all those applications that I sent in terms of
13 electronic references from the unemployment web
14 site that I most of the time used to apply for
15 jobs.  So it would be perfect if they kept a log
16 of anything I sent through them.
17   Q.   Okay.  Are you talking about a job
18 board, like monster.com or something like that, or
19 are you talking about jobs you're actually
20 applying for through the unemployment office?
21   A.   Through the unemployment office, through

Page 245

1 the official web site of the governmental
2 unemployment benefits office.  So hopefully, if
3 they have a log of the applications that I sent,
4 because you have to log in and verify that it's
5 you and then -- so they might keep a log.  I will
6 make sure and verify if they do and I'll
7 definitely send it to you.
8    Q.   And it's a requirement for you to
9 continue getting your unemployment benefits for
10 you to apply for a certain number of jobs?
11   A.   It is -- no, it's not a requirement.
12 It's not a requirement.  It is asked, but it is
13 not required of you to apply.  At least I didn't
14 gather that it was.
15   Q.   Okay.  So what was the position that you
16 applied for at Providence Hospital?
17   A.   I applied for cook, for line cook; I
18 applied for dietetics -- dietetic -- what's that
19 position called--dietetic technician.
20   Q.   I'm sorry, what?
21   A.   Dietetic technician.  That's what they

62 (Pages 242 to 245)

**Page 246**

1 call it, someone who helps with the nutrition
2 people, basically, someone who just verifies the
3 nutrition always, and those were the jobs that I
4 applied for. Then there was a librarian position
5 with them, too.
6   Q.   You applied for a librarian position?
7   A.   Sure.
8   Q.   So do you remember what the pay rates
9 were for those three different jobs you just
10 mentioned?
11   A.   I can't remember, but, I mean, in some
12 of them, they asked what the desired rate was,
13 so --
14   Q.   So if someone asks you how much you
15 wanted to get paid, what do you normally say?
16   A.   For a cook position, I would ask for
17 eleven dollars an hour, try to negotiate for that,
18 and I would sometimes just say negotiable.
19   Q.   How did you apply for those couple of
20 positions with Provident Hospital?
21   A.   Some of them were electronic and some of

**Page 247**

1 them by fax. I mean, those particular three
2 positions, I have an official fax form proving
3 that I did apply for them, and the receipt, the
4 letter from Providence saying that they did
5 receive my application.
6   Q.   Okay, and when did you apply for those
7 positions?
8   A.   I was still applying -- last time I
9 applied for Providence was -- I would say last
10 August, right before I started school. Last
11 August -- and even this August, that is, August of
12 2006.
13        And then ever 11 - 1 would say
14 September, actually, September 21st of 2006, I
15 submitted a resume' to the dietetics department in
16 hand, because I was there during a school trip to
17 Providence Hospital during one of my classes, and
18 I met personally with the dietetics -- the head of
19 the dietetics department and I gave him my resume'
20 by hand, and that was like maybe the fourth time I
21 had applied to Providence.

**Page 248**

1   Q.   So you applied to at least one job in
2 August of this year and one job in September of
3 this year?
4   A.   Yes, definitely one job in September,
5 and before then, at least ten jobs a month, and I
6 will get you the documentation proving that.
7 Before the school started, that is. After -- once
8 the school started in August, I did not apply as
9 extensively, because I kind of felt -- made the
10 decision to try to finish with school.
11   Q.   And when did school start for you again?
12   A.   August, I believe it was -- maybe
13 August -- the 12th of August, I think.
14   Q.   So after the 12th of August, about how
15 many jobs a month would you say you applied for?
16   A.   Maybe one.
17   Q.   One a month?
18   A.   One a month, yes. And then none. Now
19 none, because I'm intending to go full time to
20 school, and I wouldn't be able to work with a
21 full-time schedule.

**Page 249**

1   Q.   So when did you stop looking for jobs?
2   A.   I mean, I never officially stopped, but,
3 I mean, I never pursued a profession as of, maybe,
4 last month. As of September of two thousand
5 and -- I mean October of 2006.
6   Q.   So as best you can remember, what was
7 the date of the last job application you
8 submitted?
9   A.   It would be September 21st. September
10 21st, 2006.
11   Q.   That would be the last job application?
12 That was when you turned in your resume' by hand
13 to the dietetics department at Providence
14 Hospital?
15   A.   Correct.
16   Q.   So these jobs that you applied for at
17 Providence Hospital, did you get an interview for
18 any of them?
19   A.   No.
20   Q.   Did you get any sort of rejection
21 letter?

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 250

1    A.    No.  No.

2    Q.    You just never heard anything.

3    A.    I got a letter stating that they did
4 receive the application, and that if in thirty
5 days I did not hear from them, that I could assume
6 that I was not taken.

7    Q.    Okay.  So what job did you apply for at
8 Sodexo?

9    A.    It was a cook, a cook's position, and it
10 was a dietetics aide position.

11    Q.    Two different jobs?

12    A.    Yes, and the correct position at
13 Providence was also a dietetics aide.  That's what
14 they called it, a dietetics aide.

15    Q.    And how did you submit your application
16 to Sodexo?

17    A.    Electronic.  Electronic, and then I got
18 a phone call from someone at human resources.

19    Q.    Saying that they had received the
20 application?

21    A.    Yes, yes, saying, and then another phone

Page 251

1 call from the person at human resources directing
2 me to another department, because they had -- I
3 think they had closed down that advertised
4 position, and then when I asked about another
5 position, I was referred to another department at
6 human resources who took care of the cook's
7 position.

8    Q.    Do you remember what the pay rates were
9 for either of those jobs at Sodexo?

10    A.    No.  Probably they advertised for the
11 dietetics maybe around -- I forgot exactly; maybe
12 $30,000 a year seems a lot now.  It may be -- some
13 of the figures were around those for those
14 positions.

15    Q.    So did you get any interviews with
16 Sodexo?

17    A.    Never, no.  No, I only got phone calls
18 from one person at human resources and that was
19 it.

20    Q.    So other than the jobs at Providence
21 Hospital and the jobs at Sodexo, do you remember

Page 252

1 any other places that you applied to?

2    A.    Their names don't come to mind now, but
3 a lot of them was -- oh, yes, there was this one
4 in Bethesda called -- there was also some
5 nutrition position, and -- Beta.  It was called
6 Beta something, Beta Labs or something, but I will
7 get you the exact name of it when I forward all
8 the applications.

9    Q.    So do you have any applications pending
10 right now?

11    A.    I believe not.  I believe -- usually
12 what they advise is in thirty days, if you don't
13 hear from an employer, they don't take you.

14         I mean, Providence Hospital might still
15 turn out.  The head of the dietetics department
16 that I talked to was also offered a position to
17 teach at my school, so it may be still a
18 possibility that if I became a student, then it
19 would be a possibility that they would reconsider
20 my application.  That may be.  So far, I hadn't
21 heard from them.

Page 253

1    Q.    But so far as you know, you don't have
2 any pending applications right now?

3    A.    No.

4    Q.    And you received unemployment benefits
5 since you were terminated from Restaurant
6 Associates, right?

7    A.    After I was terminated from The Diner,
8 not right after I was terminated from Restaurant
9 Associates.

10    Q.    When did you start getting unemployment
11 benefits?

12    A.    Maybe in -- I honestly can't remember.
13 Maybe in February or March.  But that can
14 definitely be documented very accurately, because
15 I keep a log and I can just print it out if you
16 desire and I can send it to you if you want it,
17 along with the other job applications if you want
18 it.

19    Q.    Yes, I would.

20    A.    Sure.

21    Q.    So how much are you getting in

64 (Pages 250 to 253)

Page 254

1 unemployment benefits?

2    A.    It stopped.  I got it and I got it for a

3 few months, a few months that I was allowed to

4 get, and then -- and when I was getting, I was

5 getting $440 every two weeks.

6    Q.    $440?

7    A.    Yes.  But they took out the taxes

8 already.

9    Q.    And about for how many months do you

10 think you got unemployment?

11    A.    I think it was six months?  I think I

12 was entitled to six months.

13    Q.    So other than the unemployment that you

14 got and your job at The Diner and your job at

15 Woodley Cafe, have you had any other income

16 sources since you were terminated from Restaurant

17 Associates?

18    A.    No.

19    Q.    And you have been going to school

20 full-time since when?

21    A.    Well, it's not -- particularly, it's no

Page 255

1 full time.  Full time is over twelve credits.

2    Q.    Okay.

3    A.    So now I'm taking ten credits.  It's

4 more -- longer hours, because there's a lot of lab

5 courses, but technically speaking, I'm not

6 considered a full-time student as of this semester

7 yet.

8    Q.    So you're taking ten credits.

9    A.    Yes.  So that's less than full time.

10    Q.    And is that how many you have been

11 taking since August of this year?

12    A.    Yes, since August, I -- yes, that's

13 correct.

14    Q.    And where are you going to school now?

15    A.    UDC, University of the District of

16 Columbia.

17    Q.    Do you recognize that document?

18 (Proffers document to the witness.)

19    A.    Yes, I do.

20    Q.    Is that the complaint you filed in the

21 Superior Court against Compass and Restaurant

Page 256

1 Associates?

2    A.    I believe so, yes.

3         MS. GOETZL:  Can we get this marked,

4 please?

5         (Deposition Exhibit No. 16 marked for

6         Identification.)

7 BY MS. GOETZL:

8    Q.    Do you recognize that document?

9    A.    Yes, I do.

10    Q.    Is that the elaborate statement that you

11 filed with the federal court in the case?

12    A.    I believe so, yes.

13         MS. GOETZL:  Can we get that marked,

14 please?

15         (Deposition Exhibit No. 17 marked for

16         Identification.)

17 BY MS. GOETZL:

18    Q.    Do you recognize that document?

19    A.    Yes, I do.

20    Q.    Are those your interrogatory answers in

21 this case?

Page 257

1    A.    I believe so, yes.

2         MS. GOETZL:  Can we get those marked?

3         (Deposition Exhibit No. 18 marked for

4         Identification.)

5         THE WITNESS:  Tortious interference.

6 Now I remember.  That statute of the law that I

7 hadn't been able to remember; now I do.  It's

8 tortious interference.  Because malicious

9 interference is some radio law.

10 BY MS. GOETZL:

11    Q.    So you have got discriminatory

12 termination, discriminatory denial of promotion,

13 and tortious interference?

14    A.    Tortious interference, yes, because

15 of -- yes.

16    Q.    And what is the tortious interference

17 based on?

18    A.    I think it was that emotional stress

19 thing.  I think this is how I categorized it,

20 categorized it under the tortious interference,

21 but as you more correctively said, it was probably

Page 258

1 better classified under emotional distress.

2    Q.    Well, I don't want to tell you what your

3 claims are.

4    A.    I mean, I can try to look up here

5 exactly, if I may, and most likely it is here, if

6 I can just get to that question, if I remember

7 which one that you asked to formulate the exact

8 law or laws that I thought were violated.

9    Q.    Well, I have some questions for you

10 about your interrogatory answers, and the first

11 one is about your answer to interrogatory number

12 two, which is on page two.

13    A.    Yes.

14    Q.    And you say in here in the middle of the

15 page, "Allegation of possible attempts by

16 defendants to interfere with mitigation of damages

17 through influencing subsequent employer at the

18 time to terminate plaintiff."

19    A.    Yes.

20    Q.    What does that mean?

21    A.    That they asked The Diner guys to fire

Page 259

1 me.

2    Q.    Who asked The Diner to fire you?

3    A.    Restaurant Associates.

4    Q.    Who at Restaurant Associates?

5    A.    Who?

6    Q.    Who from Restaurant Associates asked The

7 Diner to fire you?

8    A.    Well, I believe if -- the one I might

9 allege may have is a colleague of mine called --

10 I'm trying to remember the name.  His name just

11 escapes me, but one of my colleagues at Restaurant

12 Associates -- Norvill.  Norvill.  Now I remember,

13 it's like Deborah Norvill.  So Norvill knew Marco

14 Corenza, who was my supervisor at The Diner, and

15 he had asked me to kind of relay, like, his, you

16 know, his -- to him that he said hello or

17 something, so I knew for a fact that he knew him.

18         Now, he might have been one of --

19 because Marco Corenza, after I had started,

20 basically, suing Restaurant Associates, kind of

21 changed his behavior to me, which led up,

Page 260

1 ultimately, to my firing at The Diner.

2         Now, I'm not trying to -- this is in

3 what I claim to have told people, but I'm not -- I

4 mean, as you know, suing them for doing that.  But

5 I have talked to people about that.

6    Q.    You talked to people about what?

7    A.    About a possibility of them trying to

8 influence my current employer at the time.  This

9 is in my discussion with the Justice Department

10 regarding the incident, that I --

11    Q.    Okay.  Who is this Norvill person?

12    A.    Norvill is a colleague of mine who

13 worked --

14    Q.    What was -- I'm sorry, go ahead.

15    A.    -- who worked is at a Restaurant

16 Associates' restaurant.

17    Q.    Is Norvill his first or last name?

18    A.    Norvill is his first name.

19    Q.    Was he a line server with you?

20    A.    He was sometimes on stations.  His main

21 job was to basically supply the stations, just --

Page 261

1 I'm trying to remember the exact term of his

2 duties.  But he just rotated, basically.  He

3 supplied -- he got the supplies for the stations.

4    Q.    So he was a line server or some sort of

5 supply person?

6    A.    Like -- yes.  I mean, he technically did

7 do the stations, and even at some point he started

8 to get kitchen training.

9    Q.    Was he a manager?

10    A.    He was not a manager, no, he was not in

11 a managerial position, he was like in a service

12 position.  He was hired in a service position.

13    Q.    Okay.  So you think that Norvill asked

14 The Diner to fire you?

15    A.    I said may have.  This is one of the

16 things that I talked to people about concerning

17 this case.

18    Q.    Okay, but you don't know that that ever

19 happened.

20    A.    No, I don't know.  This is by far like

21 just wild speculation, nothing more than that.

Rami Elmusseini

Page 262

1    Q.    All right.  In your answer to
2 interrogatory number 20, which is on pages 13 and
3 14, you refer three times to the amount of
4 $300,000.
5    A.    Yes.
6    Q.    And you say that that's the amount
7 that's allowed by law.
8    A.    .I believe I recall from our first
9 session with the judge, if you recall him telling
10 me that the maximum amount I was allowed to ask
11 for was $300,000, and this is what I based my
12 request upon.  I requested that, since I believe
13 they violated several statutes of law, being one
14 of being a civil right, a corporation law and the
15 law prohibiting intentional affliction (sic) of
16 emotional distress, that I asked for $300,000 for
17 each of those.
18    Q.    Okay.  So you understand that what the
19 judge was talking about was that that's the amount
20 that you can recover if you're bringing your
21 claims under Title 7?

Page 263

1    A.    Under Title 7 of civil rights, yes.  I
2 understand that -- for some reason, I concluded
3 that under each of those titles, I would be
4 entitled to a maximum of $300,000.
5    Q.    Okay.  So you remember that earlier
6 today I was asking you if you were bringing your
7 claims for discriminatory denial of promotion and
8 discriminatory termination under Title 7.
9    A.    Well, under Title 7, it was -- I believe
10 it's basically, yes, then it would be -- the
11 termination and lack of promotion.
12    Q.    So you're bringing both of those claims
13 under Title 7?
14    A.    Just lack of promotion under Title 7,
15 because the other one would be -- the wrongful
16 termination would be under the corporation law,
17 under the unfair termination, since it did not get
18 the proper investigation, I was denied the proper
19 investigation, that I would claim that they
20 violated the statute, the corporation law
21 statutes.

Page 264

1    Q.    What page are you looking at?
2    A.    I'm looking at page two.
3    Q.    And what is the law that you think says
4 you're entitled to a fair investigation?
5    A.    The number of the law, you mean?
6    Q.    What is it called?
7    A.    I thought it was called the corporation
8 law.  I mean, one of the -- if I'm not mistaken.
9 And then I also mentioned unjust enrichment law
10 and restitution law, and I claimed that they're
11 using promise of promotion as false motivation,
12 that they basically made me work for them and make
13 money for them and I was denied a promotion, which
14 in my view is an infraction of the unjust
15 enrichment law and the restitution law, because
16 they did not compensate me for the effort that I
17 had -- that I have given, because supposedly I
18 thought I would --
19    Q.    Are you saying they didn't pay you?
20    A.    No, they paid me too little for what I
21 have given.  I'm claiming that they paid too

Page 265

1 little for the amount of effort that I have given
2 the company, that I was given much less than what
3 I did, and fact that I did give a lot to the
4 company was because I was under the impression
5 that I would end up getting promoted because of --
6 when I showed promise of good work, so this is why
7 I claimed the infraction of unjust enrichment and
8 restitution law.
9    Q.    I still am just not clear what you think
10 your claims are, again, and --
11    A.    Well, about the civil rights, it's -- is
12 my claim to Title 7 is kind of the claim that I
13 war being exposed to a form of antisemitism
14 because I was not promoted due to the fact that I
15 was nonwhite.  And then that's one --
16    Q.    Yes, I understand what your claim is
17 with respect to the denial of promotion being
18 discriminatory, and I understand your termination,
19 you think, was discriminatory, but I guess I don't
20 understand how you're trying to bring claims other
21 than those two.

67 (Pages 262 to 265)

Rami Elhusseini

Page 266

1   A.   The emotional distress.

2   Q.   Is that it?

3   A.   Emotional distress, that's different,

4 right?  The law of the tort, that's different,

5 right, or do we not call it that in our case, in

6 our situation.

7   Q.   That's a completely different claim than

8 the two discrimination claims.

9   A.   Yes, we're talking about the claims.  I

10 thought we were talking about the claims.

11   Q.   That's what I'm trying to figure out,

12 what your claims are.

13   A.   Well, one of them is the discrimination

14 under Title 7 because of lack of promotion.

15   Q.   Right.

16   A.   And then the emotional distress.

17   Q.   Okay.

18   A.   And then if you think it's -- yes,

19 it's -- better understood, that wrongful

20 termination was a violation of Title 7, then, yes,

21 we could say that.

Page 267

1   Q.   Okay.  So you have just stated three

2 separate claims.

3   A.   Three separate claims, wrongful

4 termination, denial of promotion and emotional

5 distress.

6   Q.   Are those your three claims in this

7 lawsuit?

8   A.   Yes.

9   Q.   Is that it?

10   A.   Correct.

11   Q.   Okay.  Now, if you go back to your

12 answer to interrogatory number 20 on pages 13 and

13 14, at the top of page 14, in the second line, you

14 have a reference in here to $300,000 being based

15 on comparisons with salaries of the company

16 managers.

17   A.   Yes.

18   Q.   How do you know what the salaries of the

19 company managers are?

20   A.   I don't know.  I just assumed what a

21 general manager or CEO gets paid.  I just assumed

Page 268

1 what the head of human resources would be getting,

2 but I have no particular proof of -- or knowledge

3 of that.

4   Q.   Okay.  Now, in your answer to

5 interrogatory number 25, which is on page 15, you

6 list a lot of doctors that you have seen since

7 2000.

8   A.   Yes.

9   Q.   So I understand that Dr. Edward Kahl.

10   A.   Dentist.

11   Q.   Is a dentist?

12   A.   Yes.  You said all the doctors.

13   Q.   And I'm not saying that a dentist is not

14 a doctor.  And Gary Franz is also a dentist.

15   A.   Franz is also a dentist, yes.  I just

16 thought it better not to omit anybody.

17   Q.   Absolutely.  Okay.  So let's start with

18 Dr. Dale Matthews.

19   A.   Yes.

20   Q.   When did you first see him?

21   A.   Dale Matthews, I saw him, I believe, in

Page 269

1 2000.  If I remember correctly, it was 2000.  It

2 was definitely -- he may have been in September of

3 2000.

4   Q.   What did you go see him for?

5   A.   Oh, before September.  Definitely before

6 September, because -- it was definitely before

7 June.  So I started seeing him, I would say, in

8 maybe April or June.

9   Q.   Of 2000?

10   A.   April of 2000, yes.  That would be the

11 most -- yes.  Oh, of 2000?  What am I talking

12 about?  2001.  I'm thinking 2001.  September,

13 2001, he had already been seeing me for a couple

14 of months, so it would have been in April or May

15 of 2001.  I apologize for that.

16   Q.   That would be the first time you saw

17 Dr. Matthews?

18   A.   I think so, yes.

19   Q.   And what did you see him for?

20   A.   I saw him because I had problems.  I was

21 taking drugs and I was having difficulty getting

68 (Pages 266 to 269)

Rami Elhusseini

Page 270

1  off of drugs and I needed professional help.

2      Q.    What kind of drugs?

3      A.    Marijuana and ecstasy.

4      Q.    Are you saying you were addicted?

5      A.    I think I was.  I mean, I think I was,

6  since I had been taking them regularly, I would --

7  had a job at the same time, so I was not socially

8  incompatible, but I was taking them on a regular

9  basis, which I would think, yes, would qualify me

10  as addicted.  I don't know --

11      Q.    Did he diagnose you as a drug addict?

12      A.    No.  No, he didn't.

13      Q.    Was there any sort of diagnosis related

14  to his treatment of you?

15      A.    Well, he did diagnose me as someone who,

16  you know, has -- you know, taking drugs.  But I

17  wasn't diagnosed as incapable of handling it

18  without a problem.  That's why I came to the

19  conclusion that I was not diagnosed as an addict.

20      Q.    Did he prescribe any sort of medication

21  for you?

Page 271

1      A.    Yes, he did.  He prescribed Zoloft.  He

2  did blood tests first, because I think it has to

3  do with lithium levels in the blood that they

4  would have to make sure of before prescribing that

5  particular medication, because it's supposed to be

6  a very potent medication.  So he did whatever he

7  had to do in terms of blood tests and lithium

8  levels, if I remember correctly, and then after

9  that, once he got the results back, he prescribed

10  Zoloft to me.

11      Q.    Okay.  So were you prescribed Zoloft in

12  April of 2001?

13      A.    I would believe so, yes.

14      Q.    And what is that for?

15      A.    Basically it's an antidepressant.  This

16  is what the most common prescription of Zoloft is

17  for.

18      Q.    And how long did you take that for?

19      A.    I took it for a year.

20      Q.    And did you see Dr. Matthews more than

21  one time?

Page 272

1      A.    Yes, I saw him several times.  I saw

2  him -- he was my doctor.

3      Q.    So you were seeing him on a regular

4  basis?

5      A.    I was seeing him, probably, once every

6  month and then once every two months, and then I

7  stopped because I lost my insurance, so I stopped

8  seeing him.

9      Q.    So you're not seeing Dr. Matthews any

10  more?

11      A.    No, stopped seeing him in two thousand

12  and -- the last time I saw him, I think it was

13  maybe in the new year of 2001.  Like around,

14  maybe, October of 2001 would be the last time that

15  I saw Dr. Matthews.

16      Q.    So you only saw him for six months?

17      A.    Correct.

18      Q.    Okay.  But he gave you a prescription of

19  Zoloft for a year?

20      A.    Yes.  Yes.  After -- because I

21  couldn't -- I couldn't -- you know, I didn't have

Page 273

1  any coverage anymore, so we basically disagreed on

2  the terms of how would I be finishing my therapy,

3  and then he just left me with instructions on how

4  to decrease the amounts and how to finish in a

5  year's time, starting April.

6      Q.    Okay.  What about Dr. Herbert Moskowitz

7  when was the first time you saw him?

8      A.    Dr. Moskowitz, I saw him in 2004.  I

9  believe it was 2005.  I believe it's 2005, and --

10      Q.    The first time you saw him?

11      A.    Yes.

12      Q.    2005?

13      A.    I believe it was in maybe June.  June?

14  Yes, I think it would be June, 2005.

15      Q.    And what did you go to see him for?

16      A.    For depression.  For depression.  That's

17  when I realized that I probably would be better

18  off on Zoloft again.

19      Q.    And did he diagnose you as being

20  depressed?

21      A.    Yes, he did.

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Rami Elhusseini

Page 274

```
1      Q.   And he prescribed Zoloft for you?
2      A.   And he prescribed Zoloft, yes.  I
3 mentioned that I had been on Zoloft before and I
4 thought that it -- then he agreed and he said that
5 I probably should be on it again.
6      Q.   And how long did you take Zoloft for
7 that time?
8      A.   And for that time I took Zoloft for
9 another year.
10     Q.   So June, 2005 until June of this year?
11     A.   Yeah.  Well, April, to be exact.  It was
12 April of this year.
13     Q.   And did you see Dr. Moskowitz more than
14 one time?
15     A.   Yes, I did.  He became my doctor until
16 he had left that office that I was visiting and
17 Dr. Eng became my physician.
18     Q.   Okay.  So how often were you seeing
19 Dr. Moskowitz?
20     A.   I had once-a-month appointments.  Once a
21 month I had to go see him and do liver function
```

Page 275

```
1 tests, you know, because of the medication.
2      Q.   And you're not seeing Dr. Moskowitz any
3 more.
4      A.   No, I'm seeing neither.  Neither
5 Dr. Moskowitz nor Dr. Eng.
6      Q.   And when did you stop seeing
7 Dr. Moskowitz?
8      A.   I stopped seeing -- the last time I saw
9 Dr. Moskowitz would be probably in August.
10     Q.   Of 2005?
11     A.   August of 2005, yes, ma'am.
12     Q.   When did you first see Dr. Eng?
13     A.   I believe that in August, it would be
14 fair to say in August.  When I went for my
15 appointment with Dr. Moskowitz, I was assigned to
16 see Dr. Eng, because I was told that Dr. Moskowitz
17 was no longer assigned to a clinic.
18     Q.   So you were seeing Dr. Eng also for
19 depression?
20     A.   Yes, he finished seeing me.  Yes, I
21 think it was continued care; I don't know how we
```

Page 276

```
1 classified, but, yes, he continued on seeing me on
2 what was diagnosed by Dr. Moskowitz.
3      Q.   So were you seeing Dr. Eng on a monthly
4 basis?
5      A.   On a monthly basis, too, yes.
6      Q.   So you saw Dr. Eng on a monthly basis
7 from August of 2005 until April of 2006?
8      A.   No, until, maybe -- January?  January of
9 2006, that would be.
10     Q.   So was January, 2006 the last time that
11 you saw Dr. Eng?
12     A.   Yes, because that was the last month of
13 coverage that I had.
14     Q.   But you kept taking Zoloft until April
15 of 2006?
16     A.   Yes, did, yes.  I had enough medication
17 to keep on taking it until I didn't need it.
18 Okay.
19     Q.   And what about Dr. Thomas Kehey?
20     A.   He's a dermatologist.
21     Q.   Okay.  And what did you go to Howard
```

Page 277

```
1 University hospital for?
2      A.   Just their dental school.  I was a
3 student there and we had dental coverage and they
4 just gave us free dental care.  So it was for
5 dental work.
6      Q.   Did you say you were a student there?
7      A.   I was a student at Howard University
8 when I was working for Restaurant Associates, yes.
9      Q.   I'm sorry, I got it confused.  I thought
10 you were saying you were a student at the dental
11 school there.  But you went to the dental school
12 to get some work done on your teeth?
13     A.   Yes  They gave it free, basically.
14 dental care as Howard students.
15     Q.   All right.  So other than Dr. Matthews,
16 Dr. Moskowitz, Dr. Eng, Dr. Kehey, Dr. Kahl,
17 Dr. Franz and Howard University Hospital, have you
18 been to any other health care providers since
19 2000?
20     A.   I believe not, no.  Not that I can
21 recall, no.
```

70 (Pages 274 to 277)

**Page 278**

1    Q.   Other than what you described in terms
2 of when you were taking Zoloft, have you taken any
3 medication regularly since 2000?
4    A.   Other than Zoloft, no.
5    Q.   So do you have a primary care provider
6 now?
7    A.   No.  I mean, I have access to the
8 District of Columbia health care system if I
9 wanted to, but I haven't used it yet.
10    Q.   Okay.
11    A.   Actually, I have been to a dentist that
12 I didn't mention here the last time.  Should I --
13 it was a dentist.  It was just a dentist; it was a
14 cap -- I got a dental cap fixed.  I don't know if
15 you think that's relevant, but I can forward it to
16 you.  It was just last month; that's why it wasn't
17 there.
18    Q.   I don't think that I need that.
19    A.   It was just a dental visit.
20    Q.   In your complaint, you have alleged that
21 Restaurant Associates' actions caused you

**Page 279**

1 emotional distress.
2    A.   Yes.
3    Q.   Can you describe that emotional distress
4 for me?
5    A.   It was like -- like a feeling of
6 helplessness and stuff like that, or the actual --
7 like the reasons behind it?
8    Q.   I want to know how you felt.
9    A.   Well, I felt bad.  I mean, I felt
10 depressed.  You feel helpless; you feel like
11 trapped, if you like, when you're faced with
12 unjustifiable discrimination, if you like.
13       This is the feeling, that you feel
14 trapped because you can't do anything about it and
15 you're there and you realize that a lot of --
16 basically, a lot of it has to do with -- a lot of
17 it has to do with deception to you, a lot of
18 feelings of -- sometimes they're defined as
19 unpleasure, a feeling of unpleasure is a state --
20 is an emotional state that is caused when a desire
21 or a decision is based on an untrue -- on an

**Page 280**

1 untrue reasons or cause, if you like, and then
2 when you realize it's like -- how do we say
3 that -- retrospective effect, like all that time
4 that I have been so-and-so turned out to be
5 so-and-so.
6       So although you get -- or although I did
7 get to feel bad when it was practiced at the time
8 that it was practiced, when eventually I was
9 denied promotion, although I felt that I did
10 deserve it, at that time, I convinced myself that
11 it was not yet time for me to get that promotion,
12 that I felt that it was okay for me to be treated
13 or denied promotion or given so little money.
14       But then after the wrongful termination
15 process, at the wrongful termination investigation
16 process, it also came to mind or I came to the
17 realization that all that time when that
18 feeling -- those feelings of lack of justice, if
19 you like, were intentional, were caused because
20 someone intended them to take place, and this is
21 also part of the feeling that adds to the

**Page 281**

1 general -- to the general, if you like, dynamic of
2 the depression that I felt I was in due to the
3 course of their actions.
4    Q.   So the feelings that you were just
5 describing, when did you experience those?
6    A.   Well, I started feeling the effect of
7 them, you know, when I felt the need to get
8 medication and go see Dr. Moskowitz.  I was not
9 consciously aware that I was having those feelings
10 because of the doing of someone in human resources
11 in Restaurant Associates.  This is not how I
12 formulated it to myself, but I started feeling
13 those feelings of being trapped and working very
14 hard for nothing, and being unappreciated for all
15 the effort and all the, if you like, sort of the
16 sacrifice that you -- because it's sort of a
17 sacrifice, even when you decide not to go to a
18 Saturday night event, for instance, and see your
19 favorite artist and you decide not to go because
20 you wanted to be at your best on Sunday morning to
21 impress your boss, and then this is kind of a

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

Page 282

1 sacrifice, so when you feel that all these
2 sacrifices have been in vain and for nothing, that
3 also adds up to the feeling of deception that
4 enhances, if you like, the effects of that
5 depression.
6     Q.   So when you're saying you started to
7 feel that way?
8     A.   I believe that it would be a precise
9 date to put it -- I think I can get the exact date
10 of seeing Dr. Moskowitz, but let's say just for
11 the sake of the argument that it was in May.  That
12 I said earlier that it was in June.  Probably the
13 last time that I saw him was -- because I did see
14 him once, but not as -- not as my physician; he
15 happened to be at the clinic.  So maybe the first
16 time that I met with Dr. Moskowitz was in May, May
17 of '05.  '05, yes.
18    Q.   And how long did those feelings that you
19 were describing last?
20    A.   They lasted, you know -- you mean when
21 did they stop?

Page 283

1     Q.   Yes.
2     A.   Well, they stopped when I was on 150
3 milligrams of Zoloft.
4     Q.   And when was that?
5     A.   I reached the 150 probably soon after I
6 started.  I started, probably, on a hundred, and
7 then ended up, definitely, on 150 by -- I think by
8 June, I was on 150.  Yeah.  And even at some
9 point, I mean, I did get a prescription for 300
10 milligrams.  There was a point in my medical
11 history following the events of all this -- all
12 these incidents that I was prescribed an eventual
13 300 milligrams of Zoloft a day.
14    Q.   So you were experiencing those feelings
15 between May and June of 2005?
16    A.   Yeah.  I mean, up until -- I mean, up
17 until, you know, especially after -- especially
18 after the termination process.  The termination
19 process sort of culminated into, like, the
20 symptomatic aspect of the depression, that I was
21 really feeling that it would not go until I would

Page 284

1 get heavy doses of Zoloft.
2     Q.   So when was your dosage of Zoloft
3 increased?
4     A.   It was -- it was increased, basically,
5 the first time, basically, in June to 150, and
6 then it definitely reached a height of -- like I
7 said, I believe that I did use 300 milligrams of
8 the medication at some point, and it was
9 definitely after September, after all the
10 termination and investigation and all that was
11 going on.  So I would say in October.  October was
12 the hardest.
13    Q.   And in April of this year, you stopped
14 taking the Zoloft, right?
15    A.   Yes, I gradually decreased the
16 dosage as I was told by the doctor.
17    Q.   In May and June of 2005, were there any
18 other things going on in your life that could have
19 caused you to feel depressed?
20    A.   No.  No, I had everything going for me
21 to make me feel very good.  I had two jobs that

Page 285

1 were both sort of, you know, good jobs; I was
2 making good money; I was in school.  I had no
3 reason to be -- and this is one of the reasons
4 that made me go see Dr. Moskowitz, the fact that I
5 didn't have any obvious reasons for it, just felt
6 it, and it wouldn't go.  And, I mean, it was
7 behavior -- self-medication behavior started,
8 before the actual thought, because I realized that
9 I was consuming alcohol a little more than I would
10 usually do, and then it was -- that
11 self-medication behavior that eventually led me to
12 the actual -- decision to go --
13    Q.   When was that?
14    A.   When was what?
15    Q.   When were you consuming a lot of
16 alcohol?
17    A.   Well, after, I would say it was after
18 Lent of 2004.  Was it?  Was it in April?  April
19 makes it -- I guess April of 2005, I'm sorry.
20 April of 2005.  April, May, you know, at the end
21 of Lent.  I don't know when was Lent in 2005.  It

72 (Pages 282 to 285)

**Rami Elhusseini**

Page 286

1  was probably April, May, right?

2      Q.    I'm not sure.

3            Okay, so did you see any other doctors

4  for your depression?

5      A.    No, no, after Dr. Moskowitz and Dr. Eng,

6  nobody, no.  I didn't have a reason to.

7      Q.    And after you started taking the Zoloft

8  in June of 2005, you said that your feelings that

9  you were describing earlier went away.

10     A.    They started, definitely, dissipating.

11 They started dissipating and it was more of a

12 conscious feeling of malaise, if you like; it was

13 a conscious realization of the presence of

14 depression, and then the medication would -- then

15 I would, for instance, ask for a medication

16 increase because simply I knew that there was a

17 feeling -- a bad feeling of depression going on

18 and I needed more medication to stop it.

19           It wasn't like before, where I didn't

20 know what were the feelings about what I -- but

21 they kept on increasing.  They did not stop by

Page 287

1  June, but by June, I felt that they were being

2  dealt with through the medication, that the

3  medication was having an effect against these --

4  the symptoms of the disease, if you like.

5      Q.    So you were able, when you were on the

6  Zoloft, to continue working; you had your two jobs

7  and you were --

8      A.    Yes.  Yes.  I never stopped working,

9  ever since I -- even before I was on the

10 medication.

11     Q.    So you were able to function.

12     A.    I was able to function.  I wasn't

13 feeling good, despite the fact that I should have

14 felt good because of the potential reward that I

15 should have been feeling for doing -- having two

16 jobs and going to school and all that sort of

17 stuff, and when I did not, this is when I resorted

18 to medication.

19     Q.    Okay.  Have you ever sued any employer

20 other than Restaurant Associates?

21     A.    I sued Romain's Table, The Diner, and

Page 288

1  Woodley Cafe after that, after I had started

2  suing -- I was in the proceedings of suing

3  Compass, and then they fired me and then I sued

4  them.

5            (Discussion off the record.)

6            (Brief recess.)

7            MS. GOETZL:  Let's go back on.

8      Q.    Before the break, we were talking about

9  how you had sued Romain's Table, also known as The

10 Diner.

11     A.    Yes, the owner of the diner.

12     Q.    And what did you sue them for?

13     A.    I think it was personal injury.  I had

14 contracted hepatitis on their premises, and

15 because of negligence, and that was the basis of

16 my --

17     Q.    And when did you sue them?

18     A.    I filed both -- I think both cases at

19 the same time, if I'm not mistaken.  Maybe this

20 one a little earlier.  I forgot.  It was probably

21 the same time.

Page 289

1      Q.    And you filed that case in D.C. Superior

2  Court?

3      A.    Yes, both of them in Superior Court.

4      Q.    Were you deposed as part of that case?

5      A.    No, no.  It was dismissed by the judge.

6      Q.    And when was that?

7      A.    I think it was dismissed in -- I would

8  say July of 2006.

9      Q.    Did you have an attorney in that case?

10     A.    No.

11     Q.    Do you recognize that?  (Proffers

12 document to the witness.)

13     A.    Yes, I do.

14     Q.    Is that the complaint that you filed in

15 the D.C. Superior Court against Romain's Table?

16     A.    I believe so, yes.

17     Q.    And you said Romain's Table is the same

18 as The Diner.

19     A.    Yes, correct, they own The Diner.

20     Q.    And you filed this complaint on the same

21 day that you filed your complaint against

Page 290

```
1 Restaurant Associates and Compass?
2      A.   I believe so, yes.  I believe so, yes.
3           (Deposition Exhibit No. 19 marked for
4           Identification.)
5 BY MS. GOETZL:
6      Q.   Looking at this exhibit, Mr. Elhusseini,
7 it looks to me like you sued Romain's Table for
8 denial of promotion due to favoritism and
9 discrimination?
10     A.   I was -- it wasn't, what do you call
11 that, one that we -- we also ended up fighting
12 when you asked for an amended complaint, for
13 more -- the form where you restate the reason for
14 suing.
15     Q.   Your elaborate statement?
16     A.   Well, I want -- I forgot what they call
17 it, but, yeah, and the reformulation of my
18 complaint, because it was just personal injury.
19 It was -- I think so.
20     Q.   You're saying that you didn't claim in
21 that case that you were denied promotion because
```

Page 291

```
1 of discrimination?
2      A.   I mean, I did, yeah, but I didn't even
3 go to the court, so -- but, yeah, if you like, it
4 was one of claims that I did raise, yes.
5      Q.   Didn't you claim in your case against
6 Romain's Table that only the Latino employees were
7 promoted, even though they were incompetent?
8      A.   Yes.  Yes, that was -- did I call that
9 Elaborate Statement?
10     Q.   Yes.
11     A.   Then yes.  Then, yes, now that you have
12 refreshed me on that.
13     Q.   Do you recognize that?
14     A.   Yes, I do.
15     Q.   Is that the elaborate statement you
16 filed in your case against Romain's Table?
17     A.   Yes.
18          (Deposition Exhibit No. 20 marked for
19          Identification.)
20 BY MS. GOETZL:
21     Q.   So in your complaint against Romain's
```

Page 292

```
1 Table, there is something in here about caused to
2 leave previous employer.  In the complaint, not
3 the elaborate statement.
4      A.   Yes.
5      Q.   What is that about?
6      A.   I would say -- I mean, the reason why I
7 wrote it, I was thinking that what I had in mind
8 is basically that I was not -- I mean, it was too
9 far-fetched and speculative.  Maybe they were
10 behind the reason why I didn't maybe just swallow
11 my pride and just not dwell on the issues that led
12 to my termination with Restaurant Associates.
13          That's the only association I can think
14 of, looking back now.  If this is what I meant.
15 If I meant Restaurant Associates.  Yeah, I -- oh,
16 no, actually, in this, I believe I was referring
17 to Woodley Cafe.  I believe that I left Woodley
18 Cafe to join them because of the promise of
19 promotion.  This is what I think.  This is what I
20 think I meant in here, if I'm not correct -- if
21 I'm not mistaken.
```

Page 293

```
1      Q.   So in this claim against The Diner, you
2 were claiming that The Diner caused you to leave
3 the Woodley Cafe because The Diner promised you
4 that you would be promoted.
5      A.   Yes, that I would be promoted and I
6 would get more money, and that's why I left
7 Woodley Cafe, because I wasn't getting a raise and
8 The Diner offered more money and promotion.
9          They said that they were opening a new
10 restaurant and they needed new people and that I
11 would eventually be promoted, and I think this is
12 what I meant by previous employer.
13     Q.   Now, isn't it true that you tried to
14 bring the owner of the Woodley Cafe into your
15 lawsuit against The Diner?
16     A.   I did, yes.  Yes, I did try to file an
17 amended complaint, amend the complaint and join
18 him into the complaint, yes.  I believed he did
19 sort of conspire with The Diner to -- and
20 eventually terminate me.
21     Q.   So was what the claim that you were
```

74 (Pages 290 to 293)

Page 294

1 trying to bring against the owner of the Woodley
2 Cafe?
3     A.    Well, the claim that I was subjected to
4 discrimination under his watch and he did not act
5 to change the conditions that I was exposed to
6 because he was trying to favor Romain's Table's
7 position, in the sense that if he would fire me,
8 then I would be at a disadvantage in general, like
9 economic disadvantage, and I would be, you know,
10 more likely to settle, maybe, or not go to court
11 at all.
12    Q.    So the owner of the Woodley Cafe wanted
13 The Diner to fire you?
14    A.    No, the owner of Woodley Cafe wanted The
15 Diner to be at an advantage, and that advantage
16 would be me out of the job.  If I did not have a
17 job, then it would be easier for The Diner to
18 handle my case in court.  I would be an easier --
19 a more manageable, if you like, adversary to them
20 if I do not have a job, and it is my belief that
21 one of the reasons that the Woodley Cafe owner had

Page 295

1 was that in order to leave certain discrimination
2 atmosphere going on at Woodley Cafe, even though I
3 complained about it.
4     Q.    So you think there was some sort of
5 agreement between The Diner and the Woodley Cafe
6 that the Woodley Cafe would fire you so you would
7 not be able to continue your case against The
8 Diner?
9     A.    Yes, that I would be weaker with the --
10 while pursuing my case against The Diner.
11    Q.    Okay.  So since April of 2004, you have
12 had three employers: Woodley Cafe, Romain's Table,
13 also known as The Diner, and Restaurant
14 Associates.
15    A.    Correct.
16    Q.    And you have either sued or tried to sue
17 all of them.
18    A.    I did sue all of them.
19    Q.    Okay.  Other than this lawsuit against
20 Restaurant Associates and Compass and the one we
21 were just talking about involving The Diner and

Page 296

1 Woodley Cafe, have you ever been a party to a
2 lawsuit?
3     A.    No.  I mean, there was a lawsuit with
4 the immigration, but that's with regard to my
5 immigration status, but it wasn't a lawsuit.  It
6 wasn't a court with a judge, so --
7     Q.    What was that about?
8     A.    It was because of my status.  I was --
9 the immigration authorities found me to be in
10 infraction of the immigration law and they brought
11 legal proceedings against me.
12    Q.    And have you ever filed any sort of
13 administrative charge of discrimination, meaning
14 with the EEOC, the D.C. Human Rights Office, any
15 sort of agency like that?
16    A.    Before -- before these incidents with my
17 employer in 2004 and 5?
18    Q.    Yes.  Those are court filings.  I mean
19 filing something with an administrative agency
20 like the EEOC or --
21    A.    No, I have not.  No, I haven't.

Page 297

1     Q.    What's your date of birth?
2     A.    1st of May, 1973.
3     Q.    And are you married, divorced,
4 separated?
5     A.    No, single.
6     Q.    Do you have any children?
7     A.    No, I don't.
8     Q.    Have you ever been convicted of a crime?
9     A.    Nope.
10    Q.    And does anyone live with you right now?
11    A.    No.
12    Q.    And how long have you lived at your
13 current address?
14    A.    Since April of 2000.
15    Q.    Where did you live before that?
16    A.    I lived in -- 19th and R, 1830 R Street.
17    Q.    How long did you live there?
18    A.    Four or five months.
19    Q.    And what's the highest level of
20 education that you have?
21    A.    I have had a B.A., a B.A. in philosophy,

75 (Pages 294 to 297)

Rami Elhusseini

Page 298

1 and then a licence, which is equivalent of a B.A.
2 in philosophy, too.  I don't know what is the
3 equivalent of that.
4      Q.   Why did you get that?
5      A.   In France, in Toulouse, France.
6      Q.   And what year did you get that?
7      A.   In '98.  Yeah, '97, technically.  No,
8 '98.
9      Q.   So you have a B.A. in philosophy?
10     A.   A B.A. in philosophy and a licence in
11 philosophy.  I have two degrees.
12     Q.   I'm not getting the second thing you're
13 saying.
14     A.   The second one is a licence.  It's like
15 the equivalent of a B.A., but it's sort of what
16 the French give for a B.A.  It's three years.
17 That's what it is, three years of college.
18     Q.   And how long have you been going to
19 school pursuing your nutrition career?
20     A.   I started out as a nutrition major in
21 1990, when I first got into school, in 1990, but I

Page 299

1 graduated from philosophy in 1995, and then I went
2 back as a nutrition student at Howard University
3 in 2003, I would say.
4      Q.   So you went to Howard from 2003 until
5 2005?
6      A.   2004.  In the fall of two thousand
7 and -- yes, I was not at Howard in 2005.  I was at
8 Howard up till the spring of 2004?  Would that be
9 correct, or no?
10          No, you're right, until 2005.  Until the
11 spring of 2005, but I was not in the fall of 2005.
12     Q.   Did you go to school in the fall of
13 2005?
14     A.   No, I did not.  No, I did not.  I
15 concentrated on the work with Restaurant
16 Associates.  Because they said that eventually, in
17 a year's time of my employment, they would pay for
18 my education.
19     Q.   But you weren't still employed by
20 Restaurant Associates in the fall of 2005.
21     A.   So I started 2004.  There was one fall

Page 300

1 that I did not register, because they -- because
2 it was just better to work hard and -- there was
3 one semester that I did not register, so let me
4 just try to recollect and get the exact date.
5          All right, I was not at school, I
6 believe -- not at Howard anymore -- I believe,
7 yes, in the spring of 2005.  Yes, spring, 2005.
8 Because the reason for my mixup is that at some
9 point during my work with The Diner, my course
10 schedule was in issue, but now I remember that I
11 was working at The Diner and Restaurant Associates
12 at the same time as I was going to school, and
13 that's why my course schedule was an issue with
14 regard to my training during the days when I was
15 off at The Diner.
16          So that would have been in the -- up
17 until the fall, end of the fall of 2005.  So in
18 the spring of 2005, I was not a student at Howard
19 anymore.  Spring of 2005 meaning in May of 2005,
20 and I was terminated in August of 2005.
21     Q.   Right.  I thought you testified earlier

Page 301

1 that you took one class in the fall of 2004, that
2 introduction to nutrition.
3      A.   Yes.
4      Q.   And then you took one class at Howard in
5 the spring of 2005.
6      A.   2005.
7      Q.   Meal management?
8      A.   The meal management, that's what I'm
9 trying to locate.  I'm trying to locate when was
10 meal management taken.  Was it taken in the spring
11 of 2005 -- oh, wait a minute.  No.  So the fall of
12 2005 would have been after the spring of 2005.
13 That's the finish.
14     Q.   Yes.
15     A.   It would not have been the fall of 2006.
16 So it would have begun in August of 2005, and
17 that's the month where I was terminated from
18 Restaurant Associates.
19     Q.   So did you go to school in the fall of
20 2005?
21     A.   No, I did not.

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 302

1    Q.   Okay.

2    A.   No, I did not.  The last semester was

3 the intro.  The food management was in -- it was

4 in the spring.

5    Q.   Okay, and then you started at UDC in --

6    A.   In the spring of 2006.

7    Q.   Okay.  And that's where you are now.

8    A.   Yes, correct.

9         MS. GOETZL:  Why don't we go off the

10 record for a minute.

11        (Discussion off the record.)

12        MS. GOETZL:  Let's go back on.

13        Two things that I want to follow up on.

14 The first one is you're going to provide for me

15 all of the information that you have regarding any

16 job that you have applied for since February of

17 2006.

18        THE WITNESS:  Correct.

19        MS. GOETZL:  And I am going to keep your

20 deposition open in the event that I have any

21 questions that I need to ask you about the

Page 303

1 documents that you provide me about the jobs that

2 you have been looking for.

3         THE WITNESS:  Yes.

4         MS. GOETZL:  The other thing that we

5 need to talk about is, you're going to have the

6 right to review your transcript from this

7 deposition, and when you're reviewing it, make any

8 spelling corrections and things like that; not

9 change the actual substance of your testimony.

10        So you can either exercise your right to

11 do that or you can waive your right to do that.

12 Do so you need to decide which one you're going to

13 do.

14        THE WITNESS:  I'll read it.  Just for

15 the sake -- in that case, I would have a copy of

16 this?  Is that what it is?  Or would I have a copy

17 that I would have to return, in case I choose to

18 review it?

19        MS. GOETZL:  You can decide now that you

20 want to read and sign or if you want to waive your

21 right.

Page 304

1         THE WITNESS:  I believe that -- I.

2 believe it's -- all that what we have said, would

3 be a good idea to have it for the sake of having

4 it just for documentation.  For $500, I probably

5 would rather waive.

6         MS. GOETZL:  It's two different things.

7 Just because you read and sign it doesn't mean you

8 have to buy a copy of it.  What I was saying was,

9 if you're going to read and sign it, you would go

10 to their office to do that if you're not going to

11 buy a copy.

12        THE WITNESS:  Yeah.  I mean, if I want

13 to read it and -- I probably would rather have a

14 copy.

15        MS. GOETZL:  So are you going to read

16 and sign?

17        THE WITNESS:  Yes.

18        MS. GOETZL:  I have no further

19 questions.  Thank you for your cooperation and

20 patience today.

21        (Signature not waived.)

Page 305

1         (Deposition concluded at 5:20 p.m.)

2              -    -    -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

77 (Pages 302 to 305)

Rami Elhusseini

Page 306

ACKNOWLEDGMENT OF DEPONENT

1
2        I, Rami Elhusseini, do hereby
3 acknowledge that I have read and examined the
4 foregoing pages of testimony, and the same is a
5 true, correct and complete transcription of the
6 testimony given by me, and any changes and/or
7 corrections, if any, appear in the attached errata
8 sheet signed by me.
9
10 _____        _____
11 Date                   Name
12
13
14
15
16
17
18
19
20
21

Page 308

CERTIFICATE OF NOTARY PUBLIC

1
2        I, George W. Tudor, the officer before whom
3 the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears
5 in the foregoing deposition was duly sworn by me;
6 that the testimony of said witness was taken
7 stenographically by me and thereafter reduced to
8 typewriting by me or under my direction; that said
9 deposition is a true record of the testimony given
10 by said witness; that I am neither attorney nor
11 counsel for, nor related to or employed by any of
12 the parties to the action in which this deposition
13 is taken, and further, that I am not a relative or
14 employee of any attorney or counsel employed by
15 the parties hereto or financially interested in
16 this action.
17 _____        _____
   Date                   George W. Tudor
18 My Commission expires   Notary Public in and for
19 January 1, 2007         the District of Columbia
20
21

Page 307

1 ESQUIRE DEPOSITION SERVICES
2 1020 19TH STREET, N.W.
3 SUITE 620
4 WASHINGTON, D.C. 20036
5 (202) 429-0014
6            ERRATA SHEET
7 Case Name:  Elhusseini vs. Compass Group USA, Inc.
8 Witness Name:  Rami Elhusseini
9 Deposition Date:  Nov. 10, 2006
10 Job No.:  177566
11                              Reason for
12 Page No.  Line No.  Correction   Correction
13
14
15
16
17
18
19
20 _____         _____
21    Signature                 Date

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979