## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
RAMI ELHUSSEINI                                        )
                                                                     )
                        Plaintiff,                                )
                                                                     )
            v.                                                      )            Civil Action No. 06-0100 (RBW)
                                                                     )
COMPASS GROUP USA, INC. et al.                 )
                        Defendants.                           )
_____  )


## <u>MEMORANDUM OPINION</u>

On November 12, 2004, the plaintiff, Rami Elhusseini, proceeding <u>pro se</u>, filed this

action in the Superior Court of the District of Columbia ("Superior Court") against the

defendants, Compass Group USA, Inc. and Restaurant Associates, Inc. ("RA"). Subsequently,

this matter was removed by the defendants to this Court on January 19, 2006.[1] Notice of

Removal. Then, on January 26, 2006, the defendants filed an unopposed motion for a more

definite statement requesting that "the Court [issue] an Order directing [the] [p]laintiff . . . to file

a more definite statement of his claim" because the complaint filed by the plaintiff in the

Superior Court "consist[s] of two sentence fragments and is practically illegible." Defendants'

Unopposed Motion for More Definite Statement at 1. After this Court granted the defendants'

motion, on January 31, 2006, the plaintiff filed a statement alleging that he was subjected to

racial discrimination in promotions and termination[2] when he "was denied [a] promotion and

_____

[1] This action was removed to this Court pursuant to 28 U.S.C. §1332(c)(1) (2000).

[2] In subsequent pleadings filed by the plaintiff, he asserts that he "believes that anti-Semitism is
the reasons behind [the] [d]efendant's discriminatory actions. Plaintiff's Opposition to Defendants'
(continued...)

advancement in the company . . . despite [his] competitive qualifications on both the applied and

academic levels,"and also when his employment was terminated. Plaintiff's Elaborate Statement

("Pl.'s Stmt."),[3] Docket Entry 6 at 3.   Although the plaintiff does not specifically state under

which statutory authority he is bringing his employment claims in either his Complaint or

Statement, he testified during his deposition that he is bringing his claims pursuant to Title VII of

the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. (2000).[4]   Defs.'

Mem, Ex. A ("Elhusseini Dep") at 38.   Currently before this Court is the defendants' Motion for

Summary Judgment ("Defs.' Mot.") and their Memorandum of Points and Authorities in Support

---

[2](...continued)

Motion for Summary Judgment  ("Pl's Opp'n") at 11 n. 23.  Because he does not make any claim of race throughout his filings, the Court assumes that the plaintiff is alleging discrimination based on national origin.

[3] Because neither the paragraphs nor the pages of the plaintiff's Statement are numbered, the Court has sequentially numbered the pages of his five page statement  for ease of reference.

[4] Because the plaintiff filed his Complaint in the Superior Court, the Courts notes that to the extent the plaintiff is asserting claims pursuant to District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401 et seq. (2001), formerly D.C. Code §§ 1-2510 et seq. (1981), the Court's analysis is the same under both federal and District of Columbia law.  The DCHRA, like Title VII, prohibits certain discriminatory practices "[b]y an employer." D.C. Code § 2-1402.11(a)(1). And, it has been uniformly held that when construing the DCHRA courts should look to precedent construing Title VII.  Howard Univ. v. Green, 652 A.2d 41, 45 (D.C.1994) (using Title VII as guidance in interpreting the DCHRA); Wisconsin Ave. Nursing Home v. Dist. of Columbia Comm'n on Human Rights, 527 A.2d 282, 290 n. 7 (D.C. 1987) (same); see also  Sparrow v. United Air Lines, 216 F.3d 1111, 1114 (D.C. Cir. 2000) (same analysis applied to Title VII discrimination claims controls discrimination cases brought under the DCHRA); Carpenter v. Fed. Nat'l Mortgage. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (District of Columbia Courts rely on federal court interpretations of Title VII when evaluating DCHRA discrimination claims); Stevens v. Nat'l R.R. Passenger Corp., 517 F. Supp. 2d 314, 320 (D.D.C. 2007) (courts look to Title VII and its jurisprudence when construing the DCHRA); Ramey v. Potomac Elec. Power Co.; 468 F. Supp. 2d 51, 60 (D.D.C. 2006) (DCHRA claims and federal discrimination claims are analyzed under the same legal standard); see also Underwood v. Archer Mgmt. Servs. Inc., 857 F.Supp. 96, 98 (D.D.C. 1994); Hodges v. Washington Tennis Serv. Int'l Inc., 870 F. Supp. 386 (D.D.C. 1994) (relying exclusively on Title VII standards in determining whether employer should be held responsible for harassing conduct of employees under the DCHRA).

2

of Defendants' Motion for Summary Judgment ("Defs.' Mem.").[5]  Upon consideration of the

parties' submissions and the record, the defendants' Motion for Summary Judgment must be

granted.

## I.  FACTUAL BACKGROUND

The following facts are undisputed except where otherwise noted by the Court.[6]  The

plaintiff was first interviewed for employment with RA by Tara Peralta, the sous chef, in late

---

[5] The following papers have also been submitted in connection with the defendants' summary judgment motion: (1) Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl's Opp'n") which is titled Plaintiff's Motion for Summary Judgment, and (3) Defendants' Reply To Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Defs.'Reply").  The defendant has filed a motion to strike the document filed by the plaintiff on January 19, 2007, and entitled "Plaintiff's Motion for Summary Judgment" because it was filed one month after the Court imposed deadline for the filing of dispositive motions.  Defendants' Motion to Strike at 1-2.  Specifically, the defendants request that the Court "grant their Motion to Strike and strike [the] [p]laintiff's Motion for Summary Judgment to the extent [the] [p]laintiff is moving for summary judgment on his claims."  Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Strike.  The defendant correctly notes that on November 29, 2006, the Court set a deadline requiring that all dispositive motions be filed by December 20, 2006 and that any oppositions to the dispositive motions to be filed by January 24, 2007.  November 29, 2006 Docket Entry.  In his opposition to the defendants' Motion to Strike, the plaintiff asserts that he "filed his motion for summary judgment on [January 19, 2007] as opposition to [the] [d]efendant's motion for summary judgment . . . ."  Plaintiff's Opposition of Defendants' Motion to Strike at 1.  The plaintiff further asserts that the filing of the "[m]otion was only possible after 12/20/06 since [the] [d]efendants only filed their motion on that date.  As an opposition [the] [p]laintiff's motion falls within the 24th of [the] January deadline set by the court on November 29, 2006."  Id. Upon consideration of the plaintiff's representation, the Court finds that he intended for his motion entitled "Plaintiff's Motion for Summary Judgment" to actually serve as his opposition to the defendants' Motion for Summary Judgment.  This conclusion is also supported by the failure of the plaintiff to file a pleading entitled opposition to the defendants' motion for summary judgment and the format of what he did file. Therefore, the Court will treat the plaintiff's motion entitled "Plaintiff's Motion for Summary Judgment" as his opposition to the defendants' Motion for Summary Judgment.  Accordingly, the defendants' motion to strike the plaintiff's submission is denied.

[6] "In deciding whether there is a genuine issue of material fact [precluding a grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c)], the [C]ourt must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." Dist. Intown Props. Ltd. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (citation omitted).

August or early September 2004.[7]  Defs.'Mem., Exhibit ("Ex.") A (Deposition of Rami
Elhusseini) ("Elhusseini Dep.") at 68-70.  The plaintiff acknowledges that no discriminatory
remarks were made by Ms. Peralta during the plaintiff's interview.  Id. at 70.  Several days after
his interview with Ms. Peralta, the plaintiff was interviewed by Richard Hetzler, the head chef.
Id. at 70-71.  The plaintiff also admits that Mr. Hetzler also did not make any discriminatory
remarks during his interview of the plaintiff.  Id. at 72.  Mr. Hetzler subsequently decided to hire
the plaintiff as a line server.  Id. at 131-132; Ex. B (Declaration of Richard Hetzler) ("Hetzler
Decl.") ¶ 2.

    The plaintiff began working as a line server trainee for RA at the National Museum of the
American Indian ("Indian Museum") on or about September 8, 2004,  Defs.'Mem., Ex. A
(Elhusseini Dep.) at 73-74, with a starting salary of $10 per hour.  Id. at 74.  Plaintiff's duties as a
Line Server were to clean and prepare the food station at the start of his shift, serve food to
customers, maintain the food station during his shift, and clean the food station at the end of his
shift.  Id. at 102-03.  While the plaintiff worked at RA, he asked for and received some training
in the kitchen.  Id. at 124-25.

     The plaintiff received a copy of RA's Employee Handbook when his employment
commenced.  Id. at 95-96.  The plaintiff had the opportunity to read the handbook, and it was Mr.
Hetzler who the plaintiff believes explained the policies contained in the RA Employee
Handbook to him and other RA employees before he signed an Acknowledgement of Receipt of
the Handbook.  Id. at 96-98 & Ex. D ("Receipt for Restaurant Associates Employee Handbook").

---

[7] The plaintiff began working as a line cook at Woodley Café in April 2004.  Defs.'Mem., Ex. A
(Elhusseini Dep.) at 44.  However, the plaintiff performed no food-related jobs other than serving as a
line cook at the Woodley Café before he applied to work for RA.  Id.

The plaintiff was therefore made aware of the RA's Equal Employment Opportunity Policy, the Open Door Policy, its Workplace Violence Policy, and the Standards of Behavior outline in the Employee Handbook.  Id. at 97-98 & Ex. C ("Restaurant Associates Employee Handbook" and excerpts therein).  During his employment with RA, the plaintiff also saw and had the opportunity to read documents that explained RA's Equal Employment Opportunity, its Zero Tolerance Discrimination and Harassment policies, and he also was aware of its  BeAware hotline.  Defs.'Mem., Ex. A (Elhusseini Dep) at 99-101 & Ex. E (Compass Discrimination and Anti-Harassment Policies Postings).  In addition, the plaintiff received an Interoffice Memo regarding RA's Open Door Policy.  Defs.' Mem., Ex. A (Elhusseini Dep.) at 101-02 & Ex. F (Interoffice Memo to All Employees from Robin Cerrati regarding RA's Open Door Policy dated August 3, 2005).

**A.  RA's Hiring of Two New Cooks**

In March 2005, RA hired Derek Pipher and Janette O'Sullivan as cooks.  Defs.'Mem., Ex. A (Elhusseini Dep.)  at 126. Although the plaintiff never submitted an application or did anything else to apply for the position, id. at 124-25,  he nonetheless believes he should have been promoted to one of the cook positions, id. at 121.

While the plaintiff was unsure about Mr. Pipher's, id. at 127-30, and Ms. O'Sullivan's experience as cooks before becoming RA employees, id., Ex. A (Elhusseini Dep.) at 132-33, Mr. Pipher had more than 15 years experience in the food industry and had worked as a chef or a cook at four restaurants over the course of eight years,  id., Ex. G (Resume of Derek Pipher), and Ms. O'Sullivan had worked as a chef at five restaurants over the course of more than six years and had graduated from culinary school, id., Ex. H (Resume of Janette O'Sullivan).  The

minimum qualifications for the cook positions awarded to Mr. Pipher and Ms. O'Sullivan were: "(1) one year cooking experience in a high volume kitchen; (2) [the] ability to use [a] knife and demonstrate basic knife skills; (3) [the] ability to work independently with speed and accuracy; and (4) [the] ability to read and understand basic menu techniques." Id., Ex. B (Hetzler Decl.) ¶ 3.  Thus, according to Mr. Hetzler, "the  plaintiff was not qualified for nor considered for either of the cook positions filled by Mr. Pipher and Ms. O'Sullivan.," id. ¶ 4, when he decided to hire Mr. Pipher and Ms. O'Sullivan," id. ¶ 5.  When the selections were made the plaintiff did not complain to anyone at RA about not being selected for one of the positions or allege that he was not selected because of discrimination.  Id.,  Ex. A (Elhusseini Dep.) at 134-35.

**B.  The Plaintiff's Arguments With His Coworker In August 2005**

On August 12, 2005, the plaintiff had an argument with a coworker named Chris Spangler, id. at 143, while they were working at the same food station, id. at 144.  The encounter occurred when the plaintiff was critiquing Mr. Spangler's work performance as a new RA employee, and Mr. Spangler allegedly made disparaging remarks about the plaintiff being a homosexual and threatened to physically assault the plaintiff.  Id. at 144-45.  Other RA employees working at the food station and customers waiting in line at the food station allegedly heard Mr. Spangler's remarks.  Id. at 148.  The plaintiff reported the argument with Mr. Spangler to either Ms. Peralta or Mr. Hetzler that day, id.  at 149, and on the same day of the argument the plaintiff and Mr. Spangler met with Mr. Hetzler and Mr. Pipher, id. at 149-50.  During the meeting, Mr. Hetzler told the plaintiff and Mr. Spangler that they could not let their difference interfer with their ability to work with each other.  Id. at 150-51.  The plaintiff and Mr. Spangler then returned to their work station and completed their shifts.  Id. at 153-55.  The following day -

6

on August 13 - the plaintiff and Mr. Spangler had another argument while they were again

working at the same food station.  Id. at 56.  The plaintiff was again critiquing Mr. Spangler's

work performance and Mr. Spangler again allegedly made disparaging remarks about the plaintiff

being a homosexual and threatened to physically assault the plaintiff.  Id. at 156-59.  As was the

situation the day before, other RA employees working at the food station and customers waiting

in line at the food station allegedly heard Mr. Spangler's remarks.  Id. at 158.  This event was not

reported to anyone at RA that day.  Id. at 168-69.

## C.  Plaintiff's Fist Fight With His Coworker

Sometime around 4:00 pm on August 13, 2005, both the plaintiff and Mr. Spangler

"checked out" for the day and the plaintiff accompanied Mr. Sprangler down to the work site

locker room.  Id. at 171-75.  Mr. Spangler had been given permission to leave early, id. at 173-

74, while the plaintiff admittedly did not have permission to leave work early that day, id. at 196

& 202.[8]  Upon entering the locker room, Mr. Spangler told the plaintiff that his locker had been

damaged, id. at 172-73, and the plaintiff believed Mr. Spangler caused the damage because he

had borrowed the plaintiff's key earlier to enter the locker room, id. at 168.  After the two exited

the locker room, the plaintiff followed Mr. Spangler outside of the building and across the street

to the Air & Space Museum.  Id. at 175-77.  The plaintiff then grabbed Mr. Spangler's arm and a

fight between the two ensued.  Id. at 177.  After the fight ended, the plaintiff picked up Mr.

Spangler's sunglasses, which had fallen to the ground, threw them back on the ground and

stepped on the sunglasses causing them to break.  Id. at 178.

_____

[8] However, the plaintiff testified that he was given permission to leave early.   Defs.' Mem., Ex.
A (Elhusseini Dep.) at 173-74.

Following the altercation, the plaintiff returned immediately to the Indian Museum and told Mr. Pipher that his locker had been damaged.  Id. at 170-71, 181-82.   However, the plaintiff did not tell Mr. Pipher about either the August 13 argument or the fist fight.  Id.  Mr. Pipher took pictures of the damaged locker and allowed the plaintiff to store his personal belongings in the office.  Id. at 170.   The plaintiff clocked back into work around 4:30 p.m., and worked for another hour before leaving at 5:30 p.m. for the day.  Id. at 182.

**D.  The Events Of August 14, 2005**

On August 14, 2005, the plaintiff went to work at 9:00 a.m. as scheduled, id. at 188-89, and was summoned to Mr. Pipher's office.  Id. at 189-90.  Mr. Pipher asked the plaintiff about what had happened between him and Mr. Spangler on the previous day.  Id. at 190.   The plaintiff responded that what had occurred outside the Indian Museum was his personal business.  Id. at 190.  Mr. Pipher then told the plaintiff not to work at the same work station as Mr. Spangler, not to talk to Mr. Spangler, and not to talk to anyone about what had happened the previous day.  Id. at 191-92.  Later that day, the plaintiff met with Ms. Peralta and Mr. Pipher, id. at 192, and Ms. Peralta told the plaintiff that she was investigating what had happened on August 13 and that he was suspended until the investigation was complete.  Id. at 192-93 & Ex. I (Corrective communication dated August 14, 2005).

**E.  The Events Of August 16, 2005**

On August 16, 2005, Ms. Peralta telephoned the plaintiff and told him to attend a meeting with her and Larry Ponzi, the Director of the Mitsitam Café.  Id. at 199-200.  Later that day,  the plaintiff met with Ms. Peralta, Courtney Willis, the Controller of the Mitsitam Café, and Mr. Ponzi.  Id. at 200.  During the meeting, the plaintiff reduced to writing his account of the fist

fight and admitted that he had checked out of work early without permission.  Id. at 202 & Ex. J

(Statement of Rami Elhusseini dated August 16, 2005).   The plaintiff's employment was then

terminated for clocking out early without permission and starting a fight with a coworker.  Defs.'

Mem., Ex. K (Corrective Communication dated August 16, 2005).   The plaintiff admits that no

one made any discriminatory remarks during the August 16 meeting,  Defs.'Mem., Ex. A (Rami

Elhusseini) at 206, and acknowledges that he is unaware of any RA employee who has clocked

out without permission and started a fight with a coworker and had not been terminated, id. at

239.   Nonetheless, the plaintiff believes someone in RA's Human Resources Department

discriminated against him when he was not selected for one of the cook positions and when his

employment was terminated, id. at 216, because of his Lebanese national origin and has pro-

Zionist beliefs, id. at 38-43.   The plaintiff harbors these beliefs even though he has no evidence

that anyone in RA's Human Resources Department knew of his pro-Zionist beliefs or his

Lebanese national origin, id. at 217, and no one in a management position at RA ever made any

discriminatory comments about him, id. at 119.

**F.  The Plaintiff's Post-Termination Contacts with the Defendants**

On August 16, 2005, the plaintiff called RA's BeAware hotline regarding his termination.

Id. at 207–09.  On August 18, 2005, he spoke by telephone with Sherley Montina, an employee

in RA's Human Resources Department, about his termination.  Id. at 210-11.  The plaintiff

explained that he had not been the guilty party regarding the events involving Mr. Spangler and

that there was no basis for his termination; however, he was  told by Ms. Montina that the

termination decision would not be reconsidered.  Id. at 212-14.  The plaintiff admits that Ms.

Montina did not make any discriminatory remarks to him during their August 18 telephone

conversation.  Id. at 215.

In late August 2005, the plaintiff spoke twice by telephone with Robin Cerrati, another employee in RA's Human Resources Department, about his termination.  Id. at 218.   During these two telephone calls, the plaintiff again explained his version of the fist fight with Mr. Spangler and asked that his termination be reconsidered.  Id. at 219-21.  Ms. Cerrati did not make any discriminatory remarks to the plaintiff during their August telephone conversations, id. at 224-26, and on September 1, 2005, Ms. Cerrati sent the plaintiff a letter confirming his termination for clocking out without permission and fighting with a coworker, id. at 228-29 & Ex. M (Letter from Robin Cerrati to Rami Elhusseini dated September 1, 2005).

In September 2005, the plaintiff spoke twice by telephone with Joe Machicote, the Compass Ombudsman, about his termination.  Id. at 231-36.  During those two telephone calls, the plaintiff yet again explained his version of the fist fight with Mr. Spangler and asked that his termination be reconsidered, id., and was told again that his termination would not be reconsidered.  Id. at 236.   As with the other decisions he had following his termination, the plaintiff does not contend that Mr. Machicote make any discriminatory remarks to him during their September telephone conversations.  Id. at 237.

## G.  Exhaustion of Administrative Remedies

The plaintiff admits that he knew about the Equal Employment Opportunity Commission ("EEOC").  Defs.' Mem., Ex. A (Elhusseini Dep) at 26-27.  However, the plaintiff did not file an administrative complaint with the EEOC or any government agency against either defendant.  Id. at 31-32.

10

## II.  STANDARD OF REVIEW

Courts will grant a motion for summary judgment when Federal Rule of Civil Procedure 56 if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods. Inc. ., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Simply put, "conclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted). Rather, to withstand a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]here is no [genuine] issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and if the Court concludes that the evidence adduced by the non-moving party "is merely colorable . . . or is not significantly

probative," id. (citations omitted), or if the non-moving party has otherwise "failed to make a

sufficient showing on an essential element of [his] case with respect to which [he] has the burden

of proof," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), then the moving party is entitled to

summary judgment. Finally, "[a]ll supporting and opposing affidavits [submitted in connection

with a Rule 56(c) motion] shall be made on personal knowledge, shall set forth such facts as

would be admissible in evidence, and shall show affirmatively that the affiant is competent to

testify to the matters stated therein." Fed. R. Civ. P. 56(e).

## III.  LEGAL ANALYSIS

### A.  Exhaustion of Administrative Remedies

The defendant contends that the plaintiff's discrimination claims must be dismissed

because "he failed to comply with the administrative prerequisites set forth in [Title VII]."

Defs.' Mem. at 11.  The plaintiff responds that "[the] [d]efendants should be barred from using

the lack of EEOC charges argument by the doctrines of estoppel, unclean hands and latches since

they had claimed acting on behalf of [the Equal Employment Opportunity Commission

("EEOC")] and were aware of possible litigation."  Pl's Opp'n at 10.  For the reasons set forth

below, the Court agrees with the defendants.

A Title VII plaintiff  must file an administrative complaint with the EEOC or a State

human rights agency prior to, and as a mandatory prerequisite to, filing a federal judicial

complaint.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 104-05 (2002);  Park v. Howard

Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (noting that "Title VII requires that a person

complaining of a violation file an administrative charge with the EEOC and allow the agency

time to act on the charge"); see also Marshall v. Federal Express Corp., 130 F.3d 1095, 1098

(D.C. Cir. 1997) ("Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a change to act on it.").  See, e.g., <u>Washington v. WMATA</u>, 160 F.3d 750, 751-52 (D.C. Cir. 1998).  A charge of discrimination must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred. <u>See</u> 42 U.S.C. §2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ." (emphasis added)).  The purpose of this strict requirement is to allow "the agency an opportunity to resolve the matter internally and to avoid unnecessarily burdening the courts." <u>Wilson v. Pena</u>, 79 F.3d 154, 165 (D.C. Cir. 1996).   Only after the EEOC has notified a plaintiff  of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action herself.  42 U.S.C. §2000e-5(f)(1) (civil suit may be brought by an aggrieved individual only after the filing of a charge with the EEOC, and the receipt of a right to sue letter from the EEOC.)  Indeed, a claim is time-barred from being heard in federal court if it has not been filed with the EEOC within this 180-day limit.

Courts have uniformly held that the procedural requirements of Title VII must be strictly applied. <u>See</u> <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 108 (2002) (citing <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980) (holding that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law")); <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (holding that "the particular purpose of the filing requirement" is "to give prompt notice to the employer"). Therefore, it is appropriate to grant a defendant's motion for summary judgment when a plaintiff fails to demonstrate the exhaustion of his administrative remedies. <u>See</u> <u>Siegel v. Kreps</u>, 654 F.2d

773 (D.C. Cir. 1981).

The District of Columbia Rights Act provides for a private cause of action "in any court of competent jurisdiction" for "any person claiming to be aggrieved by an unlawful discriminatory practice." D.C. Code § 1-2556 .  However, like under Title VII, the District of Columbia Court of Appeals has held that a District of Columbia employee must exhaust administrative remedies prior to seeking relief through the courts. See, e.g., Newman v. District of Columbia, 518 A.2d 698 (D.C. 1986); Williams v. District of Columbia, 467 A.2d 140 (D.C. 1983); see also Dougherty v. Barry, 604 F. Supp. 1424 (D.D.C. 1985).

Here, the plaintiff has not presented any evidence that he exhausted his administrative remedies with respect to his discrimination claims.  Although he contacted the defendants requesting reinstatement and expressing his intent to litigate, the plaintiff did not seek that relief from the EEOC.  Further, the record shows that the plaintiff was knowledgeable of the EEOC, having contacted the agency in the past.  Defs.' Mem., Ex. A (Elhusseini Dep.) at 26-27.  The Court must therefore conclude that the plaintiff has not exhausted his administrative remedies as required by both Title VII and the DCHRA and therefore the defendants are entitled to summary judgment on his discrimination claims.

**B.  The Plaintiff's Discrimination Claims Filed with the Court**

Even if the plaintiff had the exhaustion of administrative remedies requirement under either Title VII or the DCHRA, his discrimination claims would not survive the defendants' motion for summary judgment because he has failed to establish a prima facie case of discrimination as to both his promotion and termination claims.

**1.  The Plaintiff's Non-Promotion Claim**

The plaintiff asserts that the defendant subjected him to discrimination based on his national origin and religion when he "was denied [a] promotion and advancement in the company . . . despite [his] competitive qualifications on both the applied and academic levels."[9] Pl.'s Stmt., Docket Entry 6 at 3; Pl's Opp'n at 11.   Specifically, the plaintiff asserts that promotions in the company as far as cooks . . . are dispensed according to Arian features . . . ." Pl.'s Stmt., Docket Entry 6 at 3.   Further, he contends that "[t]he kitchen position was awarded to a new comer to the company; a less experienced and academically less equipped candidate but who unquestionably had the white traits."   Id. In opposition, the defendants respond that the plaintiff's discrimination claim based on failure to promote must fail because (1)"the plaintiff cannot show that he was qualified for the cook positions awarded to Derek Pipher and Janette O'Sullivan in March 2005," Defs.'Mem. at 13, (2) "he [cannot] show that he applied for those positions," id., (3) "[he] cannot show that he was considered for and denied a cook position," id. at 14, and (4) "[the] [p]laintiff cannot show . . . that RA sought applicatons from individuals who were no more qualified than [the] [p]laintiff or awarded the position to such a person," id. at 15.

The DCHRA, like Title VII, prohibits certain discriminatory practices "[b]y an employer." D.C.Code § 2-1402.11(a)(1) (emphasis added).[10] The legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII. See Sparrow v.

---

[9] Since neither the paragraphs nor the pages of the plaintiff's Elaborate Statement are numbered, the Court has sequentially numbered the pages of his five page Complaint for ease of reference.

[10] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," 42 U.S.C. § 2000e-2(a)(2), based on a protected characteristic.

United Air Lines Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000) (same analysis applied to Title VII

discrimination claims controls discrimination cases brought under the DCHRA); Regan v. Grill

Concepts-DC., Inc., 338 F. Supp. 2d 131, 134 (D.D.C. 2004) ("The DCHRA prohibits an

'employer' from discriminating against its employees.); MacIntosh v. Bldg. Owners & Managers

Assoc. Int'l, 310 F. Supp. 2d 240, 244 (D.D.C. 2004) ("In analyzing a claim of employment

discrimination under the DCHRA, Courts look to Title VII and its jurisprudence."); Hollins v.

Fed. Nat'l Mortgage Ass'n, 760 A.2d 563, 571 (D.C. 2000) (noting that in considering claims

brought under the DCHRA, the District of Columbia Court of Appeals applies the familiar

burden-shifting test articulated by the Supreme Court for Title VII cases in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973), Knight v. Georgetown Univ., 725 A.2d 472, 478 n. 5 (D.C.

1999) (noting that the same body of law is used to construe both provisions); Daka v. Breiner,

711 A.2d at 94 (noting that the District of Columbia Court of Appeals "in deciding issues arising

under the DCHRA, consistently relies upon decisions of the federal courts in Title VII cases as

particularly persuasive authority").  Where, as here, the plaintiff has not proffered any direct

evidence of intentional discrimination, his Title VII discrimination claims are evaluated pursuant

to the McDonnell Douglas burden-shifting framework.  411 U.S. at 803-05;[11]  see Weber v.

Battista, 494 F.3d 179 at 181-83 (D.C. Cir. 2007). Under this framework, the plaintiff bears the

initial burden of "establish[ing] a prima facie case of discrimination by a preponderance of the

evidence." Id. (internal quotation marks and citation omitted). To do so in the context of an

---

[11]  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the
particular fact in question without any need for inference. Such evidence includes any statement or
written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp.,
431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and ellipsis
omitted) (emphasis in original). The plaintiff does not argue, nor could he, that the factual record in this
case contains any such direct evidence of discrimination.

adverse selection decision, the plaintiff must demonstrate that "(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone filled the position or the position remained vacant and the employer continued to seek applicants." <u>Jackson v. Gonzales</u>, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks, citation, and ellipsis omitted); <u>see also</u> <u>Holcomb</u>, 433 F.3d at 895 (same). If the plaintiff succeeds in establishing a prima facie case, "the burden shifts to the defendant employer to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." <u>Jackson</u>, 496 F.3d at 707 (quoting <u>Reeves</u>, 530 U.S. at 142) (internal quotation marks omitted). If the employer presents such an explanation, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." <u>Holcomb</u>, 433 F.3d at 896-97 (internal quotation marks and citation omitted); <u>see</u> <u>Weber</u>, 494 F.3d at 181-83 (stating that "the plaintiff must [ultimately] demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory") (internal quotation marks and citation omitted).

Here, it is undisputed that the plaintiff is a member of a protected class – he is of Lebanese national origin and has pro-Zionist beliefs.  Defs.' Mem., Ex. 1(Elhusseini Dep.) at 42-43.  However, the plaintiff has not presented sufficient evidence to satisfy the second and third prongs of a prima facie case of discriminatory failure to promote.  First, the plaintiff has not demonstrated that he was qualified for the cook positions awarded to Mr. Phiper and Ms. O'Sullivan.  The defendants have presented evidence that the minimum qualifications for the cook positions obtained by Mr. Pipher and Ms. O'Sullivan were: "(1) one year cooking

experience in a high volume kitchen; (2) [the] ability to use [a] knife and demonstrate basic knife skills; (3) [the] ability to work independently with speed and accuracy; and (4) [the] ability to read and understand basic menu techniques.  Defs.' Mem., Ex. B (Hetzler Decl.) ¶ 3.   The plaintiff began working as a line cook at Woodley Café in April 2004, Defs.' Mem., Ex. A (Elhusseini Dep.) at 44, but the plaintiff had no food-related experience as a line cook before he applied to work at RA.[12]  Id.  On this record, the plaintiff has failed to show that he was qualified for the cook positions awarded to the selectees in March 2005, including failing to show that he possessed one year cooking experience in a high volume kitchen.  In addition to not demonstrating that he was qualified for the position, the plaintiff has failed to provide any evidence that he applied for the cook positions.  To the contrary, the plaintiff concedes in his deposition testimony that he did nothing to apply for the cook positions.  Defs.' Mem., Ex. A (Elhusseini Dep.) at 124-25. The District of Columbia Circuit having steadfastly held that "an element of a prima facie case of discriminatory non-promotion is that the plaintiff '*applied for* and was denied an available position for which he/she was qualified,'" Lathram v. Snow, 336 F.3d 1085, 1089 (D.C. Cir. 2003) (citing Stella v. Mineta,  284 F.3d 135, 139 (D.C. Cir. 2002) (emphasis in original); see Cones, 199 F.3d at 516, dooms the sustainability of the discriminatory non-promotion claim.  Although the plaintiff asserts that the "[d]efendants are liable for denying [him the] promotion by the doctrine of estoppel because they had committed through promise to promoting all qualified employees," Pl's Opp'n at 14, this allegation, even if proven (which is not the case here), is not a substitute for satisfying the element of the prima facie case for discriminatory failure to promote as set forth above.  As the District of Columbia Circuit's

---

[12] The plaintiff began working as a line server at RA on or about September 8, 2004. Defs.'Mem. Ex. A (Elhusseini Dep.) at 73-74.

repeated admonition that the statute does not, and was not intended to, transform the Court into "a super-personnel department that reexamines an entity's business decisions." <u>Holcomb</u>, 433 F.3d at 897 (internal quotation marks and citations omitted).  Permitting the plaintiff's non-promotion claim to survive the defendant's summary judgment motion based on this novel theory would disregard this admonition.

Even assuming, however, that the plaintiff can establish a prima facie case, he has not presented any evidence that the defendants' legitimate nondiscriminatory reason is a pretext for discrimination.  The defendants assert that the plaintiff  was not hired because he was not qualified for the position.  As previously noted, in or around March 2005, RA hired Derek Pipher as a cook and Janette O'Sullivan as a cook.  Defs.' Mem., Ex. A (Elhusseini Dep.) at 126. Before RA hired Mr. Pipher, he had more than 15 years experience in the food industry, and had worked as a chef or a cook at four restaurants over the course of eight years.  <u>Id.</u>, Ex. G (Resume of Derek Pipher).  Before RA hired Ms. O'Sullivan, she had worked as a chef at five restaurants over the course of more than six years, and had graduated from culinary school.  <u>Id.</u>, Ex. H (Resume of Janette O'Sullivan).  In contrast, the plaintiff had no food-related jobs other than as a line cook at Woodley Café in April 2004, before he applied to work at RA.  On this record the defendant has clearly presented a legitimate nondiscriminatory reason for the plaintiff's non-selection; thus, the burden returns to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination. <u>See</u> <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).  The plaintiff having failed to produce any evidence to demonstrate that the defendants' possessed any discriminatory animus in not selecting him for one of the cook positions or that the defendants' proffered reason is false, the Court is compelled

to conclude on this alternative ground that the defendants' motion for summary judgment as to

the plaintiff's discriminatory failure to promote claim must be granted.

### 2.  The Plaintiff's Termination Claim

The plaintiff contends that he was the victim of discrimination based on national origin

and religion when the defendant terminated his employment for leaving his work site without

permission and starting a fight with a coworker.  Pl's Opp'n at 3.  Further, the plaintiff contends

that because he "clocked back in and returned to finish his shift on the date of the incident. . . .,"

id., and "was not missed and had not failed to [perform] any of his duty requirements at the time

of his clocking out . . .  and clocking back in," id. at 3, "the [defendants'] reason for terminat[ing]

[the plaintiff] . . . is false and a blatant pretext for termination, " id.  In opposition, the defendant

responds that the plaintiff's discriminatory termination must fail because (1) "[the] [p]laintiff

cannot show that he was treated differently from similarly situated employees who are not part of

his protected class," Def.'s Mem. at 19, and (2) "RA had legitimate, nondiscriminatory reasons

for terminating [the] [p]laintiff," id.

In order to establish a prima facie case of retaliatory termination under Title VII (or the

DCHRA), a plaintiff must demonstrate the existence of the following four elements: "(1) [his]

membership in a protected class . . . (2) [his] performance at or near the employer's legitimate

expectations, (3) [his] discharge, and (4) [his] replacement by a person of equal or lesser ability

who is not a member of a protected class, or alternatively, the position remains open after [his]

termination." Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1512 (D.C. Cir.

1995); see also Klein v. Derwinski, 869 F. Supp. 4, 7 (D.D.C. 1994).  It is undisputed that the

plaintiff is a member of a protected class, being of Lebanese national origin and having pro-

Zionist beliefs.  Defs.' Mem., Ex. 1(Elhusseini Dep.) at 42-43.  Prior to the several verbal

confrontations between the plaintiff and his fellow coworkers, the record is devoid of any

indication that he was not qualified for continued employment and was not satisfying the normal

requirements of his job.  It is also undisputed that the plaintiff was terminated.  However, the

plaintiff has not presented any evidence showing that he was treated differently from similarly

situated employees who are not part of his (or any other) protected class.  In fact, the plaintiff

testified that he knows of  no other RA employee who had left work without permission and

started a fight with a coworker and was not terminated.  Defs.' Mem., Ex. A (Elhusseini Dep.) at

239.  Thus, the plaintiff has not satisfied his burden of establishing a prima facie case of

discriminatory discharge.

      Even assuming, however, that the plaintiff could establish a prima facie case, he cannot

show that the defendants' articulated legitimate, nondiscriminatory reasons for terminating his

employment are pretexual.  According to the defendants, "RA terminated [the] [p]laintiff because

he clocked out without permission and started a fight with a coworker." Defs.' Mem. at 19 & Ex.

K (Corrective Communication dated August 16, 2005).  The defendants' burden is merely one of

production.  Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 854 (D.C. Cir. 2006).  "Once a

defendant has proffered such a nondiscriminatory explanation, it has 'done everything that would

be required of [it] if the plaintiff had properly made out a prima facie case.'" Czekalski v. Peters,

475 F.3d 360, 364 (D.C. Cir. 2007) (quoting  U.S. Postal Serv. Bd. of Governors v. Aikens, 460

U.S. 711, 715 (1983). "At that point, 'whether the plaintiff really did so is no longer relevant,'

and the only question is 'whether the defendant intentionally discriminated against the plaintiff.'"

Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)); see Morgan v.

Fed. Home Loan Mortgage Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2003); Waterhouse, 298 F.3d at 993 n.6.

Moreover, once the defendant produces a legitimate nondiscriminatory reason for the plaintiff's removal, the burden returns to the plaintiff to demonstrate that those reasons are a pretext for discrimination. See Reeves, 530 U.S. 133 at 143.  For a proffered reason to be a pretext for discrimination, the reason must be false and discrimination must be the real reason for the employer's actions. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993). To demonstrate that the proffered reason is pretext, the plaintiff is obligated to demonstrate that "a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) The collective evidence includes: "(1) evidence establishing the plaintiff's *prima facie* case; (2) evidence the plaintiff presents to attack the employer's proffered explanation of its action; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." Holcomb, 433 F.3d at 897.  Here, the plaintiff has not presented any evidence that the defendants' legitimate nondiscriminatory reason is a pretext for discrimination.  In fact, the plaintiff acknowledges that both of RA's reasons for terminating him are true.[13]  Defs.' Mem., Ex. A (Elhusseini Dep) at

---

[13]     As to whether he clocked out without permission and initiated the altercation, the plaintiff testified as follows:

> Q:     So do you remember, during that meeting with Tara and Derek, admitting that you had clocked out without permission.
>
> A:     Yes of course.  That's what happened.  I did clock out without getting permission.  This is what I did.
>
> Q:     And you recall admitting that you grabbed Mr. Sprangler's arm.

(continued...)

196, 177, 202 & Ex. J (plaintiff's Statement dated August 16, 2005).    He further asserts that he "clocked out for the day without authorization because he did not wish to get injured on company time." Id. Ex. J (plaintiff's Statement dated August 16, 2005).  And, although the plaintiff alleges that two of his coworkers committed policy violations similar to his, but were not terminated, Pl's Opp'n at 2-9, he has provided no admissible evidence to support his allegations. The plaintiff, who has the ultimate burden of persuasion, has "offered nothing beyond his own speculations and allegations to refute the [defendants'] legitimate, non-discriminatory reasons for its decisions." Brown v. Brady, 199 F.3d 446, 458-59 (D.C. Cir. 1999).  "As courts are not free to second-guess an employer's business judgment," a plaintiff's mere speculation is "insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." Id. (citing Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)); see also Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (stating that conclusory statements are not accepted as true in summary judgment proceedings); Davis v. Ashcroft, 355 F. Supp. 2d 330 (D.D.C. 2005) (summary judgment granted where plaintiff failed to set forth evidence sufficient to support Title VII claim; conclusory allegations are not enough).

Having failed to satisfy his burden of proving a prima facie case as to his discriminatory termination claim and having failed to refute the defendant's legitimate, non-discriminatory explanation for his termination, the defendant must be awarded summary judgment on the plaintiff's discriminatory termination claim.

---

[13](...continued)
        A:    Yes, I did.

Defs.' Mem., Ex. A (Elhusseini Dep.) at 196-97.

**_____3. The Plaintiff's Intentional Infliction of Emotional Distress Claim**

The plaintiff also appears to be asserting a claim of intentional infliction of emptional

distress, arguing in his opposition to the defendants' summary judgment motion that the

"[d]efendants' actions are extreme, outrageous and intentional." Pl's Opp'n at 15.  Specifically,

the plaintiff alleges that the "[d]efendant's actions are outrageous because their Anti-Semitic

motivation was never disclosed or even hinted at." Id. at 9.  According to the plaintiff the

"[d]efendants continue to deny having Anti-Semite motivation and a White Supremacist agenda

despite clear connotations in their actions and demonstration thereof, well ahead of litigation."

Id.  Further, the plaintiff contends that the "[d]efendants' actions are intentional because their

policy and agenda were not disclosed to [the] plaintiff therefore occluding the possibility of

choosing whether to continue [to] work. . . for [the] employer." Id.  In opposition, the defendant

responds that "[the] [p]laintiff cannot satisfy his burden on the first and third elements of this

claim." Defs.'Mem. at 21.

To prove his emotional distress claim, the plaintiff must establish that:  (1) the

defendants' conduct was extreme and outrageous; (2) the emotional distress he suffered was

severe; and (3) the defendants' conduct intentionally or recklessly caused the alleged emotional

distress.  Darrow v. Dillingham & Murphy, LLP, 902 A.2d 135, 139 (D.C. 2006); Joyner v.

Sibley Memorial Hosp., 826 A.2d 362, 373 (D.C. 2003).  In the employment context, to

constitute extreme and outrageous conduct, the conduct must be "so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized community." McManus v. MCI Commc'n Corp.,

748 A.2d 949, 958 (D.C. 2000) (affirming grant of summary judgment to employer where

24

employee alleged that employer made racist comments about her hair and clothes and

discriminated against her based upon her race and personal appearance); see also

Than v. Radio Free Asia, 496 F. Supp. 2d 38, 51 (D.D.C. 2007) .

Here, the plaintiff seemingly bases his intentional infliction of emotional distress claim

on the alleged discriminatory motivation and actions of the defendants in terminating him.  The

undisputed evidence in this case demonstrates that the defendants discharged the plaintiff after he

left his work site without authorization and started a fight with a fellow co-worker.  Defs.' Mem.,

Ex. A (Elhusseini Dep.) at  Ex. K (Corrective Communication dated August 16, 2005).  The

evidence also indicates that during (1) the plaintiff's initial interview for employment with the

defendants, (2) meetings with the defendants' representatives regarding the plaintiff's verbal

disputes and physical altercation with one of his co-worker, and (3) during telephone

conversations with managerial employees of the defendants regarding his termination, no

manager or human resources employee of the defendants ever made any discriminatory remarks.

Id., Ex. A (Elhusseini Dep.) at 70-72, 119, 206, 215, 224-26, 237.  Moreover, the evidence shows

that representatives of the defendants met with the plaintiff and Mr. Spangler after their initial

verbal confrontation in an attempt to resolve the animosity between them.   Id. at 149-51.   And

although the plaintiff alleges that the defendants' Anti-semitic and racist motivation for their

actions were deceptive, atrocious, and uncivilized, the plaintiff has presented no evidence to

support these allegations.  "'[M]ere insults, indignities, threats, annoyances, petty oppressions, or

other trivialities'" are not sufficient. Waldon v. Covington, 415 A.2d 1070, 1076 (D.C. 1980)

(quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Further, Courts are "particularly

demanding" when intentional infliction of emotional distress claims are made "in an employment

context." <u>Paul v. Howard Univ.</u>, 754 A.2d 297, 307 (D.C. 2000). Employer-employee conflicts

generally do not, as a matter of law, rise to the level of outrageous conduct.  <u>Howard Univ. v.</u>

<u>Best</u>, 484 A.2d 958, 986 (D.C. 1984). Moreover, the mere discharge of an employee is not

considered extreme and outrageous conduct sufficient to constitute an intentional infliction of

emotional distress claim. <u>Tiefenbacher v. AARP</u>, Civil Action No. 05-1802, 2006 WL 1126841,

at *4 (D.D.C. Apr. 27, 2006) (dismissing intentional infliction of emotional distress claim against

employer where plaintiff claimed that various supervisory employees either directed vulgar

expletives at her, made obscene and crude comments in her presence, warned her to cease

making complaints in a hostile and threatening manner, terminated her without an exit interview

or severance pay, and escorted her out of the building like a common criminal); <u>Crowley v. North</u>

<u>American Telecomm. Assoc.</u>, 691 A.2d 1169, 1172 (D.C. 1997) (allegations of being subjected

to contemp, scorn, and other indignities and unwarranted evaluation and discharge did not

support a claim for intentional infliction of emotional distress); <u>Elliott v. Healthcare Corp.</u>, 629

A.2d 6, 9 (D.C. 1993) ("mere discharge of an employee is not 'conduct that goes beyond all

possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized

community'" for the purpose of supporting intentional infliction of emotional distress claim)

(quoting <u>Schoen v. Consumers United Group, Inc.</u>, 670 F. Supp. 367 (D.D.C. 1986)).  Here, the

plaintiff cannot demonstrate that the defendants' conduct–not promoting him to a job for which

he was not qualified and terminating him for admittedly leaving his work site without permission

and starting a fight with a coworker–was extreme and outrageous.  Therefore, the plaintiff's

intentional infliction of emotional distress claim must fail.  Accordingly, the defendants' motion

for summary judgment as to the plaintiff's intentional infliction of emotional distress claim must

be granted.

## IV.  CONCLUSION

Based on the foregoing reasons, the defendants' motion for summary judgment as to the plaintiff's discrimination claim based on his non-promotion, his discrimination claim based on his termination, and his intentional infliction of emotional distress claim must be **Granted**. [14]

**SO ORDERED**.

/s/_____

REGGIE B. WALTON
United States District Judge

---

[14] An order consistent with this memorandum opinion has been issued.